# 1.  Deposition of Kimberly Fail

Kimberly Fail

Page 3

IN UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RICHARD J. SHEPPARD,   *
        Plaintiff,      *
                        *
vs.             * Civil Action No:
                * 1:17-cv-00355
PATHWAY OF BALDWIN      *
COUNTY, LLC, and        *
PATHWAY, INC.,          *
        Defendants.     *

DEPOSITION TESTIMONY OF
KIMBERLY FAIL,
was taken on the 29th day of January, 2024,
from 9:10 a.m. to 3:12 p.m. before Susan
Andrews, CCR, (ACCR 284), in and for the
State of Alabama, reported by machine
stenography at the offices of SATTERWHITE &
REESE, LLC, 1325 DAUPHIN STREET, MOBILE,
ALABAMA.

---

Page 3

```
 1               I N D E X
 2
 3  WITNESS                    PAGE
 4  KIMBERLY FAIL
 5    Examination By Mr. Satterwhite........ 25
 6
 7        PLAINTIFF EXHIBIT LIST
 8
 9  NUMBER         DESCRIPTION        PAGE
10
11  Plaintiff's 1 -  Notice of Taking Video
12                   Deposition of Kimberly
13                   Fail.................... 48
14
15  Plaintiff's 2 -  Amended Notice of
16                   Taking the Video
17                   Deposition of Defendant
18                   Pathway of Baldwin
19                   County, LLC Pursuant to
20                   Rule 30(b)(6).......... 48
21
22
23
```

---

Page 2

```
 1          A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3      SATTERWHITE & REESE, LLC
 4      BY:  HARRY V. SATTERWHITE
 5      1325 DAUPHIN STREET
 6      MOBILE, ALABAMA 36604
 7      251-432-8120
 8      harry@satterwhitelaw.com
 9
10  FOR THE DEFENDANTS:
11      HAND, ARENDALL, HARRISON & SALE, LLC
12      BY:  CAINE O'REAR, III
13         CHRISTOPHER S. WILLIAMS
14      104 SAINT FRANCIS STREET
15      SUITE 300
16      MOBILE, ALABAMA 36602
17      251-694-6308
18      corear@handfirm.com
19      cwilliams@handfirm.com
20
21
22  ALSO PRESENT:
23      Jennifer English, Videographer
```

---

Page 4

```
 1        E X H I B I T S  (cont.)
 2
 3        PLAINTIFF EXHIBIT LIST
 4
 5  NUMBER         DESCRIPTION        PAGE
 6
 7  Plaintiff's 3  - First Amended Complaint
 8                   Under False Claims Act.. 50
 9
10  Plaintiff's 4 -  Defendant Pathway of
11                   Baldwin County, LLC's
12                   Responses to
13                   Plaintiff's First Set
14                   of Interrogatories...... 51
15
16  Plaintiff's 5 -  Defendant Pathway of
17                   Baldwin County, LLC's
18                   Responses to
19                   Plaintiff's First Set
20                   of Requests For
21                   Production of Documents. 54
22
23
```

Kimberly Fail

| Page 5 | | Page 7 | |
|---|---|---|---|

**Page 5**

1   E X H I B I T S (cont.)

2

3      PLAINTIFF EXHIBIT LIST

4

5   NUMBER          DESCRIPTION          PAGE

6

7   Plaintiff's 6 -  E-mail from Jennifer

8                Lee Dated May 23, 2013,

9                Bates Labeled 000108.... 59

10

11  Plaintiff's 7 -  E-mail from Jennifer

12               Lee Dated April 28,

13               2014, Bates Labeled

14               000121................. 60

15

16  Plaintiff's 8 -  Baldwin County

17               Probationary Employee

18               Three Month Evaluation

19               Bates Labeled Pathway

20               Defs. 0003 and Pathway

21               Defs. 0004.............. 62

22

23

**Page 7**

1   E X H I B I T S (cont.)

2

3      PLAINTIFF EXHIBIT LIST

4

5   NUMBER          DESCRIPTION          PAGE

6

7   Plaintiff's 12 - Baldwin County

8                Commission Personnel

9                Appraisal Form Dated

10               August Bates Labeled

11               Pathway Defs. 0013

12               Through Pathway Defs.

13               0015.................... 89

14

15  Plaintiff's 13 - Baldwin County

16               Commission Personnel

17               Appraisal Form Dated

18               August 2015 Bates

19               Labeled Pathway Defs.

20               0019 Through Pathway

21               Defs. 0022.............. 91

22

23

**Page 6**

1   E X H I B I T S (cont.)

2

3      PLAINTIFF EXHIBIT LIST

4

5   NUMBER          DESCRIPTION          PAGE

6

7   Plaintiff's 9 -  End of Probation

8                Evaluation Bates

9                Labeled Pathway Defs.

10               0005 Through Pathway

11               Defs. 0007.............. 73

12

13  Plaintiff's 10 - Development Plan Dated

14               10/1/13, Bates Labeled

15               000266 Through 000270... 75

16

17  Plaintiff's 11 - Baldwin County

18               Commission Personnel

19               Appraisal Form Dated

20               February 2014 Bates

21               Labeled Pathway Defs.

22               0009 Through Pathway

23               Defs. 0011.............. 87

**Page 8**

1   E X H I B I T S (cont.)

2

3      PLAINTIFF EXHIBIT LIST

4

5   NUMBER          DESCRIPTION          PAGE

6

7   Plaintiff's 14 - Ron Ballard Reference

8                Contact Bates Labeled

9                Pathway Defs. 0038...... 93

10

11  Plaintiff's 15 - Shayna Staska Reference

12               Contact Bates Labeled

13               Pathway Defs. 0039...... 99

14

15  Plaintiff's 16 - Pathway of Baldwin

16               County, LLC Variance

17               Report Dated 10/30/16,

18               Bates Labeled Pathway

19               Defs. 0068.............. 101

20

21

22

23

Kimberly Fail

---

Page 9

1        E X H I B I T S  (cont.)
2
3          PLAINTIFF EXHIBIT LIST
4
5    NUMBER          DESCRIPTION          PAGE
6
7    Plaintiff's 17 - Combined Job
8              Description and
9              Competency Assessment
10             Bates Labeled Pathway
11             Defs. 0075 and Pathway
12             Defs. 0076.............. 106
13
14   Plaintiff's 18 - E-Mail From Bruce
15             Predmore Bates Labeled
16             001215................. 108
17
18   Plaintiff's 19 - Development Plan Bates
19             Labeled 000306 Through
20             309.................... 111
21
22
23

---

Page 10

1        E X H I B I T S  (cont.)
2
3          PLAINTIFF EXHIBIT LIST
4
5    NUMBER          DESCRIPTION          PAGE
6
7    Plaintiff's 20 - Collection of Thank You
8              Notes and Cards......... 114
9
10   Plaintiff's 21 - Perpetual History
11             Report Bates Labeled
12             Pathway Defs. 0180
13             Through Pathway Defs.
14             0182................... 118
15
16   Plaintiff's 22 - PowerPoint Presentation
17             on Basic Medicaid
18             Documentation
19             Requirements Bates
20             Labeled 000517 and
21             000518................. 120
22
23

---

Page 11

1        E X H I B I T S  (cont.)
2
3          PLAINTIFF EXHIBIT LIST
4
5    NUMBER          DESCRIPTION          PAGE
6
7    Plaintiff's 23 - Screen Shot Pathway
8              Website Bates Labeled
9              001255................. 126
10
11   Plaintiff's 24 - Basic Living Skills
12             Progress Note Bates
13             Labeled 001209......... 127
14
15   Plaintiff's 25 - Basic Living Skills
16             Group Note Bates
17             Labeled 00288.......... 133
18
19   Plaintiff's 26 - Instructions for Basic
20             Living Skills Progress
21             Report Bates Labeled
22             001256................. 136
23

---

Page 12

1        E X H I B I T S  (cont.)
2
3          PLAINTIFF EXHIBIT LIST
4
5    NUMBER          DESCRIPTION          PAGE
6
7    Plaintiff's 27 - Letter from Rick
8              Sheppard to Mr.
9              Clifford Bates Labeled
10             001213 and 001214....... 155
11
12   Plaintiff's 28 - E-mail from Kimberly
13             Fail Dated March 14,
14             2017, Bates Labeled
15             Pathway Defs. 0131...... 182
16
17   Plaintiff's 29 - Staff Incident Report
18             Dated 3/15/2017 Bates
19             Labeled Pathway Defs.
20             0079................... 183
21
22
23

Kimberly Fail

Pages 13 to 16

---

Page 13

```
 1            E X H I B I T S  (cont.)
 2
 3           PLAINTIFF EXHIBIT LIST
 4
 5    NUMBER           DESCRIPTION      PAGE
 6
 7    Plaintiff's 30 - Attachment 1 to
 8              Employee Variance
 9              Report Dated 3/24/17
10              Bates Labeled 001257.... 194
11
12    Plaintiff's 31 - Staff Incident Report
13              Dated 3/28/2017 Bates
14              Labeled Pathway Defs.
15              0082.................... 197
16
17    Plaintiff's 32 - Response to Staff
18              Incident Report of
19              March 29, 2017, Bates
20              Labeled Pathway Defs.
21              0080 and Pathway Defs.
22              0081.................... 198
23
```

---

Page 14

```
 1            E X H I B I T S  (cont.)
 2
 3           PLAINTIFF EXHIBIT LIST
 4
 5    NUMBER           DESCRIPTION      PAGE
 6
 7    Plaintiff's 33 - E-mail from Kimberly
 8              Fail Dated March 29,
 9              2017, Bates Labeled
10              Pathway Defs. 0138...... 203
11
12    Plaintiff's 34 - E-mail from Beth Aaron
13              Dated March 29, 2017,
14              Bates Labeled Pathway
15              Defs. 0140.............. 203
16
17    Plaintiff's 35 - E-mail from Kimberly
18              Fail Dated March 29,
19              2017, Bates Labeled
20              Pathway Defs. 0141...... 205
21
22
23
```

---

Page 15

```
 1            E X H I B I T S  (cont.)
 2
 3           PLAINTIFF EXHIBIT LIST
 4
 5    NUMBER           DESCRIPTION      PAGE
 6
 7    Plaintiff's 36 - E-mail from Kimberly
 8              Fail Dated March 30,
 9              2017, Bates Labeled
10              Pathway Defs. 0143 and
11              Pathway Defs. 0044...... 211
12
13    Plaintiff's 37 - E-mail from Rick
14              Sheppard Dated March
15              31, 2017, Bates Labeled
16              Pathway Defs. 0143 and
17              Pathway Defs. 0149...... 234
18
19    Plaintiff's 38 - E-mail Chain Between
20              Rick Sheppard and
21              Kimberly Fail Dated
22              April 1, 2017, Bates
23              Labeled 001135.......... 236
```

---

Page 16

```
 1            E X H I B I T S  (cont.)
 2
 3           PLAINTIFF EXHIBIT LIST
 4
 5    NUMBER           DESCRIPTION      PAGE
 6
 7    Plaintiff's 39 - E-mail From Kimberly
 8              Fail Dated April 1,
 9              2017, Bates Labeled
10              Pathway Defs. 0152...... 236
11
12    Plaintiff's 40 - Staff Incident Report
13              Dated 4/4/2017 Bates
14              Labeled Pathway Defs.
15              0094.................... 237
16
17    Plaintiff's 41 - Response to Staff
18              Incident Report of
19              April 4, 2017, Bates
20              Labeled Pathway Defs.
21              0098.................... 241
22
23
```

---

Kimberly Fail

| | Page 17 |
|---|---|
| 1 | E X H I B I T S (cont.) |
| 2 | |
| 3 | PLAINTIFF EXHIBIT LIST |
| 4 | |
| 5 | NUMBER          DESCRIPTION          PAGE |
| 6 | |
| 7 | Plaintiff's 42 - Basic Living Skills |
| 8 | Daily Progress Note |
| 9 | Bates Labeled Pathway |
| 10 | Defs. 0095 Through |
| 11 | Pathway Defs. 0097...... 245 |
| 12 | |
| 13 | Plaintiff's 43 - Response to Staff |
| 14 | Incident Report Dated |
| 15 | 4/4/2017 Bates Labeled |
| 16 | 001258.................. 247 |
| 17 | |
| 18 | Plaintiff's 44 - E-mail With Attachment |
| 19 | from Kimberly Fail |
| 20 | Dated April 4, 2017, |
| 21 | Bates Labeled Pathway |
| 22 | Defs. 0158.............. 249 |
| 23 | |

| | Page 19 |
|---|---|
| 1 | E X H I B I T S (cont.) |
| 2 | |
| 3 | PLAINTIFF EXHIBIT LIST |
| 4 | |
| 5 | NUMBER          DESCRIPTION          PAGE |
| 6 | |
| 7 | Plaintiff's 48 - Staff Incident Report |
| 8 | Dated 4/12/2017 Bates |
| 9 | Labeled Pathway Defs. |
| 10 | 0100.................... 259 |
| 11 | |
| 12 | Plaintiff's 49 - E-mail from Kimberly |
| 13 | Fail Dated April 14, |
| 14 | 2017, Bates Labeled |
| 15 | Pathway Defs. 0175...... 261 |
| 16 | |
| 17 | Plaintiff's 50 - Staff Incident Report |
| 18 | Dated 4/17/2017 Bates |
| 19 | Labeled Pathway Defs. |
| 20 | 0102.................... 263 |
| 21 | |
| 22 | |
| 23 | |

| | Page 18 |
|---|---|
| 1 | E X H I B I T S (cont.) |
| 2 | |
| 3 | PLAINTIFF EXHIBIT LIST |
| 4 | |
| 5 | NUMBER          DESCRIPTION          PAGE |
| 6 | |
| 7 | Plaintiff's 45 - E-mail from Kimberly |
| 8 | Fail Dated April 6, |
| 9 | 2017, Bates Labeled |
| 10 | Pathway Defs. 0161...... 250 |
| 11 | |
| 12 | Plaintiff's 46 - Letter from Rick |
| 13 | Sheppard to Kimberly |
| 14 | Fail Dated 4/11/17 |
| 15 | Bates Labeled 000284.... 253 |
| 16 | |
| 17 | Plaintiff's 47 - E-mail from Kimberly |
| 18 | Fail Dated April 11, |
| 19 | 2017, Bates Labeled |
| 20 | Pathway Defs. 0169...... 258 |
| 21 | |
| 22 | |
| 23 | |

| | Page 20 |
|---|---|
| 1 | E X H I B I T S (cont.) |
| 2 | |
| 3 | PLAINTIFF EXHIBIT LIST |
| 4 | |
| 5 | NUMBER          DESCRIPTION          PAGE |
| 6 | |
| 7 | Plaintiff's 51 - Change In Personnel |
| 8 | Status Bates Labeled |
| 9 | Pathway Defs. 0103...... 265 |
| 10 | |
| 11 | Plaintiff's 52 - Pathway Termination |
| 12 | Record Bates Labeled |
| 13 | Pathway Defs. 0127...... 266 |
| 14 | |
| 15 | Plaintiff's 53 - Narrative Authored By |
| 16 | Kimberly Fail Bates |
| 17 | Labeled Pathway Defs. |
| 18 | 0104 Through Pathway |
| 19 | Defs. 0107.............. 267 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Kimberly Fail

Page 21

1    E X H I B I T S (cont.)
2
3        PLAINTIFF EXHIBIT LIST
4
5   NUMBER          DESCRIPTION          PAGE
6
7   Plaintiff's 54-  Narrative Authored By
8                Beth Aaron Bates
9                Labeled Pathway Defs.
10               0108 Through Pathway
11               Defs. 0113.............. 269
12
13
14
15
16
17
18
19
20
21
22
23

Page 22

1          S T I P U L A T I O N
2        It is stipulated by and amongst the
3   parties hereto and their respective attorneys
4   at law that the deposition of KIMBERLY FAIL,
5   shall be taken before Susan Andrews,
6   Certified Court Reporter, Notary Public for
7   the State at Large, and that the said
8   deposition shall be taken in accordance with
9   the provisions of the applicable sections of
10  the Alabama Rules of Civil Procedure.
11       It is further stipulated that all notices
12  provided for by said applicable sections of
13  the Alabama Rules of Civil Procedure are
14  waived, as is the signing and certification
15  of said Susan Andrews and all other
16  requirements and technicalities of every sort
17  regarding the taking and filing of the
18  deposition, except as hereinafter set out:
19       All objections save as to the form of
20  questions asked are reserved until the time
21  of trial in accordance with the applicable
22  provisions of the said Alabama Rules of Civil
23  Procedure.

Page 23

1        Further that the original transcript
2   will be delivered to Harry V. Satterwhite,
3   Esq., as custodian, for filing should the
4   Court so direct.
5        It is further stipulated and agreed that
6   the witness hereto does waive her right to
7   read and sign said deposition as provided for
8   by said Alabama Rules of Civil Procedure.
9        I, Susan Andrews, Commissioner and
10  Certified Court Reporter, certify that on
11  this date, as provided by the Alabama Rules
12  of Civil Procedure and the foregoing
13  stipulation of counsel, there came before me
14  at the offices of SATTERWHITE & REESE, LLC,
15  1325 DAUPHIN STREET, MOBILE, ALABAMA, on
16  January 29, 2024, commencing at 9:10 a.m.,
17  KIMBERLY FAIL witness in the above cause, for
18  oral examination, whereupon the following
19  proceedings were had:
20
21
22
23

Page 24

1        THE VIDEOGRAPHER:  This begins the
2   video deposition of Kimberly Fail in the
3   matter of Richard Sheppard versus Pathway of
4   Baldwin County, LLC, and Pathway, Inc.
5        We are on the record today at
6   9:10 a.m., on January 29, 2024.  Would
7   counsel please identify yourself and state
8   whom you represent?
9        MR. SATTERWHITE:  Harry Satterwhite
10  for the plaintiff, Richard Sheppard.
11       MR. O'REAR:  Caine O'Rear for the
12  defendants and the witness.
13       MR. WILLIAMS:  Christopher Williams
14  on behalf of the defendants.
15
16  (Whereupon,
17       KIMBERLY FAIL,
18  having been first duly sworn, was examined
19  and testified as follows:)
20       THE COURT REPORTER:  Usual
21  stipulations?
22       MR. O'REAR: (Indicated
23  affirmatively.)

Kimberly Fail

Page 25

1       MR. SATTERWHITE:  That's fine.
2
3               EXAMINATION
4  BY MR. SATTERWHITE:
5       Q.  Okay.  Ms. Fail, we've already been
6  introduced.  I'm Harry Satterwhite.  I'm here
7  to ask you some questions this about case on
8  behalf of Richard.  We call him Rick; right?
9       A.  Yes.
10       Q.  You're familiar with Rick, because
11  when he first started working at Camp
12  Horizon, I believe you were at Camp Horizon
13  at that time, too?
14       A.  I was.
15       Q.  So you're familiar with him from then
16  all the way through to April of 2017?
17       A.  Correct.
18       Q.  Were you part of -- Were your -- What
19  was your position back when y'all were at
20  Camp Horizon together?
21       A.  I was the clinical director.
22       Q.  And what was his position?
23       A.  He was a resident advisor.

Page 26

1       Q.  Did -- Were you involved in his
2  hiring?
3       A.  I believe so.
4       Q.  Okay.  And then would you have been
5  involved in training him?
6       A.  Under Camp Horizon?
7       Q.  Yes.
8       A.  Somewhat.  I was the program director
9  at the time and did not do a whole lot of the
10  training.
11       Q.  When -- What was his position, again,
12  at Camp Horizon?
13       A.  He was a residential advisor.
14       Q.  Okay.  Now, those had to have a
15  certain amount of training before they could
16  have begin; correct?
17       A.  Correct.
18       Q.  And then they were asked to also
19  obtain certain certifications?
20       A.  Yes, like CPR, per se.
21       Q.  Okay.  Aren't there some other
22  ones like --
23       A.  I -- I don't recall.

Page 27

1       Q.  -- dealing with children and minors
2  and --
3       A.  Certifications?
4       Q.  Uh-huh.
5       A.  I don't recall.
6       Q.  Is that a requirement at Pathway of
7  Baldwin County?
8       A.  Certifications?
9       Q.  Uh-huh, yes.
10       A.  No.
11       Q.  Okay.  So then in September of 2016,
12  Pathway of Baldwin County took over the
13  operations; is that correct?
14       A.  Correct.
15       Q.  Okay.  And then you continued to work
16  with Mr. Sheppard from that point all the way
17  through to April of 2017?
18       A.  Correct.
19       Q.  What was the reason for his
20  termination?
21       A.  Well, there were several things that
22  led up to termination.
23       Q.  Well, I'm asking you what was the

Page 28

1  reason for his termination?
2       A.  Mr. Sheppard was placed on a
3  performance improvement plan, and he did not
4  complete the performance improvement plan.
5  He refused to work a shift, refused to follow
6  directives of myself and his supervisor, and
7  he was terminated.
8       Q.  Who was his supervisor?
9       A.  Tyrone Hartley was the person that
10  was over the -- the direct care staff.
11       Q.  Just to be clear, he -- Tyrone
12  Hartley was Mr. Sheppard's immediate
13  supervisor?
14       A.  No.  There were other supervisors
15  that Mr. Sheppard would have reported to on
16  his shift.
17       Q.  Okay.  But the only one that you're
18  saying he refused a directive was Mr. Tyrone
19  Hartley?
20       A.  He refused to follow his shift
21  schedule.
22       Q.  Did --
23       A.  And -- and Mr. Predmore, the program

Kimberly Fail

Page 29

1  director, and Mr. Hartley were in control of
2  the -- the shift scheduling.
3      Q.  Is that what you're calling refusing
4  a directive, just the fact that they made up
5  the schedule and then Rick refused to report
6  according to that schedule?
7      A.  He refused to follow his -- his
8  schedule, yes.
9      Q.  And that's what you're saying is
10 refusing a directive of his supervisor?
11     A.  At that time, yes.
12     Q.  Okay.  And then separately, you said
13 that he refused a directive you gave him
14 which was what?
15     A.  As part of his termination, he -- he
16 contacted me regarding not being willing to
17 work his schedule.
18     Q.  That doesn't answer the question.
19     A.  Okay.
20     Q.  I asked you what directive did you
21 give him that he refused?
22     A.  I asked him if he was going to work
23 his schedule, and he said no.

Page 30

1      Q.  Okay.  And so that's what you're
2  saying is refusing a directive?
3      A.  Yes.
4      Q.  Okay.  Were there any other reasons
5  for the termination?
6      A.  No.
7      Q.  Okay.  Have you ever been deposed
8  before?
9      A.  No, sir.
10     Q.  Okay.  Have you ever been a plaintiff
11 or a defendant in a lawsuit?
12     A.  No, sir.
13     Q.  Have you ever been arrested or
14 convicted of a crime?
15     A.  No, sir.
16     Q.  Are you taking any medications that
17 might affect your ability to testify today?
18     A.  No, sir.
19     Q.  What did you do to prepare for the
20 deposition?
21     A.  I reviewed several of the exhibits.
22 I reviewed the complaint.  I reviewed
23 Mr. Sheppard's deposition.

Page 31

1      Q.  When you say exhibits, do you mean
2  the exhibits to his deposition or to the
3  complaint or both?
4      A.  I believe it was to the deposition.
5      Q.  Okay.  Did you do anything else to
6  prepare?
7      A.  No.
8      Q.  Did you have any meetings with anyone
9  to prepare?
10     A.  I did meet with our attorney.
11     Q.  Is that all?
12     A.  Yes.
13     Q.  You didn't meet with Mr. Peeples?
14     A.  No.
15     Q.  Did you talk with Mr. Peeples about
16 testifying?
17     A.  No.
18     Q.  You never have?
19     A.  I mean, other than I'm coming to
20 testify.
21     Q.  Uh-huh.  You didn't --
22     A.  Huh-uh.
23     Q.  -- discuss this whole case with him

Page 32

1  and what you might say and --
2      A.  No.
3      Q.  Have you had that kind of
4  conversation with anyone else other than the
5  lawyers?
6      A.  No.
7      Q.  Other than those documents you listed
8  a minute ago, which is the -- possibly the
9  exhibits to the complaint and the exhibits to
10 the deposition, did you review any other
11 documents to prepare for today?
12     A.  No.  We -- The complaint and the --
13 our response to the complaint.
14     Q.  Okay.  Any other documents?
15     A.  No, sir.
16     Q.  So we've listed all the documents
17 that you reviewed?
18     A.  Yes, sir.
19     Q.  Okay.  Where were you born?
20     A.  Mobile.
21     Q.  Okay.  Which high school did you go
22 to?
23     A.  High school?

Kimberly Fail

Page 33

1    Q.  Yeah.
2    A.  Baldwin County High School.
3    Q.  And what year did you graduate?
4    A.  2002.
5    Q.  Okay.  What did you do after
6  graduation?
7    A.  I went to college.
8    Q.  Where was that?
9    A.  Initially went to Auburn --
10   Q.  Uh-huh.
11   A.  -- and then I transferred to South.
12   Q.  Okay.  Did you complete a degree?
13   A.  I did.
14   Q.  Okay.  What was that in?
15   A.  It was in psychology.
16   Q.  All right.  Do you have any other
17  degrees?
18   A.  I do.  I have a master's in social
19  work.
20   Q.  Where did you get that?
21   A.  University of Alabama.
22   Q.  What year?
23   A.  2006.

Page 34

1    Q.  Okay.  Do you have any other degrees?
2    A.  No.
3    Q.  Do you have any other certifications,
4  professional certifications?
5    A.  I have a license.
6    Q.  Uh-huh.  Anything else?
7    A.  No.
8    Q.  Okay.  Could you just briefly take me
9  over your work experience?
10   A.  I started working at Camp Horizon
11  after graduating college.  I started as a
12  therapist there.  And after a few years, our
13  director left, and my supervisor took that
14  position, so I was promoted to program
15  director.
16   Q.  What year was it that you started?
17   A.  2008, I believe.
18   Q.  Okay.  And than you were promoted?
19   A.  Uh-huh.
20   Q.  What year was that?
21   A.  I don't remember.  I think it was
22  2011, but I'm not sure.
23   Q.  Okay.  Approximately?

Page 35

1    A.  Uh-huh.
2        THE COURT REPORTER:  Yes?
3    A.  Yes.
4        MR. O'REAR:  Say yes or no.
5    A.  Yes.
6    Q.  Promoted from therapist to what did
7  you say?
8    A.  Program director.
9    Q.  Okay.  Who was the person who left?
10   A.  Bill Ford was our director.
11   Q.  Who was the -- What do you -- what do
12  you call the head of the camp at Camp Horizon
13  at this time?
14   A.  Director.
15   Q.  It's not -- It's just director?
16   A.  Director.
17   Q.  Okay.  And who was that?
18   A.  Bill Ford.
19   Q.  Okay.  And he left?
20   A.  That's correct.
21   Q.  Who became director at that point?
22   A.  Jennifer Lee.
23   Q.  Okay.  Where is she today?

Page 36

1    A.  She doesn't live here anymore.
2    Q.  She moved out of town?
3    A.  Yes.
4    Q.  Did you know her?
5    A.  Yes.
6    Q.  Were you friends with her?
7    A.  I didn't know her prior to working
8  with her, no.
9    Q.  After you worked with her, were you
10  friends?
11   A.  No.
12   Q.  Why not?
13   A.  We worked together.
14   Q.  So you just considered yourselves
15  colleagues with nothing more?
16   A.  Correct.
17   Q.  Okay, okay.  Did you have any other
18  promotions at the Camp Horizon?
19   A.  I was promoted to the clinical
20  director.
21   Q.  About when was that?
22   A.  I believe it was 2014.
23   Q.  Okay.  So what does a clinical

Kimberly Fail

Page 37

1 director do?
2    A. I supervisor the therapists. I
3 reviewed their documentation and --
4    Q. Is that it?
5    A. -- basically just ensure that the
6 clients were receiving the clinical care that
7 they needed.
8    Q. Okay. Does -- does that include
9 supervising the counselors?
10    A. The therapists?
11    Q. Well, let's go ahead and let's just
12 break down how the camp works. There's a
13 director?
14    A. Uh-huh.
15    Q. And then who's right under that?
16    A. The clinical director.
17    Q. Just one person?
18    A. No, not necessarily. The clinical
19 director, the program director would have
20 been under the director and any other
21 departmental supervisors, so like nursing,
22 education.
23    Q. They come directly under the

Page 38

1 director?
2    A. Yes.
3    Q. So you'll have like a nursing
4 director?
5    A. Supervisor.
6    Q. Supervisor?
7    A. Uh-huh.
8    Q. And then a clinical director?
9    A. Correct.
10    Q. And then what else?
11    A. Program director.
12    Q. Okay. And what else?
13    A. At -- Are -- We're talking about
14 under Camp Horizon; correct?
15    Q. Yes, uh-huh.
16    A. I -- I believe that would have been
17 it.
18    Q. Okay. So that's sort of the second
19 tier of people?
20    A. Correct.
21    Q. And then is there a third tier?
22    A. Yes.
23    Q. Who -- who would be on that level?

Page 39

1    A. It would be under the clinical side.
2 It would have been therapists. And we had --
3 I don't remember their title, but we had
4 individuals that would teach basic living
5 skills group during the week.
6    Q. Uh-huh.
7    A. And they were under the -- with the
8 therapists under the clinical --
9    Q. Uh-huh.
10    A. -- side. And then for program
11 director, they supervised the direct care
12 staff and the supervisors of the direct care
13 staff.
14    Q. Okay. How does that -- how does
15 it -- Tell me how at Camp Horizon it worked
16 as far as when a resident, I guess you'd call
17 them, the kid that's --
18    A. Right.
19    Q. -- coming in and needs the
20 counseling, how -- just how did it work when
21 they came in, and what did they -- what were
22 they exposed to, say, in the first three or
23 four days of being there?

Page 40

1    A. What exactly? There's a lot of
2 things.
3    Q. Yeah. We want to know what it is.
4    A. Okay. So start to finish, like just
5 when they arrived, what happens?
6    Q. No. I -- You don't have to give me
7 every detail like you take down their address
8 and Social Security Number, but I -- I'm
9 really interested in the people that they
10 encounter, like the directors and the
11 therapists and all that so that I can
12 understand how it worked.
13    A. Okay. They would meet with their
14 therapist, and their therapist would ask a
15 lot of questions about their history just to
16 try to find out what things they need to work
17 on.
18       They would meet with nursing, have a
19 nursing intake. They would meet -- I mean,
20 they would be introduced to their staff.
21    Q. So they could have -- The therapist
22 is doing an evaluation of some kind?
23    A. Correct.

Kimberly Fail

Page 41

1   Q.  Like for mental health?
2   A.  Correct.
3   Q.  And then the nurse would be doing an
4 evaluation for medical?
5   A.  Right.
6   Q.  Okay.  Any -- Does anybody else
7 consult with them?
8   A.  I believe the teachers did as well.
9   Q.  Okay.  So -- so how does a resident
10 go through the program?  Who is it that
11 interacts with them, say, in a -- in a given
12 week?  Who would be interacting with them on
13 a regular basis?
14   A.  Most of the staff, most everybody
15 that's employed.  I mean, they -- All of the
16 therapists, they would have interaction with.
17 They would have interaction with their -- We
18 call them group leaders now -- their
19 residential advisors at that point.  They
20 would interact with food service staff.  They
21 would interact with teachers.
22   Q.  So it wouldn't be just one therapist
23 that stayed with them the whole time?  It

Page 42

1 would be all -- all the therapists that would
2 deal with one particular --
3   A.  For some things, yes.  All therapists
4 did group with all clients.
5   Q.  Okay.  What does that mean, did
6 group?
7   A.  They facilitated group therapy.
8   Q.  What is group therapy?
9   A.  It's therapy to address the client's
10 issues.
11   Q.  Well, it's a group?
12   A.  Correct.
13   Q.  Okay.  So the therapist is giving --
14 I call it counseling, I guess, to an entire
15 group of the kids?
16   A.  Correct.
17   Q.  How many would have been in a group?
18   A.  Typically eight.
19   Q.  Was that true for Pathway as well?
20   A.  Yes.
21   Q.  And then who would be giving that --
22 Did you -- You called it group therapy.  Who
23 would be in charge of doing that?

Page 43

1   A.  The therapist.
2   Q.  Okay.  Is that who's in charge of
3 doing it at Pathway?
4   A.  Yes.
5   Q.  Okay.  Do the -- At Pathway, do the
6 group leaders do group therapy?
7   A.  They don't to group therapy.  They do
8 do group with them.
9   Q.  Okay.  That's a different --
10   A.  Correct.
11   Q.  -- group setting?
12      MR. O'REAR:  Let him finish his
13 question --
14      THE WITNESS:  I'm sorry.
15      MR. O'REAR:  -- before you answer.
16   Q.  (BY MR. SATTERWHITE) So you call that
17 group, group.  What is it, counseling group,
18 that the -- that the group leaders do?
19   A.  It would be like basic living skills
20 group.  So it is, you know, not counseling.
21   Q.  Uh-huh.  And is that because
22 therapists are qualified to be counselors in
23 their training and education and mental

Page 44

1 therapy for minors, and the group leaders
2 don't have that qualification?
3   A.  What is your question?
4   Q.  Why is it that there's a difference
5 between when a therapist is talking to the
6 group and a group leader is talking to the
7 group?
8   A.  The therapist would provide
9 counseling, group counseling.
10   Q.  Uh-huh.
11   A.  The group leaders would provide group
12 on more basic living skills topics.
13   Q.  Okay.  Where did the -- Let's say at
14 Pathway, where did the group leaders obtain
15 information to be able to counsel with a
16 group about basic living skills?
17   A.  We did have some resources for them,
18 but it's also just general life skills.
19   Q.  Okay.  So then what would the
20 therapists' group therapy sessions, what
21 would be some examples of what the -- what
22 the therapists would do?
23   A.  It would be more tailored towards

**Page 45**

1  counseling techniques, counseling services.
2  So if that group needed the ability to better
3  manage their stress, therapists would dig a
4  little deeper on those things.
5      Q.  Okay.  So -- But at Camp Horizon, did
6  you say the group leaders in the hierarchy,
7  they're under the therapists?
8      A.  No.
9      Q.  Not really?  Who -- who are the --
10 who are the supervisors at Camp Horizon of
11 the group leaders, or what did you call them,
12 resident advisors?  Yeah.
13     A.  Right.
14     Q.  Yeah.  Who were -- Who was their
15 supervisor?
16     A.  They had a residential advisor
17 supervisor.
18     Q.  Okay.  How did they determine who
19 should be a residential advisor supervisor?
20 Was it somebody had been promoted from
21 resident advisor?
22     A.  Correct.
23     Q.  Okay.  The resident advisor at Camp

**Page 46**

1  Horizon, was that very similar to the group
2  leader at Pathway?
3      A.  Yes.
4      Q.  Okay.  And who would have been the
5  supervisor of a group leader at Pathway?
6      A.  The group leader supervisors.
7      Q.  Okay.  Mr. Tyrone Hartley was one of
8  those?
9      A.  He was a -- His title, I believe, was
10 Senior Shift Leader Supervisor.
11     Q.  Okay.  What was Mr. Bruce Predmore's
12 title?
13     A.  Program Director.
14     Q.  Okay.  Have you worked at any
15 other -- for any other employers other than
16 Camp Horizon and Pathway of Baldwin County?
17     A.  Not since getting my degree, no.
18     Q.  And do you consider yourself to be an
19 employee of Pathway of Baldwin County?
20     A.  Yes.
21     Q.  Are you compensated by Pathway of
22 Baldwin County?
23     A.  Yes.

**Page 47**

1      Q.  So your checks come from Pathway of
2  Baldwin County?
3      A.  Yes.
4      Q.  Have you ever received a check from
5  Pathway, Inc.?
6      A.  No.
7      Q.  Have you ever been disciplined for
8  anything at Camp Horizon or Pathway of
9  Baldwin County?
10     A.  No.
11     Q.  Today at Pathway your title is what?
12     A.  Executive Director.
13        MR. O'REAR:  Pathway of Baldwin
14 County?
15        MR. SATTERWHITE:  Pathway of Baldwin
16 County.
17     Q.  (BY MR. SATTERWHITE) Okay.  So who's
18 your immediate supervisor?
19     A.  Joe Peeples.
20     Q.  And what is his title?
21     A.  Chief Executive Officer.
22     Q.  Okay.  Of Pathway of Baldwin County?
23     A.  No, of Pathway, Inc.

**Page 48**

1      Q.  Okay.  Do you know what relationship
2  Joe Peeples has to Pathway of Baldwin County?
3      A.  He just supervises me.
4      Q.  Okay.  I'm going to show you an
5  exhibit.  I'm going to mark this as
6  Exhibit 1.
7          (Plaintiff's Exhibit 1 was
8           marked for identification, and
9           a copy thereof is attached
10          hereto.)
11     Q.  (BY MR. SATTERWHITE) This is the
12 notice of taking your -- your deposition
13 today.  Have you seen that before?
14     A.  No.
15     Q.  All right.  It's no big deal.  You
16 understand you're here today pursuant to
17 Exhibit 1?
18     A.  Yes.
19     Q.  Okay.  All right.  Let me show you
20 what we're going to mark as Exhibit 2.
21          (Plaintiff's Exhibit 2 was
22           marked for identification, and
23           a copy thereof is attached

Kimberly Fail

Page 49

1           hereto.)
2       Q.  (BY MR. SATTERWHITE) This is an
3   Amended Notice of Taking the Video Deposition
4   of Pathway of Baldwin County Pursuant to Rule
5   30(b)(6).  Have you seen that before?
6       A.  No.
7       Q.  Okay.
8           MR. O'REAR:  Well, it's -- I -- I
9   don't know if she quite -- She's seen the one
10  that has the responses.
11          THE WITNESS:  Yes.
12          MR. SATTERWHITE:  All right.
13          MR. O'REAR:  -- which has this same
14  information on it.
15      Q.  (BY MR. SATTERWHITE) So you -- You'll
16  see there, there's some topics of inquiry?
17      A.  Correct.
18      Q.  You've reviewed those before?
19      A.  Yes, I have seen those.
20      Q.  And then there's requests for
21  documents.  You've seen that before, too;
22  right?
23      A.  Yes.

Page 50

1       Q.  Okay.  We'll -- we'll get to that
2   later.  I'm going to mark this as Plaintiff's
3   Exhibit 3.
4           (Plaintiff's Exhibit 3 was
5           marked for identification, and
6           a copy thereof is attached
7           hereto.)
8       Q.  (BY MR. SATTERWHITE) Is that the
9   complaint that you said that you've read
10  before the deposition?
11      A.  Yes.
12      Q.  Okay.  When was the first time you
13  saw that complaint?
14      A.  I don't remember.
15      Q.  Did you see it before you started to
16  prepare for this deposition?
17      A.  I believe so, yes.
18      Q.  So you read it at least one time
19  before you started preparing for the
20  deposition?
21      A.  Yes.
22      Q.  Did you read it more than one time?
23      A.  No.

Page 51

1       Q.  What context was it that you were
2   reading it?
3       A.  I don't remember.
4       Q.  Who provided it to you?
5       A.  Our attorneys.
6       Q.  Did you go over that complaint with
7   anyone else?
8       A.  No.
9       Q.  You never have been over the
10  complaint with Mr. Peeples?
11      A.  No.
12      Q.  And you never went over that
13  complaint with Ms. Aaron?
14      A.  No.
15          (Plaintiff's Exhibit 4 was
16          marked for identification, and
17          a copy thereof is attached
18          hereto.)
19      Q.  (BY MR. SATTERWHITE) Okay.  I'm going
20  to show you what I've marked as Exhibit 4.
21  And this is Defendant Pathway of Baldwin
22  County's Responses to Plaintiff's First Set
23  of Interrogatories.  Do you know what I --

Page 52

1   Well, have you seen that document before?
2       A.  Yes.
3       Q.  Okay.  In what context was it that
4   you saw that document?
5       A.  I reviewed it in preparation for
6   this.
7       Q.  Okay.  So that's an extra.  I think
8   you -- you neglected to mention that earlier.
9   So that -- that is -- Exhibit 4 is another
10  document that you've reviewed?
11      A.  Was this in the exhibits?  I'm sorry.
12      Q.  No.
13      A.  Yes.
14      Q.  Well, any -- It doesn't matter.  You
15  did review Exhibit 4 prior to this
16  deposition --
17      A.  Yes.
18      Q.  -- and in preparation for the
19  deposition?
20      A.  Yes.
21      Q.  Okay.  Now, what do you understand
22  that to be?
23      A.  Our response to the complaint.

**Page 53**

1  Q.  Okay.  There is an official response
2  that defendants file in court called an
3  answer; okay?
4  A.  Okay.
5  Q.  And then there's written questions
6  that the parties send to each other called
7  interrogatories.  That's -- that's what that
8  is, interrogatories.
9  A.  Okay.
10  Q.  So this is not filed with the Court
11  for the purpose of answering the complaint,
12  but it is filed to answer the questions that
13  we've asked.  So had you looked at this
14  Exhibit 4 prior to preparing for the
15  deposition?
16  A.  No.
17  Q.  Did you assist in preparing the
18  response -- the answers to these questions?
19  A.  Yes, I believe so.
20  Q.  So how did you assist?
21  A.  I believe I provided information that
22  was requested.
23  Q.  Okay.  I'm not going to ask you today

**Page 54**

1  anything that the lawyers told you or that
2  you told them, but did you have any meeting
3  with anyone other than the lawyers about
4  these interrogatories and the responses to
5  the interrogatories?
6  A.  No, I didn't meet any anybody in
7  regard to the responses.
8  Q.  Other than the lawyers?
9  A.  Correct.
10  Q.  I'm going to mark this as Exhibit 5.
11      (Plaintiff's Exhibit 5 was
12      marked for identification, and
13      a copy thereof is attached
14      hereto.)
15  Q.  (BY MR. SATTERWHITE) This a similar
16  document.  This is Defendant Pathway of
17  Baldwin County's Responses to Plaintiff's
18  First Set of Requests For Production of
19  Documents.
20      So Exhibit 4 is questions.  Exhibit 5
21  is a request to produce documents.  Have you
22  seen Exhibit 5 before?
23  A.  Yes.

**Page 55**

1  Q.  In what context?
2  A.  I did review this for today.
3  Q.  Okay.  Had you seen it before?
4  A.  No.
5  Q.  So the only time you've seen that one
6  is in preparation for the deposition?
7  A.  Yes.
8  Q.  So you did not assist in preparing
9  the responses to the request for production,
10  Exhibit 5; is that correct?
11  A.  I didn't see these laid out like
12  this, no.
13  Q.  Do you recall pulling documents
14  that --
15  A.  Yes.
16  Q.  -- that are referenced there in order
17  to -- to respond to that?
18  A.  Yes.
19  Q.  Okay.  In Exhibit 4, the
20  interrogatories, if you look at Page 4
21  there's a question at the top, Number 2, that
22  says:  (Reading.)
23      Identify all persons who may

**Page 56**

1      have knowledge of facts
2      concerning the subject matter of
3      this litigation and/or Richard
4      J. Sheppard and state your
5      understanding of their
6      knowledge.
7  So there are a number of people listed there.
8  Do you see the list?
9  A.  I do.
10  Q.  Can you think of anyone else who has
11  any information about the subject matter of
12  this litigation or Mr. Sheppard?
13  A.  No.
14  Q.  Has anybody in your experience while
15  you've been at Pathway made a complaint that
16  fraudulent submittals were being sent to
17  Medicaid --
18  A.  No.
19  Q.  -- other than Rick?
20  A.  I don't know of anyone making that
21  complaint.
22  Q.  You -- you don't know that Rick made
23  that complaint?

Kimberly Fail

Page 57

1    A.  Yes, now.
2    Q.  Yeah.  He's the only one that you
3  know of?
4    A.  That's correct.
5    Q.  Has anyone there ever made a claim of
6  discrimination?
7    A.  No.
8    Q.  There's been no complaints of any
9  kind of race, gender discrimination, or
10  disability, or any kind of discrimination
11  since you've been there?
12    A.  No.
13    Q.  Do you know, at anytime, was there a
14  written statement taken down by Pathway of
15  Mr. Sheppard?
16      MR. O'REAR:  What?
17    A.  In regard to?
18      MR. O'REAR:  Yeah.  What are you --
19    Q.  (BY MR. SATTERWHITE) Just in general,
20  that they said, Mr. Sheppard, we need you to
21  come in and give us a statement and put it in
22  writing?
23    A.  In regard to?

Page 58

1    Q.  Anything, in regard to anything.  Did
2  they ever do that, ask him to come in and
3  give a statement about something?
4    A.  No.
5    Q.  Was Mr. Sheppard ever recorded with
6  an audio recording or video recording while
7  he was at Pathway?
8    A.  Well, we have video cameras
9  everywhere, so the video cameras were
10  recording.
11    Q.  Is that all in the exterior of the
12  buildings?
13    A.  No, interior as well.
14    Q.  Is that saved?
15    A.  Yes.
16    Q.  How long is it saved?
17    A.  It -- it depends per camera, but
18  typically I would say no longer than 90 days.
19    Q.  Did anyone attempt to save any video
20  of Mr. Sheppard?
21    A.  No.
22    Q.  Okay.  I want to show you what I'm
23  going to mark as Exhibit 6.

Page 59

1         (Plaintiff's Exhibit 6 was
2         marked for identification, and
3         a copy thereof is attached
4         hereto.)
5    Q.  (BY MR. SATTERWHITE) This is an
6  e-mail from Jennifer Lee to several people at
7  Camp Horizon.  This would have been when you
8  were there.  Have you ever seen that before?
9    A.  Yes.
10    Q.  Okay.  Could you read out the e-mail
11  content there?
12    A.  It's says:  (Reading.)
13         The following staff have been
14         recognized for exceptional
15         paperwork.  Please use them as
16         trainers of new staff.
17    Q.  Okay.
18    A.  And then it lists staff members.
19    Q.  So that was in May of 2013; correct?
20    A.  Correct.
21    Q.  Okay.  So in May of 2013, one of the
22  persons listed there is Rick?
23    A.  Correct.

Page 60

1    Q.  So do you agree that he had
2  exceptional paperwork in 2003 at Camp
3  Horizon?
4    A.  I don't recall what his paperwork was
5  like at that time.
6    Q.  Do you have any reason to dispute
7  that?
8    A.  No.
9         (Plaintiff's Exhibit 7 was
10         marked for identification, and
11         a copy thereof is attached
12         hereto.)
13    Q.  (BY MR. SATTERWHITE) I'm going to
14  show you what I've marked as Exhibit 7.  This
15  appears to be another e-mail from Jennifer
16  Lee to a lot of people, including
17  Mr. Sheppard, in April of '14.  Have you seen
18  that before?
19    A.  Yes.
20    Q.  Would the exhibit that I just showed
21  you, Number 6 and this Number 7, be a part of
22  Mr. Sheppard's personnel file at Pathway?
23    A.  No.

Kimberly Fail

Page 61

1    Q.  Okay.  So when you say you've seen
2  this before, you just remember seeing it back
3  at Camp Horizon when it was sent out?
4    A.  It's sent to me.
5    Q.  Okay.
6    A.  So I'm sure I saw it at the time.
7    Q.  Okay.  Do you remember this event?
8    A.  Yes.
9    Q.  The Relay for Life?
10    A.  Yes.
11    Q.  Do you remember that Rick was a part
12  of helping organize and lead groups to
13  accomplish huge tasks?
14    A.  I don't remember specifically who all
15  was involved.
16    Q.  Is it possible that Rick wasn't
17  involved in this?
18    A.  I'm sorry?
19    Q.  Is it possible that Rick was not
20  involved in helping the Relay for Life?
21    A.  I don't remember specifically who was
22  involved.
23    Q.  Okay.  Do you have any reason to

Page 62

1  dispute that -- that he should have been
2  thanked for what he did?
3    A.  No.
4    Q.  Do you have any reason to dispute
5  that he should have a special thanks for
6  organizing and leading groups to accomplish
7  huge tasks?
8    A.  No.
9    Q.  Do you have an opinion as to whether
10  this e-mail is true or not?
11    A.  I -- I don't disagree with the
12  e-mail.  I don't think it's false.  I just
13  don't remember the specifics.
14    Q.  Okay.  But you -- you won't
15  acknowledge that -- that he did something
16  good here?
17    A.  It says that he did.
18    Q.  Let me show you what we're marking as
19  Exhibit 8.
20        (Plaintiff's Exhibit 8 was
21        marked for identification, and
22        a copy thereof is attached
23        hereto.)

Page 63

1    Q.  (BY MR. SATTERWHITE) Do you recognize
2  this?
3    A.  Yes.
4    Q.  Okay.  What -- what is this?
5    A.  This would have been a evaluation of
6  Mr. Sheppard --
7    Q.  Okay.
8    A.  -- under Camp Horizon.
9    Q.  All right.  So when employees went to
10  work at Camp Horizon, were they working for
11  Baldwin County?
12    A.  Yes, sir.
13    Q.  Okay.  So Camp Horizon was actually
14  run by Baldwin County?
15    A.  That's correct.
16    Q.  Okay.  And so when an employee came
17  to work, were they immediately placed on a
18  three-month probationary period?
19    A.  Yes.
20    Q.  Was Mr. Sheppard put on that
21  probationary period?
22    A.  Yes.
23    Q.  Okay.  Was this evaluation at the

Page 64

1  completion of that three-month probationary
2  period?
3    A.  Yes.
4    Q.  Would this have been part of his
5  personnel file at Camp Horizon?
6    A.  Yes.
7    Q.  Was it then part of his personnel
8  file at Pathway?
9    A.  No.
10    Q.  So are you saying that the personnel
11  file from Camp Horizon didn't move over and
12  stay with the employees at -- at Pathway?
13    A.  We did have some documents that
14  stayed, yes, but it wasn't part of their
15  personnel file.  We kept that separate.
16    Q.  All right.  So let's talk about that.
17  At Pathway, you have a personnel file for --
18    A.  Uh-huh.
19    Q.  -- each employee.  What other files
20  would you have on an employee other than a
21  personnel file?
22    A.  They had a medical file.
23    Q.  Okay.  Is that it, just two?

Page 65

1    A. Yes.
2    Q. So where would this one fall?
3    A. There was a group of us that came
4  over from Camp Horizon, and the -- County
5  let us keep those certain pieces of that
6  personnel file, so evaluations and training.
7  And that's kept separate in like --
8    Q. So for Rick --
9    A. -- an old file.
10   Q. For Rick at Pathway, he would have
11 had his personnel file?
12   A. Uh-huh.
13   Q. He would have had his medical file?
14   A. Uh-huh.
15   Q. And then he would --
16     THE COURT REPORTER:  Yes?
17   Q. (BY MR. SATTERWHITE) -- have had --
18   A. I'm sorry.  Yes.
19   Q. I'm sorry.  I may be going too fast.
20 He had his -- At Pathway, Rick Sheppard would
21 have had his personnel file, then he would
22 have had a separate medical file, then he
23 would have this extra file?

Page 66

1    A. Correct.
2    Q. Why wouldn't they just put that in
3  the personnel file?
4    A. It's separate.
5    Q. Okay.  So all of the employees that
6  went from Camp Horizon to Pathway had three
7  files like that.
8    A. That's correct.
9    Q. Okay.  So this is -- That's where
10 this document would have been?
11   A. Correct.
12   Q. All right.  On the back, it says that
13 this is rater's signature.  Can you read
14 that?
15   A. Kimberly Cooper.
16   Q. Okay.  Who is that?
17   A. That's me.
18   Q. Okay.  So Fail is your married name?
19   A. Yes.
20   Q. Okay.  So you did this?
21   A. Yes.
22   Q. Okay.  So at that time, you felt like
23 his progress and job performance indicate

Page 67

1  that he will be able to satisfactorily
2  perform the job by the end of the six-month
3  probationary period?
4    A. Yes.
5    Q. Okay.  So I guess I was wrong
6  earlier.  It was a six-month probationary
7  period; right?
8    A. Yes.  This was the three-month
9  evaluation, yes.
10   Q. Right.  But the probation goes all
11 the way to six months; right?
12   A. Right.
13   Q. Okay.  So this was just the halfway
14 point?
15   A. Correct.
16   Q. Okay.  At that time, did Rick
17 demonstrate an ability to perform the job
18 well and worked on feedback he was given to
19 better his performance?
20   A. Yes.
21   Q. At that time, was he quality
22 conscious and aware of the need for
23 consistency when working with kids?

Page 68

1    A. Yes.
2    Q. Did he hold the kids accountable?
3    A. Yes.
4    Q. Was Rick eager to learn and request
5  training at every opportunity?
6    A. Yes.
7    Q. Did he come to work on time and
8  prepared for his shift?
9    A. Yes.
10   Q. Did he meet all of the expectations?
11   A. Yes.
12   Q. Could you read what you wrote at the
13 bottom of page, the first page of this, about
14 Rick?
15   A. You said the first page?
16   Q. Uh-huh, the very bottom.
17   A. (Reading.)
18       Rick meets all the -- the
19       above-listed expectations.  Rick
20       clearly has a heart for the kids
21       and is at the camp for the right
22       reasons.
23   Q. Tell me about that.  Why did you put

Page 69

1 that there?
2    A.  Well, at the time, that's what Rick
3 did.
4    Q.  All right.  So at the time, he
5 clearly had a heart for the kids, and he's at
6 the camp for the right reasons?
7    A.  Correct.
8    Q.  Did you really feel that about him at
9 that time?
10    A.  Yes.
11    Q.  Did that change?
12    A.  Yes.
13    Q.  When did it change?
14    A.  Towards the end of Mr. Sheppard's
15 employment with Pathway.
16    Q.  Okay.  What caused you to believe
17 that he no longer had a heart for the kids?
18    A.  I think he did have a heart for the
19 kids.  There were just examples that he was
20 overly harsh on the kids.  I still think he
21 cared about them.
22    Q.  How much was Rick getting paid, let's
23 just say, when he left Pathway?

Page 70

1    A.  I don't remember exactly.  I think
2 around $12 an hour.
3    Q.  Okay.  And did he normally work
4 40 hours a week?
5    A.  Sometimes more.
6    Q.  Sometimes more.  Okay.  And his
7 number one job is to help kids, isn't it?
8    A.  Correct.
9    Q.  And would you call $12 an hour a
10 high-paying job?
11    A.  No.
12    Q.  I would say he was pretty dedicated
13 to helping these kids all the way through
14 from Camp Horizon all the way through
15 Pathway, wouldn't you?
16    A.  I think he definitely had a heart for
17 kids, yes.
18    Q.  On the second page, you say Rick is
19 an asset to the program and a role model for
20 the residents.  Was that true?
21    A.  Yes.
22    Q.  Now, this statement at the end, the
23 employee's comments, is this Rick?

Page 71

1    A.  That's correct.
2    Q.  And he wrote that?
3    A.  Yes.
4    Q.  It says:  (Reading.)
5       I am very thankful for this
6       review.  I am very much looking
7       forward to excelling with
8       upcoming training and how to
9       apply my skill set to the Camp
10       Horizon staff team.  Looking
11       forward to being part of this
12       professional staff --
13    I don't know what that word is.
14 (Reading.)
15       -- and how to apply myself
16       accordingly.
17    So was that his attitude at that time?
18       MR. O'REAR:  Objection as to
19 speculation of his mental state.
20    Q.  (BY MR. SATTERWHITE) No, I'm asking
21 your opinion.
22    A.  He wrote that.
23    Q.  Okay.  Do -- do you have an opinion

Page 72

1 as to whether he was sincere?
2    A.  I don't know a person's sincerity.
3    Q.  You don't --
4    A.  He wrote that.
5    Q.  You don't have an opinion?
6    A.  I can't -- I mean, I know he wrote
7 that.
8    Q.  Well, you either have an opinion or
9 you don't.  So if you don't have an opinion,
10 you --
11    A.  That's a --
12    Q.  -- need to say that.
13    A.  It's a long time ago.  I don't
14 remember his -- all of -- all of the details
15 as to whether or not he meant that.
16    Q.  Okay.  I'm going to show you what
17 we're marking as Exhibit 8.
18       MR. O'REAR:  I thought you just
19 marked Exhibit 8.
20       MR. SATTERWHITE:  Oh.
21       THE COURT REPORTER:  Yes.
22       MR. SATTERWHITE:  I'm sorry.  We're
23 going to mark this one Exhibit 9.

Kimberly Fail

**Page 73**

1      (Plaintiff's Exhibit 9 was
2      marked for identification, and
3      a copy thereof is attached
4      hereto.)
5    Q.  (BY MR. SATTERWHITE) Can you identify
6  this document?
7    A.  This is an evaluation for the end of
8  his probation.
9    Q.  So this was in July of 2013?
10   A.  Correct.
11   Q.  And were you the one that conducted
12  this evaluation?
13   A.  Yes.
14   Q.  Could you read under the comments
15  there what -- what you said about Rick?
16   A.  (Reading.)
17      Rick is a great role model for
18      the residents.  He demonstrates
19      compassion and concern for each
20      resident and gives them an
21      opportunity to talk instead of
22      just listen.  Rick clearly has a
23      heart for the kids and wants to

**Page 74**

1      see them succeed.  Rick is
2      reliable and very thorough.  He
3      accepts feedback well and does
4      the work to make changes when
5      necessary.  Rick could benefit
6      from building positive rapport
7      with all staff members that he
8      works with.  He should ensure
9      that the logbook documentation
10      is accurate and legible.  He
11      should continue to find comfort
12      in giving feedback to his
13      coworkers as this will improve
14      the consistency on campus.
15      Overall, Rick is great to work
16      with.  He's approachable and
17      works on any feedback he's
18      given.
19   Q.  Okay.  Is that how you really felt at
20  that time?
21   A.  Yes.
22   Q.  I noticed you said, overall Rick is
23  great to work with, and you exclamation

**Page 75**

1  point.  Why did you put an exclamation point
2  there?
3    A.  I must have really felt that at the
4  time.
5    Q.  I'm going to show you what we're
6  marking as Exhibit 10.
7      (Plaintiff's Exhibit 10 was
8      marked for identification, and
9      a copy thereof is attached
10      hereto.)
11   Q.  (BY MR. SATTERWHITE) Do you recognize
12  this document?
13   A.  I don't recall reading this document,
14  but it is a development plan for Camp
15  Horizon.
16   Q.  All right.  Tell me what a
17  development plan is.
18   A.  It would have been something that we
19  would do with an employee if there were
20  issues or concerns in their performance.
21   Q.  So is it possible this was done just
22  at the end of his probationary period just to
23  start his development as an employee, or are

**Page 76**

1  you saying it was necessarily because he
2  needed some corrective action?
3    A.  He would need -- This is the
4  beginning of corrective action.
5    Q.  Okay.  So this isn't routine?
6    A.  No.
7    Q.  Can you tell from this what
8  precipitated the -- the move to -- to do a
9  development plan with Rick?
10   A.  It's got constructives here, so I
11  would assume there is something that needed
12  to be addressed with the constructives.
13   Q.  Well, it just seems to me like
14  there's a -- there's a lot of positive here
15  and not very much negative.
16      MR. O'REAR:  Move to strike that
17  comment.
18   Q.  (BY MR. SATTERWHITE) Would you
19  disagree with that?
20   A.  The purpose of this would be to
21  address the constructive.  So there -- there
22  are constructives in each of these areas.
23   Q.  All right.  Well, go ahead on the

Kimberly Fail

Pages 77 to 80

**Page 77**

1  first page and read the comments.
2    A. (Reading.)
3        Rick is often very proactive in
4        managing issues and preventing
5        crisis situations.  He makes
6        good judgment calls when
7        handling an arising situation.
8        He utilizes his supervisor when
9        necessarily.  He holds the
10       residents accountable and
11       ensures that they are following
12       rules.  He is comfortable giving
13       the residents consequences when
14       they are not meeting the
15       requirements.  He's very
16       punctual and has his residents
17       where they need to be at the
18       scheduled time.
19   Q. Okay.  Would you characterize that
20  as -- as positive comments?
21   A. Yes.
22   Q. Okay.  And this was done apparently
23  by Shayna Staska?

**Page 78**

1    A. Yes.
2    Q. Okay.  Would she have been Rick's
3  supervisor?
4    A. Yes.
5    Q. And then would you read under
6  constructive?
7    A. (Reading.)
8        Rick could benefit by working to
9        improve deescalation techniques
10       and know when to remove himself.
11       He could benefit from learning
12       when to give the situation time
13       and check back in with residents
14       at a later time when the
15       resident has calmed down.
16   Q. Okay.  So that's a constructive --
17   A. Yes.
18   Q. -- statement that he should use to
19  develop his skills and his job performance?
20   A. Yes.
21   Q. Okay.  Then what is the next comment?
22   A. (Reading.)
23       Rick almost always sends his end

**Page 79**

1        of shit report on time and keeps
2        the information confidential.
3        Rick usually plans vacation
4        proactively and calls in advance
5        if he is sick.  His end of shift
6        report is very detailed and he
7        also verbalizes concern with the
8        proper staff as well.  He reads
9        the shift updates most of the
10       time to follow up on information
11       he needs to know prior to
12       beginning his shift.
13   Q. Okay.  Then what does it say under
14  constructive?
15   A. (Reading.)
16       Rick could benefit from making
17       his end of shift report shorter
18       yet more meaningful with just a
19       few lines on each resident.
20   Q. Wouldn't you say these constructive
21  comments so far are -- are pretty minor, that
22  these are not any kind of major violations of
23  policies or anything, are they?

**Page 80**

1    A. I could see that the previous
2  constructive could be a problem in terms of
3  improving his deescalation techniques.
4    Q. Uh-huh.  What about making his
5  reports shorter?
6    A. I don't know what the issue was at
7  the time, but that does not seem to be a
8  major problem, no.
9    Q. All right.  Would you read the next
10  comment?
11   A. (Reading.)
12       Rick is creative when assigning
13       a consequence and chooses a
14       consequence that will best fit
15       the resident.  He holds the
16       orange shirts to their
17       expectations and reports
18       concerns to therapists.  He's
19       able to -- to quickly find a
20       solution to help the residents
21       deescalate the behavior.
22   Q. Okay.  Now, what was under
23  constructive?

Kimberly Fail

Page 81

1   A. (Reading.)
2       Although Rick has meaningful
3       conversations with the residents
4       when they are upset, he would
5       benefit by allowing time for the
6       resident to calm down before
7       having a conversation with them.
8       When the resident is calm, they
9       will be able to retain more of
10      what is being said and be able
11      to apply what was said later.
12  Q. Now, you wouldn't characterize that
13  as a -- any kind of major violation of a
14  policy by Rick, would you?
15  A. It depends on context of what
16  occurred.
17  Q. This sounds to me like a suggestion
18  to -- just so that he can be better at
19  conversing with the residents.
20      MR. O'REAR: Move to strike the
21  comment.
22  Q. (BY MR. SATTERWHITE) There's nothing
23  here that's saying that he's bad at -- at

Page 82

1   this particular item, is it?
2   A. It's a constructive feedback.
3   Q. Uh-huh.
4   A. So the constructive would be to
5   address something that he needs to fix.
6   Q. Okay. That's fair enough. I mean,
7   do you find this so far to be an unusually
8   critical review of Rick's performance?
9   A. It's not a review of his performance.
10  It would be -- It's a development plan to --
11  to correct something.
12  Q. All right. Can you read the next
13  comment?
14  A. (Reading.)
15      Rick usually completes his work
16      on time. When he is going to
17      turn in his work --
18  Sorry. (Reading.)
19      When he's going to turn his work
20      in late, it is turned in on the
21      next day he works. He always
22      notifies the correct staff when
23      his paperwork will be late.

Page 83

1       Rick uses the front cover sheet
2       correctly and checks the RA
3       lounge to ensure his papers are
4       corrected in a timely manner.
5   Q. Okay. What's the next comment?
6   A. (Reading.)
7       Rick gives feedback as well as
8       takes constructive criticism.
9       He does not use his personal
10      cell phone around the residents.
11  Q. All right. So what's the
12  constructive?
13  A. (Reading.)
14      Rick could benefit from holding
15      his coworkers accountable to the
16      policy and procedures.
17  Q. Do you know what that means?
18  A. I understand what it -- what it says.
19  Q. I know. Well, what is that referring
20  to? How does one employee hold other
21  coworkers accountable to policies and
22  procedures?
23  A. Call them out if they see an issue.

Page 84

1   Q. Huh, that's what that means?
2   A. It could mean. I didn't write this,
3   so --
4   Q. Yeah.
5   A. -- I don't know what was --
6   Q. Okay.
7   A. -- this was intending to address.
8   Q. That's your best interpretation?
9   A. Yes.
10  Q. Have you ever written that in
11  somebody's report?
12  A. I don't recall.
13  Q. Okay. Can you read the next comment?
14  A. (Reading.)
15      Rick sometimes takes on
16      responsibilities without having
17      to be asked to. He shares new
18      ideas with the supervisors about
19      how he thinks the camp can be
20      better. He respects his
21      supervisors and what they ask of
22      him. He's a great role model
23      for the residents and strives

Kimberly Fail

Page 85

1       daily to teach them to how to be
2       successful young men.
3    Q.  Now that's interesting, because
4  that's something that you said, too, earlier;
5  right?
6    A.  What?
7    Q.  You characterized him as a great role
8  model for the residents?
9    A.  Yes.
10    Q.  Okay.  So Shayna Staska is saying the
11  same thing?
12    A.  Yes.
13    Q.  Okay.  Go ahead and read the
14  constructive.
15    A.  (Reading.)
16       Rick could benefit from
17       accepting that not everyone
18       holds themselves to such a high
19       standard as he does himself.  He
20       should continue to hold himself
21       accountable and be more willing
22       to get feedback.  He would
23       benefit from not allowing the

Page 86

1       actions and choices of others to
2       frustrate him.
3    Q.  Okay.  Based on this whole report
4  here or what you're calling the developmental
5  plan and what you're seeing here in the
6  comments and the constructive, how would you
7  characterize Rick at this stage of his
8  development?
9    A.  What do you mean?
10    Q.  Would this be a good employee, an
11  average employee, a below average employee?
12    A.  The -- Having a development plan
13  would have meant there are things that he
14  needs to correct.  So there are -- there are
15  things he needs to work on, and it sounds
16  like there are some things that he does well
17  also.
18    Q.  Would you agree with me that this
19  developmental plan has more positive comments
20  about things that he does well than it does
21  negative comments about things that he needs
22  to work on?
23    A.  There are -- there are positive

Page 87

1  comments in each area as well as
2  constructive, yes.
3    Q.  Would you agree there are more
4  positive comments in this developmental plan
5  about Mr. Sheppard's performance than there
6  are constructive things that he needs to work
7  on?
8    A.  In terms of like number of lines
9  under each comment section, yes, there's a --
10  there's a good bit of positives.
11    Q.  That one was 10.  Let me show you
12  what we're marking as Exhibit 11.
13       (Plaintiff's Exhibit 11 was
14       marked for identification, and
15       a copy thereof is attached
16       hereto.)
17    Q.  (BY MR. SATTERWHITE) Do you recognize
18  that?
19    A.  Yes.
20    Q.  Could you turn to the back page again
21  and read the comments?  Before you do that,
22  though, this was completed by you on
23  February 4 of 2014; is that right?

Page 88

1    A.  Yes.
2    Q.  Okay.  What were your comments?
3    A.  (Reading.)
4       Rick is a very hardworking staff
5       member.  He takes his role on
6       campus very seriously and is
7       clearly committing -- committed
8       to the success of the residents.
9       He has a heart for the residents
10       and wants to make a difference
11       in their lives.  Rick could
12       benefit from having a more firm,
13       fair, and fun approach to ensure
14       that he's not allowing himself
15       to give consequences based on
16       emotions.  Rick could benefit
17       from having more trust in his
18       coworkers and not see himself as
19       a protector of the staff
20       especially the female staff.
21       Rick needs to ensure that he
22       follows the chain of command and
23       ensure that he is following all

Kimberly Fail

Page 89

1    necessary safety precautions
2    when residents are in his care,
3    including transports.  Rick has
4    earned a merit increase.
5    Q.  Okay.  So is all of that true of as
6 February 4, 2014?
7    A.  Yes.
8    Q.  Okay.  So Rick has earned a merit
9 increase.  What does that mean?
10   A.  He -- he earned a pay increase.
11   Q.  Okay.  So do workers who have a poor
12 performance earn a merit increase?
13   A.  No.
14   Q.  And so workers who have a good
15 performance are the ones that receive a merit
16 increase; correct?
17   A.  Correct.
18       (Plaintiff's Exhibit 12 was
19       marked for identification, and
20       a copy thereof is attached
21       hereto.)
22   Q.  (BY MR. SATTERWHITE) All right.  I'm
23 going to show you Plaintiff's Exhibit 12 and

Page 90

1 ask you to identify that.
2    A.  This is an evaluation.
3    Q.  Okay.  Now, who was this one done by?
4    A.  Amanda Robinson.
5    Q.  Okay.  Who was that?
6    A.  She was the program director.
7    Q.  Okay.  What were her comments?
8    A.  (Reading.)
9        Rick is a great asset to the
10       team.  He often provides ideas
11       and suggestions to the team for
12       the benefit of the program.
13       Rick networks well with his
14       coworkers and supervisors.  Rick
15       could benefit from continuing to
16       ensure that he is being detailed
17       and accurate when documenting in
18       the logbook and on the BLS
19       paperwork.  He could benefit
20       from continuing to focus the
21       majority of his BLS
22       documentation to behaviors.
23       Rick could benefit from finding

Page 91

1    a balance and advocating for the
2    residents while not allowing
3    himself to be manipulated.
4    Overall Rick is a valuable team
5    player.  He has earned a merit
6    increase.
7    Q.  Okay.  Would you agree that this is a
8 good evaluation?
9    A.  Yes.
10       (Plaintiff's Exhibit 13 was
11       marked for identification, and
12       a copy thereof is attached
13       hereto.)
14   Q.  (BY MR. SATTERWHITE) Okay, okay.  I'm
15 going to show you what we marked as
16 Plaintiff's Exhibit 13.  Is that another
17 evaluation form?
18   A.  Yes.
19   Q.  Okay.  Was this one conducted by
20 Amanda Robinson again?
21   A.  Yes.
22   Q.  Okay.  Can you read her comments?
23   A.  (Reading.)

Page 92

1    Rick is a valuable team player.
2    He is often looking for ways to
3    improve his job performance.  As
4    a veteran staff, Rick takes the
5    initiative to help his coworkers
6    in any way possible.  He would
7    benefit from ensuring that he
8    continues to follow the schedule
9    and hold the residents
10   accountable to following the
11   schedule and expectations.  Rick
12   could benefit from holding his
13   coworkers accountable.  Overall
14   Rick is an asset to the program.
15   He has earned a merit increase.
16   Q.  So would you agree that this is
17 another good evaluation?
18   A.  Yes.
19   Q.  Okay.  See, it -- it says this:
20       Rick could benefit from holding his
21 coworkers accountable again.  What does that
22 mean?
23   A.  I don't know what Amanda meant, but

Kimberly Fail

Page 93

1  it sounds like she says he should hold them
2  accountable.
3      Q.  He doesn't have any authority over a
4  coworker, does he?
5      A.  No.
6      Q.  Is it encouraging him to report when
7  other coworkers have done something wrong
8  or --
9      A.  I don't know how she meant it.
10          (Plaintiff's Exhibit 14 was
11          marked for identification, and
12          a copy thereof is attached
13          hereto.)
14      Q.  (BY MR. SATTERWHITE)  Okay, okay.  I'm
15  going to show you Exhibit 14.  Okay.  Now,
16  this one shows that it's July 18, 2016.  And
17  it says it's a Pathway, Inc., at the top.
18  And it says it's a reference contact.  So
19  would this have been a reference that
20  Mr. Sheppard submitted so that he could be
21  hired by Pathway, from Camp Horizon to
22  Pathway?
23      A.  Yes.

Page 94

1      Q.  Okay.  So this was in July.  And the
2  official transition wasn't until September;
3  right?
4      A.  Correct.
5      Q.  So for a few months, everybody was
6  working on transitioning over from Camp
7  Horizon to Pathway?
8      A.  Correct.
9      Q.  Okay.  Now, Mr. Sheppard was applying
10  to work for Pathway of Baldwin County;
11  correct?
12      A.  Correct.
13      Q.  But this form is a Pathway, Inc.,
14  form?
15      A.  Correct.
16      Q.  Why wasn't it a Pathway of Baldwin
17  County form?
18      A.  We honestly didn't have time to make
19  any of those changes.  We wouldn't -- Excuse
20  me.  We wouldn't have made any of those
21  changes until after we were -- after
22  September.
23      Q.  Okay.  And do you know Ron Ballard?

Page 95

1      A.  Yes.
2      Q.  Do you value his opinions on Rick
3  Sheppard?
4      A.  Yes.
5      Q.  Okay.  And Mr. Ballard checked
6  excellent job skills, excellent initiative,
7  excellent attendance, and excellent conduct
8  for Rick; correct?
9      A.  Correct.
10      Q.  Do -- Did -- At this time, would you
11  have any reason to disagree with that?
12      A.  With Mr. Ballard's impression of
13  Mr. Sheppard?
14      Q.  No, Mr. Sheppard.  Do you disagree?
15  Do you have any reason to disagree with this,
16  what Mr. Ballard said about Mr. Sheppard in
17  July of 2016?
18      A.  I -- This -- So I didn't rate him.  I
19  would not have rated him excellent mostly in
20  my opinion because everybody has room for
21  improvement.
22      Q.  There's nothing in particular,
23  though, that you would -- would cite that

Page 96

1  would keep you from rating him excellent.
2  You just don't do that so that they can have
3  room for improvement?
4      A.  Well, I mean, there were -- there
5  were things that were developmental issues
6  that were addressed with Mr. Sheppard, so I
7  don't know how he could have been rated
8  excellent.
9      Q.  Uh-huh.  So you disagree?
10      A.  Yes.
11      Q.  Okay.  If an employee is --
12  Hypothetically, if an employee is -- has his
13  heart in the right place --
14      A.  Uh-huh.
15      Q.  -- which you've repeatedly said, and
16  others, too, and they're not perfect, but
17  they're trying to constantly improve, and
18  they have a good attitude, is that not an
19  excellent employee?
20      A.  No.
21      Q.  Okay.  So you'd call an excellent
22  employee somebody that's perfect?  You have
23  to be perfect to be excellent?

Page 97

1    A.  Maybe not perfect, but, yes, do -- do
2  your job very well; have a heart for the
3  kids; not need any sort of corrective action.
4    Q.  That's perfect; right?
5        MR. O'REAR:  Objection.  Semantics.
6    Q.  (BY MR. SATTERWHITE) There's --
7  You're describing an excellent employee as
8  one who needs no improvement.  That's -- the
9  definition of that is perfect.  Am I wrong?
10   A.  I don't have the definition of
11 excellence in front of me.
12   Q.  Okay.  So instead of excellent on
13 this form, you feel like Rick should have
14 been in the good category?
15   A.  Yeah.
16   Q.  Okay.  Is there -- Would you have
17 placed him even lower on anything or --
18   A.  I mean, I don't remember specifically
19 what his performance was like at that time.
20   Q.  Well, just based off --
21   A.  So --
22   Q.  -- of what we've read, just based off
23 of -- We've read a good many evaluations.

Page 98

1    A.  Right.
2    Q.  So you have an idea.
3    A.  Right.  I think that there would
4  probably be some areas that I would say
5  average.
6    Q.  Like what?
7    A.  The thing that I've read the most
8  about is his -- the -- the deescalation and
9  the interaction there with the -- the
10 children.
11   Q.  Anything else?
12   A.  There were other things on this
13 performance --
14   Q.  Well, I know --
15   A.  -- a development --
16   Q.  I know there were, but what we're
17 saying -- I'm asking you is things that would
18 drop him below good.  Did you see some things
19 where you feel like it would be more
20 appropriate to drop him below good?
21   A.  No.
22   Q.  Okay.  Let me show you what we're
23 marking as Exhibit 15.

Page 99

1        (Plaintiff's Exhibit 15 was
2        marked for identification, and
3        a copy thereof is attached
4        hereto.)
5    Q.  (BY MR. SATTERWHITE) Is this a
6  similar reference contact form?
7    A.  Yes.
8    Q.  Okay.  And about the same time?
9    A.  Yes.
10   Q.  And this person who was listed as a
11 reference was Shayna Staska?
12   A.  Yes.
13   Q.  And she was Mr. Sheppard's supervisor
14 at Camp Horizon; right?
15   A.  One of them, correct, yes.
16   Q.  Could you read what her other
17 comments were?
18   A.  (Reading.)
19        Rick is detail oriented and
20        shows integrity on the job.
21   Q.  Okay.  And she listed him as good in
22 every category, job skills, initiative,
23 attendance, conduct, supervision ability;

Page 100

1  right?
2    A.  Right.
3    Q.  Okay.  And based on our conversation
4  we just had, you generally agree with that?
5    A.  With the exception of the one issue,
6  yes.
7    Q.  What would that come under, job
8  skills?
9    A.  Yes.
10   Q.  The issue of deescalating a situation
11 with -- with a group?
12   A.  Yes.
13       MR. SATTERWHITE:  How long have we
14 been going now?
15       MR. WILLIAMS:  An hour and a half.
16       MR. SATTERWHITE:  Okay.  Do y'all
17 want to take a break?
18       MR. O'REAR:  Sure.
19       MR. SATTERWHITE:  Okay.  All right.
20       THE VIDEOGRAPHER:  We're off the
21 record at 10:36 a.m.
22 ///
23 ///

Kimberly Fail

Page 101

1  (The deposition of KIMBERLY FAIL was recessed
2          at 10:36 a.m.)
3  (The deposition of KIMBERLY FAIL resumed at
4          10:42 am.)
5
6       THE VIDEOGRAPHER:  We are back on the
7  record.  The time is 10:42 am.
8          (Plaintiff's Exhibit 16 was
9          marked for identification, and
10         a copy thereof is attached
11         hereto.)
12     Q.  (BY MR. SATTERWHITE) Okay.  I'm going
13  to show you what we'll mark as Plaintiff's
14  Exhibit 16.  Now, this is the first document
15  we've really looked at that was created at
16  Pathway of Baldwin County; right?
17     A.  Correct.
18     Q.  And what is this variance report?
19  What does that mean?
20     A.  Basically incident report.
21     Q.  Okay.  It doesn't really mean that
22  Rick did anything wrong.  It just means that
23  there was an incident that needs to be

Page 102

1  reported?
2     A.  Correct.
3     Q.  Okay.  And this would have been in
4  October of '16?
5     A.  Correct.
6     Q.  All right.  And who was it that was
7  filling this out?
8     A.  Rick.
9     Q.  Oh, Rick is the one?
10    A.  Yes.
11    Q.  But then there's some kind of
12  evaluation here at the bottom by, I'm
13  assuming, a supervisor?
14    A.  The -- the bottom would have been
15  where -- It's review of findings and plan of
16  action.
17    Q.  Okay.  So Rick filled out this top
18  portion?
19    A.  Correct.
20    Q.  And then below the top portion where
21  it says review findings and plan of action,
22  that part would have been filled out by the
23  evaluator?

Page 103

1     A.  Correct.
2     Q.  But then Rick would have signed it
3  over here on the left?
4     A.  Correct.
5     Q.  So who was this evaluator?
6     A.  Bruce Predmore.
7     Q.  What was his position at this time?
8     A.  Program director.
9     Q.  Okay.  Would then he have been a
10  supervisor of Rick?
11    A.  The program director supervised all
12  the direct care staff, so the -- they would
13  immediately supervisor the more senior
14  supervisors.
15    Q.  Uh-huh.
16    A.  And those people would supervise all
17  direct care staff.
18    Q.  Okay.  So it seems like the top part
19  was filled out by the evaluator, too, to me.
20  Is that -- is that --
21       MR. O'REAR:  Move to strike the
22  comment.
23    Q.  (BY MR. SATTERWHITE) Is that true?  I

Page 104

1  mean, it says: (Reading.)
2          The evaluator observed and/or
3          documentation supports the
4          following.
5     So it's saying that the evaluator is
6  filling this out; isn't that right?  And if
7  you look at just Number 1, it says:
8  (Reading.)
9          Attempts to verbally intervene
10         in order to help the client to
11         regain self control.
12    Well, Rick wouldn't be evaluating himself
13  with that; right?
14    A.  I -- I don't know if Rick evaluated
15  himself.  This is Rick's handwriting, it
16  looks like.
17    Q.  Okay.  But, I mean, just this form,
18  this is -- You're sticking with that, that
19  this is something that the employee is
20  supposed to fill out rather than the
21  evaluator?
22    A.  Yes, the employee typically filled
23  this out.

Kimberly Fail

Page 105

1    Q.  Okay, okay.  So under requires
2  comments from staff, who would have filled
3  that part out?
4    A.  Rick.
5    Q.  Okay.  And it says:  (Reading.)
6        Used verbal interactions.
7        Resident was noncompliant.
8    A.  Interventions.
9    Q.  Oh, I'm sorry.  (Reading.)
10        Used verbal interventions.
11        Resident was noncompliant.
12    A.  Yes.
13    Q.  Okay.  Do you know what that means?
14    A.  It sounds like he verbally
15  intervened, and the resident didn't respond
16  appropriately.
17    Q.  But Bruce Predone [sic], the
18  evaluator filled out the review findings.
19  And what did he find?
20    A.  Performance commendable.
21    Q.  And what else does it say?
22    A.  (Reading.)
23        Procedure followed per policy

Page 106

1        with outstanding documentation.
2    Q.  Okay.  So that was how
3  Mr. Predone [sic] --
4        MR. O'REAR:  Predmore.
5    Q.  (BY MR. SATTERWHITE) I'm sorry --
6  Predmore more found Rick's performance to be
7  on this particular occasion; is that correct?
8    A.  Yes.
9    Q.  Do you have any reason to believe
10  that that's not correct, that his performance
11  was not commendable?
12    A.  No.
13    Q.  Do you know anything about that
14  incident?
15    A.  No.
16        (Plaintiff's Exhibit 17 was
17        marked for identification, and
18        a copy thereof is attached
19        hereto.)
20    Q.  (BY MR. SATTERWHITE) Let me show you
21  what we've marked as 17.  Can you tell me
22  what this is?
23    A.  This is an evaluation.

Page 107

1    Q.  Okay.  And there's a grading scale,
2  and the evaluator just goes down all these
3  different categories and rates the employee?
4    A.  Yes.
5    Q.  And Rick received a 3.2?
6    A.  Correct.
7    Q.  And that means that his performance
8  met expectations?
9    A.  Correct.
10    Q.  Could you read on the second page
11  where the evaluator described Rick's
12  strengths?
13    A.  (Reading.)
14        One of Rick's strengths are his
15        BLS documentation.  Rick --
16    I think it says also.
17    Q.  Always?  Okay.
18    A.  (Reading.)
19        -- completes his BLS in a timely
20        manner.  Another of Rick's
21        strengths are holding the
22        residents accountable.  He does
23        a great job with all the males.

Page 108

1        Rick clearly cares about the
2        kids and their future.
3    Q.  That seems to be a consistent theme
4  so far in these evaluation, doesn't it?
5    A.  Him caring about the kids and their
6  future, yes.
7    Q.  Now, this evaluation was performed by
8  who?
9    A.  Tyrone Hartley.
10    Q.  Okay.  So that was Tyrone that listed
11  Rick's strengths that we just discussed?
12    A.  Yes.
13    Q.  Okay.  Let me show you what we're
14  marking as Exhibit 18.
15        (Plaintiff's Exhibit 18 was
16        marked for identification, and
17        a copy thereof is attached
18        hereto.)
19    Q.  (BY MR. SATTERWHITE) And this is an
20  e-mail from Bruce Predmore to Rick and a lot
21  of other people.  Now, this is all way into
22  March 15, 2017; correct?
23    A.  Correct.

Page 109

1    Q.  Can you read what Bruce was saying
2  about Rick?
3    A.  (Reading.)
4        Rick, I observed your problem
5        solving group session yesterday.
6        I was very impressed.  All the
7        boys were engaged discussing
8        individual and team goals.
9        Awesome job.  Keep up the good
10       work.  Bruce.
11   Q.  Okay.  Have you seen this e-mail
12  before?
13   A.  It looks familiar.
14   Q.  Have you discussed Bruce -- with
15  Bruce Rick's performance on that particular
16  day?
17   A.  I don't remember discussing it with
18  him, no.
19   Q.  Would you say that -- that -- that
20  that's a consistent evaluation of Rick, that
21  he does a good job with the kids?
22   A.  I would say that we've -- There's
23  been some constructive about his interactions

Page 110

1  with the kids, and there's also been some
2  positives.
3    Q.  Were the constructive things that
4  were -- that were terrible that could lead to
5  him being disciplined or demoted?
6        MR. O'REAR:  What -- what period of
7  time are you talking about?
8        MR. SATTERWHITE:  The ones that we've
9  talked about.
10   A.  Well, any constructives, if not
11  corrected, could lead to disciplinary
12  actions.
13   Q.  Okay.  So we're talking about
14  degrees, right, degrees of whether it was
15  really bad or bad or whether it could lead to
16  termination, but Rick's work with the kids in
17  this group session on March 14 was really
18  well done, wouldn't you agree, according to
19  Bruce?
20   A.  That's what -- that's what Bruce said
21  in this --
22   Q.  Matter of fact --
23   A.  -- this e-mail.

Page 111

1    Q.  -- he says it's awesome?
2    A.  He said awesome job.
3    Q.  Uh-huh you don't disagree with that,
4  do you?
5    A.  I didn't witness it.
6    Q.  Do you know Bruce Predmore?
7    A.  Yes.
8    Q.  Have you worked with him for a while?
9    A.  Yes.
10   Q.  If he had an opinion about Rick's
11  job, would you value his opinion?
12   A.  Yes.
13   Q.  Do you think Bruce is a good
14  evaluator of employees?
15   A.  He could be, yes.
16   Q.  He could be or he is?  Do you -- do
17  you have a problem with how Bruce evaluates
18  employees?
19   A.  Bruce and I didn't always agree on
20  everything, no.  I think Bruce meant this in
21  his e-mail.
22       (Plaintiff's Exhibit 19 was
23       marked for identification, and

Page 112

1        a copy thereof is attached
2        hereto.)
3    Q.  (BY MR. SATTERWHITE) Okay.  I am
4  going to show you Exhibit 19.  Can you
5  identify this document for us?
6    A.  It's a development plan.
7    Q.  All right.  Can you read the first
8  comment there?
9    A.  (Reading.)
10       Rick does allow the residents to
11       take a five when available to
12       cool down.  Rick is good at
13       holding the residents
14       accountable to the expectations
15       of the program.
16   Q.  Now, earlier you said one of the
17  criticisms of Rick was he did not deescalate
18  the situation with the residents effectively.
19  Does this look like at this point the
20  evaluator is saying that he's doing a good
21  job of deescalating?
22   A.  It says:  (Reading.)
23       Rick does allow the residents to

Kimberly Fail

Page 113

1     take a five when available to
2     cool down.
3     Q.  Isn't -- And is that a good idea to
4  do?
5     A.  It's a good idea to do that, yes.
6     MR. O'REAR:  Is there a date on this?
7     MR. SATTERWHITE:  No.  This is what
8  we got.
9     Q.  (BY MR. SATTERWHITE) Do you have any
10  why idea when this one would have been?
11     A.  No.
12     Q.  And do we know who did this one?
13     A.  No.
14     Q.  Who would know this?
15     A.  I don't know.
16     Q.  Why would there be a developmental
17  plan with no, you know, signature on it or --
18  or -- I'm sorry -- list of people involved?
19  Is that unusual?
20     A.  Yes.
21     Q.  Is this Rick's personnel file?
22     A.  I don't know.
23     Q.  You're supposed to know that if

Page 114

1  you're the corporate representative of
2  Pathway of Baldwin County.
3     A.  Well, I'm not looking at his file, so
4  I don't -- I don't know.
5     Q.  Well, I'm going to ask you about it.
6     A.  Okay.
7     Q.  You're supposed to know.  Why is this
8  in his file with -- with nothing --
9     MR. O'REAR:  Well, we're -- we're not
10  in that deposition yet, but --
11     A.  I don't know.
12     Q.  Okay.  So, anyway, this developmental
13  plan is similar to the one from before in
14  that it's got a lot of comments that are
15  positive, and then it's got a lot of
16  constructive criticism.  Is that fair enough?
17     A.  Yes.
18          (Plaintiff's Exhibit 20 was
19          marked for identification, and
20          a copy thereof is attached
21          hereto.)
22     Q.  (BY MR. SATTERWHITE) I'm going to
23  show you what we've marked as Exhibit 20.

Page 115

1     A.  Okay.
2     Q.  This is just a collection of thank
3  you notes and cards that Rick's received over
4  the years from residents.
5     A.  Okay.
6     Q.  Can you just look through that for a
7  minute?
8     A.  (The witness complied.)
9     Q.  (BY MR. SATTERWHITE) Okay.  Did you
10  look at it?
11     A.  Yes.
12     Q.  All right.  So Mr. Sheppard produced
13  these as items that he received from
14  residents.  You don't have any reason to
15  dispute that, do you, that residents give him
16  these?
17     A.  No.
18     MR. O'REAR:  Well, hold on.  Do --
19  The question is does she know anything
20  about --
21     MR. SATTERWHITE:  No.
22     MR. O'REAR:  -- those at all --
23     MR. SATTERWHITE:  The question is --

Page 116

1     MR. O'REAR:  -- not whether she --
2     MR. SATTERWHITE:  -- what I'm asking
3  her.
4     MR. O'REAR:  Well, that's an unfair
5  question, and I object to it.
6     MR. SATTERWHITE:  Okay, fine.
7     MR. O'REAR:  Okay.
8     Q.  (BY MR. SATTERWHITE) Do you have any
9  reason to believe that -- that -- that these
10  residents did not send these to Rick?
11     A.  I -- I don't know who gave them to
12  Rick.
13     Q.  Yeah.  But you don't know anything
14  about them, but if he says that -- that he
15  received these, and if you, for the purposes
16  of this question, agree with that, is this --
17  does this say anything about Rick, that the
18  residents are sending him thank you, happy
19  birthday, happy Valentine's Day, and letters
20  of thanks?
21     A.  I don't know who gave them to Rick.
22     Q.  Yeah.  I didn't ask you who gave
23  them.

Kimberly Fail

Page 117

1  A. Okay.
2  Q. So assume for the purpose of this
3  question that -- that these are residents
4  that gave him these; okay? What does that
5  say about Rick?
6        MR. O'REAR: Well, let me object.
7  There's no predicate been laid for this
8  hypothetical. You're asking about something
9  she has absolutely no knowledge of.
10  Q. (BY MR. SATTERWHITE) He has the right
11  to object and you have to answer.
12  A. What's -- Tell me the question again.
13  Q. If a counselor or a resident group
14  leader receives these type of thank you
15  notes, what does that say about them? Does
16  it say anything to you? You don't have to
17  say anything if you don't want to. I'm just
18  asking you. It's a simple question.
19  Wouldn't you rather have group leaders that
20  are the kind of people that receive thank you
21  notes from the residents?
22  A. Receiving thank you notes from the
23  residents is nice, yes.

Page 118

1  Q. Okay. That's all I'm asking. And in
2  your experience, do group leaders receive
3  thank you notes on a regular basis from the
4  residents?
5  A. I don't know how often they receive
6  that information.
7  Q. Who would know that?
8  A. The group leaders themselves.
9  Q. Anybody else?
10  A. If someone saw our -- a client give
11  them a note, that person would know.
12  Q. Does -- does the fact that a -- that
13  a group leader receives thank you notes, does
14  that say anything about that group leader to
15  you?
16  A. No.
17  Q. No? Okay. What is that? 20?
18  A. 20.
19        (Plaintiff's Exhibit 21 was
20        marked for identification, and
21        a copy thereof is attached
22        hereto.)
23  Q. (BY MR. SATTERWHITE) I'm going to

Page 119

1  show you what we've marked as 21. And this
2  was a document produced by Pathway of Baldwin
3  County to us. And can you just tell us what
4  this is?
5  A. It looks like a -- a perpetual pay
6  history.
7  Q. Okay. And is this one for Rick
8  Sheppard?
9  A. Yes.
10  Q. Okay. So does this indicate what he
11  was making over a period of time?
12  A. Yes.
13  Q. Okay. Tell me what the period of
14  time is.
15  A. This looks like his employment with
16  Pathway.
17  Q. Okay. So this covers the entire time
18  he was with Pathway?
19  A. Yes.
20  Q. Okay. And so this would tell you
21  what his gross wages were, the Federal
22  withholding, FICA, and all that, and the
23  amount of the checks that he got?

Page 120

1  A. Yes.
2  Q. Okay. 21. Let's see. 22.
3        (Plaintiff's Exhibit 22 was
4        marked for identification, and
5        a copy thereof is attached
6        hereto.)
7  Q. (BY MR. SATTERWHITE) Now let me show
8  you what we've marked as Exhibit 22. Is this
9  like a PowerPoint presentation?
10  A. Yes.
11  Q. Okay. And is the purpose of this to
12  familiarize the -- the group leaders and
13  others about basic Medicaid documentation?
14  A. Yes.
15  Q. So would this have been a part of the
16  training for employees at Pathway of Baldwin
17  County?
18  A. Yes.
19  Q. Okay. Are you familiar with this
20  PowerPoint?
21  A. Yes.
22  Q. Okay. So you see anything wrong with
23  this? Is -- is everything accurate here? Is

Kimberly Fail

Page 121

1   this is a good little synopsis of -- of what
2   they need to know?
3        MR. O'REAR:  Well, let me object.
4   The question is vague and too general without
5   more specificity.
6        Q.  (BY MR. SATTERWHITE) I'm just asking
7   you if you generally agree that this
8   PowerPoint is a good summary of -- of what
9   the employees need to know.
10       A.  It has information that they do need
11  to know.
12       Q.  Okay.  So what is the purpose of it?
13       A.  To give them information.
14       Q.  Does it achieve the purpose?
15       A.  It does give them information on
16  things that they need to know.
17       Q.  Uh-huh.  Do you have any opinion on
18  whether this is a good summary of what they
19  need to know?
20       A.  They're -- They are trained with much
21  more than just this.
22       Q.  Okay.  But that's what I'm saying.
23  It's just a summary.

Page 122

1        A.  It's got information that they need
2   to know on it, yes.
3        Q.  So would Mr. Sheppard have been
4   provided this information?
5        A.  Yes.
6        Q.  Would that have been in his training?
7        A.  Did Mr. Sheppard get training on
8   this?
9        Q.  Yes.
10       A.  Yes.
11       Q.  Okay.  So Mr. Sheppard received
12  training on basic Medicaid documentation
13  requirements?
14       A.  Yes.
15       Q.  Now, would that have been at Camp
16  Horizon and Pathway of Baldwin County?
17       A.  Yes.
18       Q.  Okay.  Were you involved in training?
19       A.  For?
20       Q.  For Medicaid documentation.
21       A.  No.
22       Q.  Who would have been in charge of
23  that?

Page 123

1        A.  In charge of the training?
2        Q.  Yes.
3        A.  For the BLS, the Medicaid
4   requirements?
5        Q.  Yes.
6        A.  Bridgette Anderson.
7        Q.  Okay.
8        A.  You're asking under Pathway?
9        Q.  Yes.
10       A.  Okay.
11       Q.  So that's who it was under Pathway?
12       A.  Yes.
13       Q.  She's a Pathway of Baldwin County
14  employee?
15       A.  Yes.
16       Q.  All right.  And this instructs the
17  employees to follow these bullet points, like
18  being accurate and timely and clear and what
19  information to record.  So it was a
20  requirement for Mr. Sheppard and others to
21  follow these rules; correct?
22       A.  Yes.
23       Q.  Are there specific written policies

Page 124

1   about this topic, or do the employees just
2   use this training to know how to do -- fill
3   out the forms for Medicaid?
4        A.  Their training is the primary basis
5   of their knowledge.
6        Q.  Uh-huh.  Is there a specific written
7   policy?  Like I've got a big stack of
8   policies that --
9        A.  Uh-huh.
10       Q.  -- that Pathway produced.  Is there
11  one of those on how to fill out the Medicaid
12  forms?
13       A.  I don't think there's one that says
14  it to that specificity, no.
15       Q.  Okay.  So basically employees like
16  Mr. Sheppard learn from their training, which
17  includes Exhibit 22?
18       A.  Yes.
19       Q.  And was Mr. Sheppard trained in the
20  Medicaid documentation requirements?
21       A.  Mr. Sheppard was trained on how to
22  provide --
23       Q.  Uh-huh.

Kimberly Fail

Page 125

1    A. -- services to the clients and
2  appropriately document them.
3    Q. Okay. And so he knew this
4  information?
5    A. He was trained on it.
6    Q. Uh-huh. So, therefore, you can
7  safely assume that he knew this; right? When
8  he was filling out his forms, whether he did
9  it right or not, he knew the information that
10  he needed to do it correctly, because he had
11  been trained based off of this?
12    MR. O'REAR: Again, you're asking --
13  asking her for his mental state and --
14    MR. SATTERWHITE: I'm asking --
15    MR. O'REAR: -- unexpressed mental --
16  mental state which --
17    MR. SATTERWHITE: Okay.
18    MR. O'REAR: -- is not a good
19  question for this witness.
20    Q. (BY MR. SATTERWHITE) So if you train
21  an employee, then you would assume that they
22  know the information you trained them on;
23  correct?

Page 126

1    A. I would know that they were trained.
2    Q. Uh-huh and you proceed -- As a
3  supervisor, when you proceed, you proceed --
4  After someone's been trained, you proceed as
5  if they knew the information that you trained
6  them on. Would that be fair enough?
7    A. We proceed as if they've been trained
8  on it. We've provided the information.
9    Q. Uh-huh. And they're supposed to
10  follow these requirements. The employees are
11  supposed to follow these Medicaid
12  requirements?
13    A. Yes.
14        (Plaintiff's Exhibit 23 was
15        marked for identification, and
16        a copy thereof is attached
17        hereto.)
18    Q. (BY MR. SATTERWHITE) Let me show you
19  what we've marked as Exhibit 23. This was
20  attached to the complaint, and it was a
21  screen shot of the website of Pathway. Does
22  this look familiar to you?
23    A. Yes.

Page 127

1    Q. Does this, in your experience, look
2  like the Pathway website?
3    A. Yes.
4    Q. Okay. And so if you were online as
5  someone who was seeking information about
6  Pathway of Baldwin County, and you called up
7  Pathway of Baldwin County in Google, is this
8  the website that would come up?
9    A. I haven't put Pathway of Baldwin
10  County in Google, so I don't know what would
11  come up.
12    Q. Well, let me ask it a different way.
13  Is there a different website for Pathway of
14  Baldwin County?
15    A. No.
16    Q. It's the same for Pathway of Baldwin
17  County and Pathway, Inc.?
18    A. There's a section of Pathway, Inc.'s
19  website that has the Baldwin information on
20  it.
21        (Plaintiff's Exhibit 24 was
22        marked for identification, and
23        a copy thereof is attached

Page 128

1        hereto.)
2    Q. (BY MR. SATTERWHITE) Okay. I'll show
3  you what we've marked Plaintiff's Exhibit 24.
4  Do you recognize this document?
5    A. Yes.
6    Q. Okay. What is this?
7    A. This is a basic living skills daily
8  progress note.
9    Q. Okay. Is this the type of document
10  that Mr. Sheppard would fill out?
11    A. For?
12    Q. I'm just asking you. Did -- Is this
13  a -- a form that he routinely filled out?
14    A. To complete his service provision
15  documentation, yes.
16    Q. Okay. So you're saying to complete
17  his service --
18    A. Provision, what --
19    Q. -- provision --
20    A. Whatever he provided to the client.
21    Q. Right. And is this form one that is
22  sent to Medicaid?
23    A. I don't perform that.

Kimberly Fail

Page 129

1    Q.  Well, you know or you don't know.
2    A.  I don't know.
3    Q.  Do you know anything about this form,
4  about how to fill it out, what should be in
5  here, how it should be done?
6    A.  Yes.
7    Q.  You do?
8    A.  Uh-huh.
9        THE COURT REPORTER:  Yes?
10       MR. O'REAR:  Is that a yes or no?
11   A.  I'm sorry.  Yes.
12   Q.  All right, all right.  So obviously
13  they put the resident's name at the top?
14   A.  Correct.
15   Q.  And the billable units are the first
16  things listed in the first column.  And if
17  the -- Let's -- Is it -- Strike that.
18       So Rick is a group leader.  Are group
19  leaders the only ones that fill out basic
20  living skills forms, or are there other
21  people who could fill out this form?
22   A.  There could be other people that
23  would fill out this form.

Page 130

1    Q.  Okay.  But if Rick were filling out
2  this form, he knows these codes through his
3  training.  Like under Column 2 and 3, he
4  knows what codes to put in there or he --
5        MR. O'REAR:  Which --
6    Q.  (BY MR. SATTERWHITE) -- he -- he
7  should?
8        MR. O'REAR:  What are you referring
9  to?  What are you referring to?
10       MR. SATTERWHITE:  The columns, the
11  second and third columns.
12       MR. O'REAR:  Type of service --
13       MR. SATTERWHITE:  Yes.
14       MR. O'REAR:  -- and progress?
15       MR. SATTERWHITE:  Uh-huh.
16       MR. O'REAR:  Well, just say that if
17  you don't mind.
18       MR. SATTERWHITE:  Sure.
19   Q.  (BY MR. SATTERWHITE) So I'm -- I'm
20  asking you is Rick -- Would Rick know, based
21  on his training, the type of service codes
22  and progress codes to put in those columns?
23   A.  He's been provided that training.

Page 131

1    Q.  Okay.  And then he knows how --
2  to fill out the first column, billable units?
3    A.  He's been provided training on how to
4  do that.
5    Q.  Okay.  Under then intervention and
6  response, under intervention, is that where
7  Rick would put the service he provided?
8    A.  Yes.
9    Q.  Okay.  And then under response, what
10  would go there?
11   A.  How the client responded to that
12  intervention.
13   Q.  Okay.  So that would be Rick's
14  description of how the client responded to
15  his intervention?
16   A.  Correct.
17   Q.  So let's just somebody -- Let's just
18  say somebody said a cuss word or something.
19  So in the intervention, Rick would put how he
20  talked to the resident about using cuss
21  words.  And then under the response, Rick
22  would put how that resident responded to his
23  discussion about using cuss words.  Is that

Page 132

1  fair enough?
2    A.  Yes.
3    Q.  Okay.  And then the second one is
4  just the same thing all over again?
5    A.  Yes.
6    Q.  Okay.  And so let's say Rick did that
7  for ten minutes.  If you look at the scale up
8  here to the right-hand corner, that would
9  come under that one unit of -- of military
10  time; right?
11   A.  Yes.
12   Q.  So then if he did that, he would put
13  one unit over here in the first column under
14  billable units?
15   A.  Yes.
16   Q.  Okay.  Now, if he was talking to a
17  group, how would he do that?  He would just
18  put the group name, or would he put each
19  individual person that was in the group, or
20  how would this work?
21   A.  This is an individual form.
22   Q.  Okay.  So there's a different form
23  for the whole group?

Kimberly Fail

Page 133

1    A. Yes.
2    Q. Okay. So Rick's job on an average
3  day, is it to do individual basic living
4  skills, counseling, and group counseling?
5    A. It could be.
6    Q. On any given day, he could be just
7  doing a group and an individual or maybe just
8  only groups, maybe other days only
9  individuals?
10    A. It would depend on the schedule.
11    Q. Okay.
12    MR. SATTERWHITE: This is 23; right?
13    THE COURT REPORTER: 25.
14    MR. SATTERWHITE: 25. Jesus.
15        (Plaintiff's Exhibit 25 was
16        marked for identification, and
17        a copy thereof is attached
18        hereto.)
19    Q. (BY MR. SATTERWHITE) Okay. I'm
20  showing you what we've marked as Exhibit 25.
21  Is that the group form that we just
22  discussed?
23    A. Yes.

Page 134

1    Q. Okay. And the same concepts would
2  apply with this. And he would just put the
3  name of the group and how they reacted to his
4  intervention. That's the process; right?
5    A. He would put what intervention he
6  provided.
7    Q. Uh-huh. He would put the name of the
8  group, then he would put what intervention he
9  provided, and then he would put how the group
10  reacted as a group?
11    A. No.
12    Q. Pardon?
13    A. He would put how the individual
14  responded to the group. This is still a -- a
15  form per individual.
16    Q. Oh, it is?
17    A. He would not put the group name.
18    Q. Oh, okay. Because it says group at
19  the top.
20    A. It says basic living skills group.
21    Q. Yeah. But this is still for an
22  individual?
23    A. Yes.

Page 135

1    Q. There's a different form, though, for
2  an individual session. There's a different
3  form. So this is just another group? This
4  is just another group form?
5    A. This is an individual's group form.
6    Q. Okay. Well, how is it different from
7  the other one?
8    A. The other one was about --
9    Q. Oh, okay. I get it.
10    MR. O'REAR: Wait. Let her --
11    Q. (BY MR. SATTERWHITE) Go ahead.
12    MR. O'REAR: You didn't let her
13  finish her answer.
14    A. The other was about an individual
15  interaction. This is a group.
16    Q. Uh-huh. All right. Yeah. I'm
17  getting it mixed up. Okay. So Exhibit 24 is
18  an individual. It really has nothing to do
19  with any kind of group. And then Exhibit 25
20  is about a group. So tell me how this is
21  used. Tell me how 25 is used.
22    A. You would have the -- the client that
23  participated in that group, their name at the

Page 136

1  top. And then you would provide the -- the
2  summary of the group, so what -- what
3  interventions did you provide to the group,
4  and then how did that particular child
5  respond under the intervention section, and
6  any other facilitator comments at the bottom.
7    Q. So -- But this one is actually for a
8  resident to sign?
9    A. Yes.
10    Q. So they are acknowledging what's
11  written at the top. The resident signs it?
12    A. Yes.
13    Q. Okay. And so the group leader who is
14  doing a group session, does he have a
15  different form that he fills out for that
16  group session?
17    A. No.
18    Q. That's what this is?
19    A. Yes.
20    Q. And then he gets the resident to sign
21  it?
22    A. Yes.
23        (Plaintiff's Exhibit 26 was

Kimberly Fail

Page 137

1    marked for identification, and
2    a copy thereof is attached
3    hereto.)
4    Q. (BY MR. SATTERWHITE) Okay. I'm going
5  to show you what we marked as Exhibit 26. So
6  what is this? Is this, say, instructions on
7  how to fill out both of the forms that we
8  just went over, or just one of them, or what?
9    A. It's instructions for basic living
10  skills progress reports.
11    Q. Okay. So let me back up. Is this a
12  document of Pathway of Baldwin County?
13    A. I'm not -- I'm not sure if this is --
14  if -- if we got this from one of our Medicaid
15  trainings or if we produced this --
16    MR. O'REAR: Yeah. This was --
17    A. -- inhouse. No. Meaning like if we
18  created it, when you say it is a Pathway of
19  Baldwin County form?
20    Q. Yeah. I'm just -- Yeah. I'm asking
21  you is this a form that's routinely provided
22  to group leaders to assist them in filling
23  out their progress reports?

Page 138

1    A. Yes.
2    Q. Okay. Now, the -- This would be
3  similar to the PowerPoint we saw earlier,
4  just giving you a lot of specific instruction
5  on how to do it; is that fair?
6    A. Yes, it's giving -- Yes.
7    Q. Would Mr. Sheppard have been provided
8  this instruction sheet from Pathway of
9  Baldwin County?
10    A. Yes.
11    Q. Would he have been expected to read
12  it?
13    A. Yes.
14    Q. Would he have been expected to
15  understand it?
16    A. Yes.
17    Q. And would he have been expected to
18  follow it?
19    A. Yes.
20    Q. Okay. How did you first learn that
21  someone had reported that there was something
22  wrong with the way Pathway was submitting
23  these forms to Medicaid?

Page 139

1    MR. O'REAR: Objection. It assumes
2  facts not in evidence.
3    A. Can you ask the question again?
4    Q. How did you first learn that someone
5  had reported Medicaid fraud?
6    MR. O'REAR: Same objection.
7    A. We -- There was an individual that
8  came by our office and requested documents.
9    Q. And who was that?
10    A. I believe his name was Jeremy
11  Nottingham.
12    Q. Okay. Who was he?
13    A. An investigator.
14    Q. When was that?
15    A. I think 2019.
16    Q. Do you know what month?
17    A. I don't remember.
18    Q. Did he provide you any documentation?
19    A. Yes.
20    Q. So who did he contact? Did he
21  contact you directly?
22    A. He came to the office.
23    Q. To your office?

Page 140

1    A. To Pathway of Baldwin County.
2    Q. Okay. So tell me what happened that
3  day.
4    A. He came in and requested to speak --
5  I don't -- I -- I don't know how -- Like if
6  he asked to speak to me or -- He came in. I
7  was alerted that there was somebody there
8  asking for records. I went out and spoke to
9  him.
10    Q. What records did he ask for?
11    A. I don't remember specifically.
12    Q. Did he provide anything in writing?
13    A. Yes.
14    Q. What did he provide?
15    A. I don't remember what all it said.
16  It was something indicating who he was and
17  they needed some documents.
18    Q. Do you know if Pathway of Baldwin
19  County has produced what he provided in
20  writing that day to the plaintiff in this
21  case?
22    A. I don't know.
23    Q. Did he provide a letter? Was it a

Kimberly Fail

**Page 141**

1   letter from his office?
2     A.  Maybe.  I don't remember exactly
3   what.
4     Q.  What office was he from?
5     A.  I -- I don't remember.
6     Q.  I hope you can remember by this
7   afternoon.  So who else was there and
8   witnessed when he came in?
9     A.  I don't know.
10    Q.  And you don't even know what month it
11  was?
12    A.  I believe it was April, maybe.  It's
13  been a long time.  I don't remember exactly.
14    Q.  It's been a long time, but you
15  prepared for this deposition.  You --
16    A.  I didn't review that information.
17    Q.  Right.  Apparently not.  But that was
18  a -- something that would definitely be asked
19  here and information we're entitled to, but,
20  anyway --
21      MR. O'REAR:  Yeah.  I think that's
22  debatable, but we can -- we can discuss that
23  this afternoon.

**Page 142**

1     Q.  (BY MR. SATTERWHITE) So a gentleman
2   named Jeremy Nottingham came in, provided a
3   letter of some kind from his office which you
4   don't know what it is, and then asked for
5   documents.  What was your reaction to that?
6     A.  What do you mean?
7     Q.  What did you do next?
8     A.  I provided the documents.
9     Q.  You -- Were you able to provide them
10  that quickly, just --
11    A.  It took some time.
12    Q.  Okay.  What did you do to collect the
13  documents?
14    A.  I gathered them.
15    Q.  What -- what were the documents?
16    A.  I don't remember what all.  I know he
17  requested basic living skills.
18    Q.  For what period of time?
19    A.  I don't remember.  It was like a
20  week.
21    Q.  A weeks' worth of time?
22    A.  Yes.
23    Q.  A weeks' worth of BLS forms --

**Page 143**

1     A.  Yes.
2     Q.  -- for everybody at the camp?
3     A.  What do you mean everyone?
4     Q.  Like he asked for all BLS forms for
5   one specific week of time, week?
6     A.  I believe so, yes.
7     Q.  Was it a current week, like the last
8   weeks' worth, or was he asking for back in --
9     A.  No.
10    Q.  -- 2017 or something?
11    A.  It was current.
12    Q.  So he asked for the -- the current
13  week --
14    A.  Yes.
15    Q.  -- of BLS forms?
16    A.  Yes.
17    Q.  Okay.  And so how long did it take to
18  compile that?
19    A.  I don't remember.
20    Q.  When you compiled it, did you mail it
21  to him?
22    A.  No.  I saved it on a flash drive and
23  gave it to him.

**Page 144**

1     Q.  So did you call him to tell him they
2   were ready?
3     A.  Yes.
4     Q.  When was that?
5     A.  I don't remember.
6     Q.  Did you -- How long did it take you
7   to compile that?  I'm sorry if I didn't --
8     A.  I don't remember exactly how long.
9     Q.  Would you say it was a matter of just
10  a week or two or --
11    A.  Less than that.
12    Q.  A month or two?
13    A.  Less than that, much less than that.
14    Q.  Less than two weeks?
15    A.  Yes.
16    Q.  Okay.  And then you called him to say
17  that those documents were ready?
18    A.  Yes.
19    Q.  And then he came back and picked them
20  up?
21    A.  Yes.
22    Q.  And was he coming from Montgomery
23  or --

Kimberly Fail

Page 145

1    A. I don't know.
2    Q. You don't know?
3    A. His office in was Montgomery.
4    Q. It was? Okay. So was there some
5  reason why you couldn't just mail them up
6  there?
7    A. I don't know.
8    Q. He wanted to drive to pick it up from
9  Montgomery --
10   A. Yes.
11   Q. -- to Pathway of Baldwin County near
12 Bay Minette?
13   A. Yes.
14   Q. Okay. So did you talk to Mr. Peeples
15 about that?
16      MR. O'REAR: Let me -- Just a minute.
17 This -- this area of inquiry has been
18 excluded by the Court. Don't -- don't shake
19 your head, because it has. This is part of
20 the qui tam investigation; all right? And
21 she -- The judge has excluded this
22 information from discovery in this case.
23      MR. SATTERWHITE: Well --

Page 146

1      MR. O'REAR: I had to no -- I -- I
2  had to let you ask a few questions to even
3  understand what you're trying to get at, but
4  that's what you're trying to get at, and I
5  think it's excluded under her order.
6      MR. SATTERWHITE: Well, I would agree
7  that she has excluded us from being able to
8  obtain financial information
9  and investigation audits and reports and
10 memos and things of that nature, but I have a
11 right to ask questions to determine when
12 Pathway knew there was a report against them
13 and what efforts they took to try to
14 determine who it was that reported it, and
15 then what did they do to Rick in retaliation
16 after they --
17      MR. O'REAR: It was two years
18 after --
19      MR. SATTERWHITE: -- after -- Let me
20 finish.
21      MR. O'REAR: I know this --
22      MR. SATTERWHITE: You said your
23 objection. Let me finish mine.

Page 147

1      MR. O'REAR: Okay.
2      MR. SATTERWHITE: And then what they
3  did to retaliate.
4      MR. O'REAR: Well, all right. It's
5  humanly impossible to retaliate two years in
6  advance on something you don't even know
7  about for two years.
8      MR. SATTERWHITE: Okay.
9      MR. O'REAR: This is part of an
10 investigation that occurred two years after
11 he was terminated, and it's clearly excluded
12 under the Court's order.
13      MR. SATTERWHITE: Well, if she -- if
14 Pathway and Ms. Fail has a story about how
15 they learned about it and what they did, then
16 I think I have a right to ask her what is
17 their story, what did they do.
18      I'm not going to ask all these
19 questions about in-depth investigation. I'm
20 just going to ask what did they do as far as
21 anything related to Mr. Sheppard after 2019,
22 when they -- when they learned about it.
23      MR. O'REAR: They didn't do anything

Page 148

1  to Mr. Sheppard after --
2      MR. SATTERWHITE: I mean --
3      MR. O'REAR: -- in -- in 2019. He
4  had been --
5      MR. SATTERWHITE: He had been --
6      MR. O'REAR: -- terminated --
7      MR. SATTERWHITE: -- gone. I
8  understand that.
9      MR. O'REAR: -- two years prior. And
10 you filed the lawsuit under seal that they
11 didn't even know about that year.
12      MR. SATTERWHITE: Well, I'm not going
13 very deep into this.
14      MR. O'REAR: Well, I know. I don't
15 think you can go into it at all. Now, your
16 question to the corporate witness related to
17 what they knew about complaints that were
18 made or reports made prior to his
19 termination, that's what the witness is here
20 to discuss, not this.
21      MR. SATTERWHITE: Uh-huh.
22      MR. O'REAR: And we -- we instruct
23 the witness not to answer any further

Kimberly Fail

Page 149

1  questions --
2      MR. SATTERWHITE:  Okay.
3      MR. O'REAR:  -- about this.
4      MR. SATTERWHITE:  In 2019?
5      MR. O'REAR:  Yes.
6      MR. SATTERWHITE:  Okay.
7      Q.  (BY MR. SATTERWHITE) So your -- You
8  had no knowledge in 2017 that a -- any kind
9  of report had been made that wrongful
10  submissions were made to Medicaid?  You
11  didn't know anything about that until 2019?
12     A.  Ask your question again.
13     Q.  I'm just trying to -- to find out
14  if -- if that's your testimony, that you
15  didn't know anything about anybody filling
16  wrongful reports with Medicaid until 2019?
17     A.  That's correct.
18     Q.  Okay.  Well, we have a -- a number --
19  a narrative that you wrote up, another
20  narrative that Beth Aaron wrote up, and
21  probably things that Rick put in the record
22  saying that you called him into the office
23  and -- and questioned him and asked him if he

Page 150

1  was the one that reported to a TCM caseworker
2  that there were wrongful reports made to
3  Medicaid.
4      A.  That was not the report.
5      Q.  What do you mean by that?
6      A.  That is not what those statements
7  say.
8      Q.  What do they say?
9      A.  I asked Mr. Sheppard if -- Well,
10  there was a report to me by a supervisor of
11  the TCM, the targeted case managers, that
12  Mr. Sheppard spoke to a TCM about being
13  passed up for a promotion because he said he
14  wouldn't do something that he considered
15  Medicaid fraud.
16     Q.  So who is this TCM supervisor that
17  you spoke with?
18     A.  Lucia Grantham.  Excuse me.
19     Q.  How do you spell that, Lucia?
20     A.  L-U-C-I-A.
21     Q.  Greenthumb?
22     A.  Grantham.
23     Q.  Oh.  G-R-A-N-T-H-A-M?

Page 151

1      A.  Yes.
2      Q.  What is her position?
3      A.  She was the supervisor of the
4  targeted case managers.
5      Q.  Is that -- That's a state employee;
6  right.
7      A.  No.
8      Q.  They -- They're an independent
9  company?
10     A.  They were contracted by The
11  Department of Youth Services.
12     Q.  Okay.  Now, she told you that.  When
13  was that?  When did she tell you that?
14     A.  I don't know the exact date.  It was
15  prior to my discussion with Mr. Sheppard
16  about it.
17     Q.  So that was in April, March and
18  April, I guess, of 2017?
19     A.  Yes.
20     Q.  That would have been around that
21  time?
22     A.  Yes.
23     Q.  So she contacted you to tell you

Page 152

1  about it?
2      A.  She met with me once a month.  So she
3  discussed it during her monthly meeting.
4      Q.  And when she told you that, she told
5  you that Rick said that he felt like that was
6  a fraudulent submittal to Medicaid?
7      A.  No.
8      Q.  No?  Okay.  She -- What did she say
9  that Rick said?
10     A.  She said that he said he was passed
11  up for promotion for refusing to do something
12  he considered Medicaid fraud.
13     Q.  I thought that's what I just said.
14     A.  You said submittal of some sort of
15  form to Medicaid.
16     Q.  Yeah.
17     A.  That's not what she said to me.
18     Q.  Well, what did she say?
19     A.  She said --
20     MR. O'REAR:  Asked and answered.  Go
21  ahead.
22     A.  She said that Rick spoke with a TCM
23  about the fact that he was passed over for a

Page 153

1  promotion for refusing to commit Medicaid
2  fraud, do something that he considered
3  fraudulent.
4     Q.  And you think that's different from
5  what I said, which is submitting fraudulent
6  forms to Medicaid?
7     A.  Yes.
8     Q.  How is that different?
9     A.  Well, I don't know what Rick thought
10 was fraudulent.
11    Q.  You said you read the complaint.  It
12 says exactly in there.
13    A.  At the time.
14       MR. O'REAR:  It -- Yeah.  Don't --
15 don't try to --
16       MR. SATTERWHITE:  You --
17       MR. O'REAR:  -- mislead her.
18 You're --
19       MR. SATTERWHITE:  No.
20       MR. O'REAR:  You're asking her about
21 a point in realtime when she met with him.
22    Q.  (BY MR. SATTERWHITE) Okay.  So since
23 that day, you have now come to learn that

Page 154

1  Rick was accusing Pathway of submitting
2  fraudulent forms to Medicaid?
3     A.  Yes.
4     Q.  Okay.  But you're saying that you
5  didn't realize that back when you first
6  talked to Ms. Lucia Grantham about it?
7     A.  I did not know that, no.
8     Q.  Did Mr. Grantham say there was an
9  investigation?
10    A.  No.
11    Q.  So did she say anything else?
12    A.  Not that I recall.
13    Q.  Did Mr. Sheppard tell this
14 information to Ms. Grantham according to
15 Ms. Grantham?
16    A.  No.
17    Q.  Who did he tell it to?
18    A.  Another TCM.
19    Q.  David Chastain?
20    A.  Yes.
21    Q.  And then David Chastain told
22 Ms. Grantham?
23    A.  I'm guessing.

Page 155

1     Q.  That's what she said?
2     A.  Yes.
3     Q.  And then she told you?
4     A.  Correct.
5     Q.  Okay.  So what -- what did you do as
6  a result of Ms. Grantham telling you this?
7     A.  I met with -- Excuse me.  I met with
8  Rick.
9     Q.  You called Rick and asked him to come
10 meet with you?
11    A.  I don't remember if I called him or
12 if I e-mailed him, but I asked him to come
13 and meet with me.
14    Q.  Uh-huh.  Okay.  And there was a
15 meeting.  When was that?
16    A.  I don't remember the exact date.  It
17 was at the end of March.
18           (Plaintiff's Exhibit 27 was
19            marked for identification, and
20            a copy thereof is attached
21            hereto.)
22    Q.  (BY MR. SATTERWHITE) Okay.  I'm going
23 to show you what we've marked as Exhibit 27.

Page 156

1     A.  Uh-huh.
2     Q.  Have you ever seen this before?
3     A.  Yes.
4     Q.  Okay.  What do you understand this to
5  be?
6     A.  This is from Mr. Sheppard to
7  Mr. Clifford.
8     Q.  Who's Mr. Clifford?
9     A.  Someone that Mr. Sheppard reported
10 this information to.
11    Q.  Do you know where he was working at
12 the time that this was sent to him?
13    A.  Mr. Clifford?
14    Q.  Yes.
15    A.  Yes.
16    Q.  Where was he working?
17    A.  Well, he was with -- Well, I'm not
18 exactly sure.  He was working on this
19 investigation.
20    Q.  So this would have been February 23
21 of 2017, that Mr. Sheppard is saying that he
22 sent this to Mr. Clifford.  Has anybody ever
23 showed you this?

Page 157

1    A.  I saw this in the exhibits that I
2  reviewed.
3    Q.  And have you ever discussed this with
4  anyone?
5    A.  No.
6    Q.  So the first time that you ever saw
7  this was when you read it as an exhibit to
8  the complaint?
9    A.  Yes.
10   Q.  Had you --
11     MR. O'REAR:  Was it an exhibit to the
12 complaint?
13     MR. SATTERWHITE:  I can't remember.
14     MR. O'REAR:  Yeah, I think she was
15 referring to an exhibit to Mr. Sheppard's
16 deposition.
17     THE WITNESS:  That's correct.
18   Q.  (BY MR. SATTERWHITE) Okay.  That was
19 the first time?
20   A.  Yes.
21   Q.  Just the other day.  Okay.  And
22 you've had a chance it read it since then.
23 You had a chance to read it --

Page 158

1    A.  Yes.
2    Q.  -- and look at it?  Now, didn't
3  Mr. Sheppard come to you at one point and
4  tell you about this conversation that he had
5  on the basketball court with Tyrone?
6    A.  No.
7    Q.  He never mentioned that to you?
8    A.  When you say that, what are you
9  asking?
10   Q.  Well, the first paragraph says:
11 (Reading.)
12        Within the first two weeks of
13        November on the small basketball
14        court, I approached Mr. Tyrone
15        with the request to be
16        considered for the next
17        promotion.  He advised me that
18        due to the basic living skills
19        group, that I had a difficult
20        time accomplishing that, I would
21        not be considered for the
22        position.  He then --
23 Do you know what he was talking --

Page 159

1  talking about there?
2    A.  No.
3    Q.  (Reading.)
4        He then proceeded to tell me
5        stating we need supervisors to
6        step up.  He then talked in the
7        paperwork the supervisors are
8        doing from staff that had left
9        the company and made a note of a
10       former staff member named Hannah
11       who did not stay for the -- stay
12       for the company long, maybe two
13       months.  He then again mentioned
14       the BLS groups stating you were
15       not there and that we need you
16       to do that kind of thing.  In
17       this conversation he mentioned
18       the amount of paperwork being
19       done by supervisors as being in
20       the thousands of dollars.  I
21       advised Tyrone that if this was
22       the case and I was being asked
23       to do corrections on staff that

Page 160

1        had left the company, I will not
2        be your supervisor.
3    So Mr. Sheppard has testified that he
4  came to you with that complaint.
5    A.  He did not.
6    Q.  So you disagree with that?
7    A.  He never mentioned any of that to me.
8    Q.  Okay.  So let me ask you this.  The
9  BLS forms, they get submitted to Medicaid;
10 right?
11   A.  I don't -- I don't submit those
12 documents, so I don't know exactly how those
13 things are billed.
14   Q.  The -- It is your understanding that
15 before they're submitted to Medicaid, they
16 have to be signed by the person who provided
17 the services?
18   A.  Yes.
19     MR. O'REAR:  Object to the form.
20 That assumes they're submitted to Medicaid.
21 She testified she didn't know they're
22 submitted.
23     MR. SATTERWHITE:  Then she said yes.

Kimberly Fail

Page 161

1    MR. O'REAR:  Well, I'm --
2    A.  I know that it's a requirement for
3  them to be signed.
4    Q.  Right.  And that was in the training
5  that we just went over.  So Rick's been
6  trained on the fact that for those forms to
7  be submitted, they have to be signed by the
8  person who provided the service; is that
9  right?
10    MR. O'REAR:  Objection.
11    A.  Correct.
12    MR. O'REAR:  Same objection.
13    Q.  (BY MR. SATTERWHITE) And that didn't
14  apply to just Rick, that applied to anybody
15  who was submitting those forms?
16    A.  It --
17    MR. O'REAR:  You're talking about
18  the -- submitting the form to -- to Pathway?
19    MR. SATTERWHITE:  No.
20    MR. O'REAR:  Who are you --
21    MR. SATTERWHITE:  Anybody --
22    MR. O'REAR:  -- talking about
23  submitting it to?

Page 162

1    Q.  (BY MR. SATTERWHITE) So the BLS forms
2  that are submitted --
3    MR. O'REAR:  To whom?
4    MR. SATTERWHITE:  To Medicaid.
5    MR. O'REAR:  Okay.
6    Q.  (BY MR. SATTERWHITE) Those forms we
7  just went over, they have to be signed by the
8  person who provided the service?
9    MR. O'REAR:  Object to the form of
10  the question.  She's already testified, and
11  there's no predicate for your assumption
12  they're submitted to Medicaid.  She said she
13  didn't know.
14    MR. SATTERWHITE:  This is getting out
15  of hand, Caine.
16    MR. O'REAR:  No, it's not.
17    MR. SATTERWHITE:  Yes, it is.
18    MR. O'REAR:  I am -- I'm entitled
19  to --
20    MR. SATTERWHITE:  Do it all you want.
21  You've already instructed --
22    MR. O'REAR:  I --
23    MR. SATTERWHITE:  -- somebody not to

Page 163

1  answer.  We're going to the judge on that
2  one.
3    MR. O'REAR:  Well, we've already --
4    MR. SATTERWHITE:  And I have a right
5  to --
6    MR. O'REAR:  -- been to the judge --
7    MR. SATTERWHITE:  -- ask her about
8  this.  Let's keep --
9    MR. O'REAR:  Excuse me.
10    MR. SATTERWHITE:  Keep to the case.
11  And if you're going to interrupt and
12  constantly object with -- with coaching the
13  witness, then we'll take that to the judge,
14  too.
15    MR. O'REAR:  I'm not coaching the
16  witness.  We've already been to the judge on
17  the former matter.  We were there Friday, and
18  she issued an order.
19    MR. SATTERWHITE:  Look, let's just
20  get --
21    MR. O'REAR:  I'm objecting to the
22  form.
23    MR. SATTERWHITE:  -- this done,

Page 164

1  Caine, without all this bull.
2    MR. O'REAR:  Okay.  Well, I'm
3  objecting to the form of the question,
4  because you imbedded in the assumption that
5  it was submitted to Medicaid.  She said she
6  didn't know.
7    MR. SATTERWHITE:  Okay.
8    MR. O'REAR:  She knows --
9    MR. SATTERWHITE:  So if you're going
10  to do this, we're going to have a major
11  problem.  I -- I don't want to have a major
12  problem with you.
13    MR. O'REAR:  I don't either.
14    MR. SATTERWHITE:  I just want get
15  these deposition done and let Ms. Fail go.
16    MR. O'REAR:  All right.  And --
17    MR. SATTERWHITE:  But you --
18    MR. O'REAR:  I'm --
19    MR. SATTERWHITE:  -- you brought a
20  witness for this afternoon who's supposed to
21  know all of this, and she's sitting here
22  telling me right now she doesn't.  So I'm --
23  I'm assuming she's going to testify

Kimberly Fail

Pages 165 to 168

Page 165

1 consistently with that this afternoon.
2      And so when we get to that point, you
3 haven't provided a corporate witness that
4 you're supposed to provided today that hasn't
5 done the research and doesn't know the
6 information she's supposed to know.  So we're
7 going to really get into it on that.
8      MR. O'REAR:  Well, I -- You know,
9 if -- if it doesn't -- if it didn't happen, I
10 don't know how any witness could -- could
11 know.  You're asking --
12      MR. SATTERWHITE:  Yeah.
13      MR. O'REAR:  Go ahead and --
14      MR. SATTERWHITE:  She -- Nobody is
15 going to be able to testify from Pathway how
16 these forms are submitted to Medicaid?
17 The -- the corporate rep doesn't know?
18      MR. O'REAR:  At Pathway of Baldwin
19 County?
20      MR. SATTERWHITE:  Yeah.
21      MR. WILLIAMS:  Let's get to that in
22 second.
23      MR. SATTERWHITE:  I mean, that --

Page 166

1 that is obviously something that we asked to
2 be able to --
3      MR. O'REAR:  I don't --
4      MR. SATTERWHITE:  -- to ask them.
5      MR. O'REAR:  -- recall that being --
6 I -- I don't recall that being in your
7 topics.
8      MR. SATTERWHITE:  Whether you recall
9 it or not doesn't really matter.  It's
10 whether we did it.
11      MR. O'REAR:  Right.
12      MR. SATTERWHITE:  And we clearly did.
13      MR. O'REAR:  All right.  Well, can
14 you --
15      MR. SATTERWHITE:  And I don't really
16 want to argue you about it.
17      MR. O'REAR:  I'm -- Okay.  I'm not
18 arguing.  I'm trying to make an objection,
19 Harry.  And I made the objection.  So
20 proceed.
21      Q.  (BY MR. SATTERWHITE)  Okay.  These BLS
22 forms in the training that we just talked
23 about, does it say that whoever fills out

Page 167

1 that form must sign the form?
2      A.  The person providing the service must
3 sign the form, yes.
4      Q.  Is that a policy of Pathway of
5 Baldwin County?
6      A.  I believe it's in our policy, yes.
7      Q.  Is that a rule of Medicaid?
8      A.  Yes.
9      Q.  And so according to your training,
10 Mr. Sheppard should know that?
11      A.  We provided Mr. Sheppard with
12 training that indicates that a service that's
13 provided has to be signed by the person that
14 provided the service.
15      Q.  Okay.  And in order to submit the
16 form to Medicaid to get paid for the services
17 provided, Medicaid requires there to be that
18 signature on the form; is that correct?
19      MR. O'REAR:  Same objection.
20      A.  I don't know that those forms are
21 submitted.  I don't submit.  I don't do that.
22 I don't bill for those services.  I'm not in
23 the billing office.

Page 168

1      Q.  Okay.  So is it okay if a group
2 leader fills out a BLS form but doesn't get a
3 chance to sign it, for someone else to sign
4 it for that person --
5      A.  No.
6      Q.  -- and submit that to Medicaid?
7      A.  Another person could not sign
8 something that was provided by someone else.
9      Q.  So whoever provided the service has
10 to be the one to sign it and submit it to
11 Medicaid?
12      MR. O'REAR:  Same objection.
13      A.  The person that -- that provided the
14 service would need to sign it to turn it into
15 us.
16      Q.  Uh-huh.  Has Pathway of Baldwin
17 County ever submitted a BLS form to Medicaid
18 that was signed by someone who was not the
19 person who provided the service?
20      A.  No.
21      Q.  Has Pathway of Baldwin County ever
22 asked one of its employees to sign a form
23 that showed someone provided a service but

Kimberly Fail

Page 169

1 didn't sign it and to sign that form instead
2 of the person who actually provided the
3 service?
4     A.  Ask the question again.
5     Q.  Has Pathway of Baldwin County ever
6 asked any of its employees to sign a form to
7 submit to Medicaid for services that they
8 didn't provide?
9     A.  I have never asked any of our
10 employees to sign anything that they didn't
11 provide, nor have I ever asked my supervisors
12 to do that.  That would not have been okay.
13     Q.  Okay.  Do you know, has anyone else
14 ever done that?
15     A.  No.
16     Q.  You don't know?
17     A.  Not to my knowledge, no.
18     Q.  To your knowledge, no one -- no
19 supervisory employee has ever asked a person
20 to sign a form that would indicate they were
21 the one that provided the service when they
22 didn't provide the service?
23     A.  No.

Page 170

1     Q.  And that includes Mr. Tyrone?
2     A.  That's correct.
3     Q.  Tyrone Hartley and Bruce Predmore?
4     A.  Correct.
5     Q.  And you understand that that's what
6 Mr. Sheppard is accusing Pathway of doing?
7     A.  I understand that now.
8     Q.  Okay.  And -- But you didn't
9 understand it in 2017?
10     A.  No.
11     Q.  When Ms. Grantham told you that
12 Mr. Sheppard was making an accusation that
13 something was fraudulent, what was your
14 understanding of what was -- what he was
15 saying was fraudulent?
16     A.  That was all the information I had.
17 There was no other information that -- that
18 he reported.  She just said that he had told
19 a TCM that he was passed up for a promotion
20 because he wouldn't do something that was
21 fraudulent.
22     Q.  Was it just that general, or was it
23 that he was saying something was being

Page 171

1 submitted to Medicaid that was fraudulent?
2     A.  That was never said.
3     Q.  Wouldn't that have to be what he was
4 referring to since TCM is there looking at
5 that kind of thing and --
6     A.  The TCM --
7     MR. O'REAR:  Let me -- let me --
8 Wait.  Is that --
9     MR. SATTERWHITE:  Yep.
10     MR. O'REAR:  -- the end of your
11 question?
12     MR. SATTERWHITE:  Uh-huh.
13     MR. O'REAR:  Objection.  Speculation,
14 calls for speculation.
15     A.  The TCM met with the clients.
16     Q.  Met with the client?
17     A.  Uh-huh.
18     Q.  Yeah, caseworkers.  Aren't -- isn't
19 that what TCM is, caseworkers?
20     A.  Targeted case manager, yes.
21     Q.  Case manager.  Yeah.  But aren't they
22 involved in seeing what happens to the kids
23 and what kind of counseling they get?  And do

Page 172

1 they review the BLS forms or look at them?
2     A.  At that time, I don't think they did.
3     Q.  So if it wasn't submitting something
4 fraudulent to Medicaid, what could it have
5 been?  What kind of fraud could there be that
6 a person could commit with regard to these
7 kids if it's not submitting fraudulent
8 reports to Medicaid?
9     MR. O'REAR:  Objection.  Calls for
10 speculation.
11     A.  I don't know.
12     Q.  You can't think of anything?
13     A.  That's why I'm -- I met with
14 Mr. Sheppard, to try to understand what he
15 was referring to.
16     Q.  Uh-huh.  What in your understanding
17 does it mean when Rick or anybody refers to
18 doing corrections?
19     A.  Their work was submitted.  We have
20 people that review that information.  After
21 they reviewed that information, if there was
22 anything in that needed a correction, if it
23 didn't make sense, if they needed to, you

Kimberly Fail

Page 173

1 know, make it more clear, it would be turned
2 around for a correction.  It would be sent
3 back for correction.
4     Q.  Uh-huh.  And then in that case,
5 sometimes the person had left and either been
6 terminated or -- or just quit.  So what would
7 Pathway do when they had this form filled
8 out, and they had -- you know, it had to be
9 corrected a little bit, and then the person
10 couldn't be there to sign it, and so that you
11 could send it to Medicaid?  What was the
12 policy then?
13     A.  If the person was no longer there to
14 sign, then it was not submitted to billing.
15     Q.  Submitted to billing, is that what
16 you said?
17     A.  Yes.
18     Q.  Is that an office at Pathway?
19     A.  No.
20     Q.  You're calling that Medicaid billing?
21     A.  No.
22     Q.  Okay.  What is billing?
23     A.  We had a person that submitted our

Page 174

1 billing.
2     Q.  Okay.  So I asked if it was an
3 office, and it wasn't an office.  It was a
4 person?
5     A.  Yes.
6     Q.  Okay.  All right.  So if you don't
7 get the signature of the person who provided
8 the service secured, then it never goes to
9 the lady who's in billing?
10     A.  Correct.
11     Q.  And who's that, again, at that time?
12     A.  At the time, I believe it was Rhonda
13 Caldwell.
14     Q.  Okay.  And so what happens to those
15 forms that don't have the signatures on them?
16     A.  They're not sent.
17     Q.  Okay.  Does that happen a lot or back
18 then?  Let's talk about then.  Did it happen
19 a lot?
20     A.  I don't know how often.  I mean, we
21 did have people leave.
22     Q.  And so Pathway just wouldn't get paid
23 if nobody signed that form saying they

Page 175

1 provided the service and sent it over to
2 billing; right?
3     A.  That's correct.
4     Q.  And then the lady in billing, was she
5 the one that submitted it to Medicaid?
6     A.  Yes.
7     Q.  So was it her job to just check it
8 and make sure it had the right signatures on
9 it and --
10     A.  No.
11     Q.  -- and then to send it off?
12     A.  No.
13     Q.  Okay.  So she didn't check for that?
14     A.  I don't know if she did or not.
15     Q.  All right.  So who checked for it?
16     A.  The reviewers.
17     Q.  Okay.  Who were the reviewers back at
18 this time?
19     A.  Bridgette Anderson, Lisa Hall,
20 Jennifer Clemmons might be have been one, and
21 at some point Shayna Staska was.
22     Q.  All right.  So what all did they
23 review?

Page 176

1     A.  The -- They would review the document
2 to make sure that it made sense, that the
3 amount of time that was listed is justified
4 in the intervention and response.  For
5 accuracy, did the -- did the codes match up
6 to what they -- what service they were
7 providing.
8     Q.  Uh-huh.
9     A.  Is it filled out, are the signatures
10 there, all those things.
11     Q.  Okay.  Now, Mr. Sheppard is saying
12 that Tyrone Hartley was telling him, when
13 this happens and the person leaves, and
14 there's time that should be billed --
15 Pathway, you know, is entitled to get
16 compensated for that, but there's nobody to
17 sign the signature, because they've left.
18     Mr. Sheppard is saying that Tyrone
19 was telling him, if you want to get a
20 promotion, you need to be able to go in and
21 sign that so we can submit it to Medicaid.
22 Do you understand that, that that's his
23 accusation?

Kimberly Fail

Page 177

1    A.  Yes.
2    Q.  Okay.  Have you ever asked
3  Mr. Hartley if he actually said that to
4  Mr. Sheppard?
5    A.  Yes.
6    Q.  What did he say?
7    A.  No.
8    Q.  Has there ever been any accusations
9  from anybody other than Mr. Sheppard that
10  somebody was signing these forms other than
11  the person that provided the service?
12    A.  No.
13    Q.  There's never been any other claims
14  or accusations or anything about that other
15  than what you've heard Mr. Sheppard say?
16    A.  No.
17    Q.  Was a promotion offered to
18  Mr. Sheppard?
19    A.  Not to my knowledge.
20    Q.  You were the director.  You would
21  know.
22    A.  I never signed any paperwork on a
23  promotion for Mr. Sheppard.

Page 178

1    Q.  Okay.  So -- But, I mean, was one
2  offered to him?
3    A.  Not to my knowledge.
4    Q.  Okay.  You didn't authorize a
5  promotion.  Would you have had to authorize
6  it?
7    A.  There would have been a discussion
8  about it.
9    Q.  Would you have had to authorize it?
10    A.  I would sign the paperwork on it,
11  but --
12    Q.  Who would make the decision?
13    A.  The -- Bruce Predmore and Tyrone
14  Hartley would have discussed that and
15  decided.
16    Q.  And then they would have --
17    A.  I would have supported their
18  decisions.
19    Q.  But aren't you above them in --
20    A.  I don't function that way.
21    Q.  Yeah.  So you basically delegate that
22  function to them?
23    A.  I would -- I would support their

Page 179

1  decision in that.
2    Q.  Okay.  Are you a supervisor to them?
3    A.  Yes.
4    Q.  Okay.  So you have the ultimate
5  decision.  You could say yes or no?
6    A.  I could.
7    Q.  Okay.  So was it -- was it ever
8  discussed that Rick Sheppard should have a
9  promotion?
10    A.  No.
11    Q.  What would have been the position he
12  would be next promoted to?
13    A.  Senior group leader.
14    Q.  Okay.  Now, he did review these forms
15  in some way; right?  Was he qualified to do
16  that or -- No, coached -- He trained -- I'm
17  sorry.  Let me rephrase that.
18        Was Mr. Sheppard assigned the task of
19  training other people to fill out these BLS
20  forms?
21    A.  He would have trained newer staff on
22  overall job duties in the form of like they
23  would shadow him.

Page 180

1    Q.  Uh-huh.  But didn't -- didn't he do
2  that quite often?
3    A.  We often had new -- new hires.
4    Q.  Yeah.  And so he was training people
5  frequently on how to fill out their forms?
6    A.  He was training them on their overall
7  job duties.
8    Q.  Why do you want to just say overall
9  job duties?  That's fine if it was.
10    A.  It wasn't his --
11    Q.  But I'm trying to --
12    A.  -- specific responsibility to train
13  them on basic living skills.
14    Q.  Well, isn't that like the -- one of
15  the first things I showed you way back at
16  Camp Horizon?  They were praising him for his
17  skill at filling these forms out, weren't
18  they?
19    A.  They did.
20    Q.  So you don't have a problem with
21  that, do you?
22    A.  No.
23    Q.  With him training people on those

Page 181

1  forms?
2  A.  No.
3  Q.  And wasn't he praised for being good
4  at it?
5  A.  Under Camp Horizon?
6  Q.  Yeah.
7  A.  Yes.
8  Q.  Okay.  When Ms. Grantham brought that
9  accusation to you, did you do anything about
10  that other than just call him in to talk to
11  Rick?
12  A.  No.
13  Q.  Did you call Mr. Peeples and tell him
14  at that point?
15  A.  I don't believe at that point, no.
16  Q.  Did you tell anyone else that
17  Ms. Grantham had told you that?
18  A.  I discussed it with Beth Aaron.
19  Q.  What was her position at that time?
20  A.  Human resources.
21  Q.  What did she say about it?
22  A.  I don't remember the specific
23  conversation.  I just remember we discussed

Page 182

1  that we were going to meet with him.
2        (Plaintiff's Exhibit 28 was
3        marked for identification, and
4        a copy thereof is attached
5        hereto.)
6  Q.  (BY MR. SATTERWHITE) All right.  I'm
7  going to show you what we marked as 28.  Is
8  this an e-mail that you were sending out in
9  March?
10  A.  I didn't send this e-mail.  Oh, or
11  the initial one, or what are you asking?
12  Q.  Yeah, the -- one on top.
13  A.  Yes, this is from March.
14  Q.  Yeah, March 14?
15  MR. O'REAR:  2017.
16  MR. SATTERWHITE:  Yeah.  2017.
17  Q.  (BY MR. SATTERWHITE) So this was sort
18  of a little problem that Rick was having here
19  when leaving a vehicle running.  And it looks
20  like Misti had told Rick that he needed to
21  not do this.  Bruce then sent it to you.  And
22  then you said:  (Reading.)
23        This has happened before with

Page 183

1        him.  He knows better.
2  A.  Correct.
3  Q.  Okay.  Was that documented in his
4  personnel file that this had happened before?
5  A.  I believe it was under Camp Horizon.
6  Q.  Is there some -- Were you frustrated
7  with him at this point?
8  A.  No.
9  Q.  This seems a -- a little, you know,
10  like you're agitated with him here.
11  A.  It just says it's happened before.
12        (Plaintiff's Exhibit 29 was
13        marked for identification, and
14        a copy thereof is attached
15        hereto.)
16  Q.  (BY MR. SATTERWHITE) All right.  I'm
17  going to show you what we've marked as
18  Exhibit 29.
19  MR. SATTERWHITE:  Let me ask you, do
20  y'all need to take a break or anything, or do
21  y'all to take a quick lunch break or --
22  MR. O'REAR:  So -- so what's your
23  plan on -- You finish with her --

Page 184

1  MR. SATTERWHITE:  My plan is --
2  MR. O'REAR:  -- and then start the
3  30(b)(6) deposition, which that one is
4  scheduled at 1:00?
5  MR. SATTERWHITE:  Yeah.  I -- I don't
6  really have a set plan, so we can power
7  through.  I probably have about another hour
8  for this.  So then we can stop and eat lunch.
9  MR. O'REAR:  Yeah, if we're going to
10  have another hour, let's -- let's take a
11  break.
12  MR. SATTERWHITE:  Now or --
13  MR. O'REAR:  Not in an hour.
14  MR. WILLIAMS:  Yeah.
15  MR. SATTERWHITE:  In an hour or now?
16  MR. WILLIAMS:  Now.
17  MR. SATTERWHITE:  Yeah.  Now?  Okay.
18  Yeah, fine.  That's fine.
19  MR. O'REAR:  I think that'd be a
20  little long to go.
21  THE VIDEOGRAPHER:  We're off the --
22  MR. SATTERWHITE:  Yeah.
23  THE VIDEOGRAPHER:  We're off the

Kimberly Fail

Page 185

1  record at 12:15 p.m.
2
3  (The deposition of KIMBERLY FAIL was recessed
4       at 12:15 p.m.)
5  (The deposition of KIMBERLY FAIL resumed at
6       1:36 p.m.)
7
8       THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 1:36 p.m.
10  Q.  (BY MR. SATTERWHITE) Okay.  Ms. Fail,
11  I wanted to ask you, Pathway of Baldwin
12  County took over Camp Horizon on about
13  September 1, 2016.  And what position were
14  you in right when that transition occurred?
15  A.  When we transitioned over to Pathway
16  of Baldwin County?
17  Q.  Right.
18  A.  Director.
19  Q.  Okay.  Does that mean the same
20  position you're in now?
21  A.  Yes.
22  Q.  Executive director?
23  A.  Yes.

Page 186

1  Q.  Okay.  Do you know, were there any
2  disciplinary problems with Mr. Sheppard in
3  the first, say, 30 days of that transition?
4  A.  I don't recall any offhand.
5  Q.  So were there any in October?
6  A.  Not that I recall.
7  Q.  Were there any in November?
8  A.  Not that I recall.
9  Q.  Were there any in December?
10  A.  Not that I recall.
11  Q.  So then we move into 2017.  In
12  January of 2017, were there any disciplinary
13  problems with Mr. Sheppard?
14  A.  There -- there was a conversation,
15  and I don't remember if this was in January,
16  but you're going month by month, and I don't
17  want to miss.  I know that he had some issues
18  with documentation that Ms. Aaron addressed.
19  Q.  Okay.  What about in February?
20  A.  Not that I recall specifically, no.
21  Q.  So there were no disciplinary
22  problems with Mr. Sheppard as far as you can
23  recall in February of 2017; is that right?

Page 187

1  A.  Not that I recall.
2  Q.  Okay.  So the disciplinary problems
3  and write-ups with Mr. Sheppard all occurred
4  in March and April of 2017; correct?
5  A.  Correct.
6  Q.  All right.  I'm going to show you
7  what we're going to mark as Plaintiff's
8  Exhibit 29.
9  A.  I have 29.
10  Q.  Oh, good.  I lost it.  I was trying
11  to find it.  Good.  All right.  So can you
12  identify what that document is?
13  A.  This is a disciplinary report.
14  Q.  Okay.  Now, this is on Mr. Sheppard?
15  A.  Correct.
16  Q.  And it says, several residents --
17  well, let's back up.  So was this -- well,
18  this was signed by Tyrone Hartley on
19  March 29?
20  A.  Correct.
21  Q.  And that's also Rick's signature --
22  A.  Correct.
23  Q.  -- on the same day?

Page 188

1  A.  Yes.
2  Q.  And then is this -- Rick wrote
3  refused down here?
4  A.  Yes.
5  Q.  Okay.  And so this was something that
6  was submitted to Rick on the -- March 29?
7  A.  Yes.
8  Q.  Okay.  How does that happen?  Do you
9  call him to the office and give it to him and
10  go over it with him, or how does that work?
11  A.  Mr. Hartley would have, yes.
12  Q.  You didn't do that?
13  A.  I addressed the situation and
14  concerns with him, yes, but Mr. Hartley did
15  the disciplinary action with him.
16  Q.  So were you in the meeting?
17  A.  No, not for this.
18  Q.  Okay.  So what would have happened
19  here?  Mr. Hartley would have determined that
20  he needed to do this and then wrote this up
21  and then called Mr. Sheppard in and presented
22  it to him?
23  A.  Right.  Mr. Hartley with Ms. Aaron

Kimberly Fail

Page 189

1  would have put the disciplinary together.
2     Q.  Okay.  As far as you know, is that
3  what happened on this one?
4     A.  As far as I know.
5     Q.  And then -- So you weren't in that
6  meeting?
7     A.  Where he presented it to
8  Mr. Sheppard?
9     Q.  Right.
10    A.  No.
11    Q.  And did you address this particular
12  issue later?
13    A.  I just -- I believe I discussed it
14  with him.
15    Q.  All right.  So up at the top, it
16  says: (Reading.)
17        Several residents reported
18        Mr. Rick made some inappropriate
19        comments.
20    And then it goes into how he was
21  describing a rap song, and then it goes into
22  personnel actions taken, and then it says:
23  (Reading.)

Page 190

1        Rick is placed on a 60-day
2        development plan.
3     So is this the normal course and pursuant
4  to the policies of Pathway of Baldwin County?
5     A.  To address performance issues?
6     Q.  Right.  Just to go and -- and prepare
7  this form in this manner with -- with these
8  sections --
9     A.  Yes.
10    Q.  -- right there?  Okay.  And then to
11  implement a -- a development plan, I guess?
12    A.  Well, the development plan would
13  depend on the situation.
14    Q.  Right.  So what are -- what are the
15  steps?  Without reference to Mr. Sheppard,
16  what are the steps that a supervisor should
17  take when filling out a staff incident
18  report?
19    A.  What do you mean?
20    Q.  I mean, do you have to fill this
21  whole thing out or, I mean, do you have to
22  give him a 60-day development plan?  Could it
23  be a 30-day development plan or what is the

Page 191

1  policy?
2     A.  You -- you have to address whatever
3  the -- the issues are.  If there are a number
4  of issues, that person might need to be put
5  on a development plan.
6     Q.  What does that mean, a development
7  plan?
8     A.  It would be a -- a plan for the
9  employee to know like here's areas that I
10  need to improve in order to maintain my
11  employment.
12    Q.  Is there any set procedures as far as
13  when you put somebody on a development plan
14  or not?
15    A.  We would just consult with HR and
16  discuss whether or not that's appropriate for
17  the situation.
18    Q.  So is there any policy that -- that
19  the supervisor is supposed to follow such as
20  having a -- maybe an oral consultation with
21  an employee, and if the problem continues, to
22  maybe then have a meeting?  And if that's the
23  problem, maybe continue to -- If the problem

Page 192

1  continues, maybe, you know, you have a
2  written sit-down counseling session, and --
3  and eventually warning or suspension or
4  termination?  Is there any policies about
5  following that type of a course with the
6  employee?
7     A.  We -- we follow progressive
8  discipline.  So that is what would be
9  followed is progressive discipline.
10    Q.  Okay.  Something similar to what I
11  just described?
12    A.  Well, I don't remember every step you
13  said, but we would -- we would address --
14    Q.  I said similar to it.  The -- I think
15  I described progressive discipline.
16    A.  I don't remember all the steps you
17  said.  In general, we would address the
18  issues through -- through progressive
19  discipline.
20        So a person wouldn't just
21  automatically be terminated.  It would be
22  they're given information on what they need
23  to improve, and if they don't improve, then

Kimberly Fail

Page 193

1 they could -- they could be terminated.
2    Q.  Okay.  Is that in the written
3 policies, that progressive discipline?
4    A.  I believe so.
5    Q.  So how does the developmental plan
6 fit into that?
7    A.  It's -- it's a part of the
8 progressive discipline in this situation.
9    Q.  So the next step after the 60-day
10 plan would be termination?
11    A.  Could be if the -- if the plan is not
12 followed.
13    Q.  Okay.  You wouldn't have to have a
14 suspension in between there?
15    A.  No, not necessarily.
16    Q.  Okay.  So when residents make reports
17 like this, are the supervisors to just
18 automatically believe what the residents say
19 about -- about a group leader?
20    A.  What is typical is they would
21 interview the clients and anyone else that
22 would have been around, if there were any
23 other staff members or anything like that.

Page 194

1 And then we would go from there, depending on
2 what is said.
3    Q.  What happens when there's a dispute
4 between the residents and the group leader
5 over what occurred?
6    A.  It really depends on the situation,
7 but if a number -- In -- in my experience, if
8 a number of the clients have the same story,
9 there's some validity to that.
10    Q.  Uh-huh.
11        (Plaintiff's Exhibit 30 was
12        marked for identification, and
13        a copy thereof is attached
14        hereto.)
15    Q.  (BY MR. SATTERWHITE) Okay.  I'm going
16 to show you what we've marked as Exhibit 30.
17 Do you recognize that document?
18    A.  Yes.
19    Q.  What is that document?
20    A.  It was in the exhibits for
21 Mr. Sheppard's deposition.
22    Q.  Yes, but what is it?
23    A.  It looks like a letter.

Page 195

1    Q.  Have you seen it before?
2    A.  Not prior to reviewing the exhibits
3 to the deposition.
4    Q.  So this is something that he
5 Mr. Sheppard is claiming that he submitted to
6 Pathway to explain criticisms of him, but you
7 don't recall ever having seen this?
8    A.  No.
9    Q.  So this wasn't considered, was it, in
10 the -- the -- the 60-day development plan?
11    A.  What do you mean?
12    Q.  Well, the -- the performance
13 improvement plan was created, but I'm asking
14 you, was Mr. Sheppard's side of the problem,
15 which is explained here in this Exhibit 30,
16 taken into consideration in developing the
17 performance improvement plan?
18    A.  I don't think we received this prior
19 to.  Mr. Hartley had a discussion with
20 Mr. Sheppard.
21    Q.  Okay.  So this is not in his
22 personnel file?
23    A.  Not that I recall.

Page 196

1    Q.  Okay.  But this was -- You would
2 consider this to be an adverse employment
3 action in his file?
4    A.  The -- the --
5        MR. O'REAR:  Excuse me.
6    A.  -- staff incident?
7        MR. O'REAR:  I'm sorry.  Let me
8 object.  I think that's confusing or
9 misleading.  It's -- When you say adverse
10 employment action, it's a letter purportedly
11 by him.
12        MR. SATTERWHITE:  No, no, no.  I'm --
13 I'm sorry.  I'm referring back to the
14 actual --
15        MR. O'REAR:  Oh, you're referring to
16 29.
17        MR. SATTERWHITE:  29.
18        MR. O'REAR:  Okay.  I thought you
19 were --
20        MR. SATTERWHITE:  Yeah.
21        MR. O'REAR:  -- referring to 30.
22        MR. SATTERWHITE:  No.  My apologies.
23    Q.  (BY MR. SATTERWHITE) So I'm referring

Kimberly Fail

Page 197

1  to Exhibit 29.  This is an adverse employment
2  action against Mr. Sheppard; right?
3      A.  It's a disciplinary report, yes.
4          (Plaintiff's Exhibit 31 was
5          marked for identification, and
6          a copy thereof is attached
7          hereto.)
8      Q.  (BY MR. SATTERWHITE) Okay.  Oh,
9  shoot.  Okay.  Let me show you Exhibit 31.
10  Do you recognize this document?
11      A.  Yes.
12      Q.  Okay.  And what is this?
13      A.  This is a disciplinary report.
14      Q.  Is this in Mr. Sheppard's personnel
15  file?
16      A.  I believe so.
17      Q.  And is this considered an adverse
18  employment action for him?
19      A.  Yes.
20      Q.  Okay.  Why isn't it signed by anyone?
21      A.  I don't know.
22      Q.  Why isn't it dated?
23      A.  I don't know.

Page 198

1      Q.  Okay.  It says:  (Reading.)
2          Rick reportedly gave four
3          resident -- gave a resident four
4          dots for one incident.
5      Who's making this accusation?
6      A.  From what I recall about the
7  incident, a -- a client alleged this, and it
8  was verified in our -- our doc system.
9      Q.  But Mr. Sheppard, has he ever, as far
10  as you know, acknowledged that this happened
11  or -- I mean, how -- how does this affect his
12  performance plan that he was on there?
13      A.  I -- I don't remember what he
14  reported about this specific situation.  I
15  know we discussed it.
16      Q.  Okay.  But you don't remember what
17  was said?
18      A.  Not -- not the specifics.
19      MR. SATTERWHITE:  What number was
20  that?
21      THE COURT REPORTER:  31.  You will be
22  32 next.
23      (Plaintiff's Exhibit 32 was

Page 199

1          marked for identification, and
2          a copy thereof is attached
3          hereto.)
4      Q.  (BY MR. SATTERWHITE) Let me show you
5  what we've marked as Exhibit 32.  Do you
6  recognize this document?
7      A.  Yes.
8      Q.  Is this in Mr. Sheppard's personnel
9  file?
10      A.  Yes.
11      Q.  Okay.  And this is his response to
12  the discipline that he received back on
13  March 29; is that right?
14      A.  Right.
15      Q.  Okay.  And I believe his explanation
16  here, if I could just summarize it, is he was
17  trying to counsel with the residents about
18  some of these rap videos that are vulgar and
19  have cursing in them, and, in doing so, he
20  was rather explicit in how he described
21  those, but he -- he felt like he had to do
22  that in order to get the point cross.  Do you
23  have a problem with that?

Page 200

1      A.  I think the issue would be that it --
2  Doing that on your own without some support
3  and pairing someone into that can escalate
4  the clients, and they were upset about the
5  situation.
6      Q.  So they were -- the -- the clients
7  were upset, you said?
8      A.  Yes.
9      Q.  How did you know that?
10      A.  They wrote a grievance.
11      Q.  All right.  What did it say?
12      A.  I don't remember exactly.  They wrote
13  a grievance about the -- the whole
14  discussion.
15      Q.  So did -- did Pathway of Baldwin
16  County produce that grievance to us?
17      A.  I -- I don't know.
18      Q.  Was it more than one?
19      A.  I don't remember.
20      Q.  I don't believe Pathway did produce
21  that.  Was there a -- a written grievance
22  about Exhibit 31, the docs?
23      A.  I believe there was, or it -- either

Page 201

1   it was reported to a supervisor, because that
2   would happen often as well if a client had a
3   concern.
4       Q.  But I'm asking you was there a
5   written --
6       A.  I don't remember --
7       Q.  Let me --
8       A.  -- if there was a --
9       Q.  Let me finish.
10      A.  I'm sorry.
11      Q.  Was there a written grievance
12  submitted by a resident for Exhibit 31?
13      A.  I don't remember.
14      Q.  Did you look for that?  Did you try
15  to find it in order to produce it?
16      A.  Recently?  I mean --
17      Q.  Yes.
18      A.  -- we would have looked for
19  grievances relating to this situation.
20      Q.  So you -- you did look for it?
21      A.  Not specifically, but we looked for
22  grievances.  When you talk about the -- the
23  other disciplinary action that referenced

Page 202

1   grievances, yes, we looked for grievances.
2       Q.  All right.  Let's go back again to
3   this first one.  Is there a written
4   grievance?
5           MR. O'REAR:  Which one are you
6   referring to?
7           MR. SATTERWHITE:  Exhibit 29.
8       Q.  (BY MR. SATTERWHITE) Okay.  So that's
9   the same one.  That's the same incident that
10  we're talking about the rap song.  But there
11  was some written grievances, according to
12  you, that were in Pathway of Baldwin County's
13  files and -- Correct?
14      A.  Yes.
15      Q.  But -- And you don't know whether
16  they've been produced to us or not?
17      A.  I don't know if they still exist.
18  These are not things that are kept in the
19  client's file or in the staff's file.
20      Q.  Why wouldn't you keep a written
21  grievance against a staff member in that
22  staff member's file, especially if you
23  thought it was credible?

Page 203

1       A.  They have client information on them
2   that cannot be kept in a -- the staff's file.
3       Q.  So that can be redacted?
4       A.  This wasn't our process.
5           (Plaintiff's Exhibit 33 was
6           marked for identification, and
7           a copy thereof is attached
8           hereto.)
9       Q.  (BY MR. SATTERWHITE) Okay.  I'm going
10  to show you what we're -- we've marked as
11  Exhibit 33.  Is this an e-mail chain here
12  involving you and Mr. Predmore?
13      A.  Yes.
14      Q.  And this is regarding to a certain
15  extent Rick?
16      A.  Yes.
17      Q.  So this is on March 28 at the bottom?
18      A.  Correct.
19      Q.  You're talking about getting Tyrone
20  to have a session with Rick about these two
21  write-ups that you have?
22      A.  Correct.
23          (Plaintiff's Exhibit 34 was

Page 204

1           marked for identification, and
2           a copy thereof is attached
3           hereto.)
4       Q.  (BY MR. SATTERWHITE) Okay.  I'm going
5   to show you what we've marked as Plaintiff's
6   Exhibit 34.  Do you recognize this?
7       A.  Yes.
8       Q.  Okay.  This is an e-mail with you and
9   Beth and Tyrone and a few other folks.  It
10  says in the middle there -- Bruce Predmore is
11  saying: (Reading.)
12          As we anticipated, Tremaine is
13          not working after Thursday
14          night.  Misti and I developed a
15          coverage plan for nights through
16          the weekend.  Also we developed
17          a coverage plan in case Rick is
18          unable to work.
19      Why was he assuming that Rick might be
20  unable to work?
21      A.  I don't remember.  I think that he
22  went to the doctor at some point in time
23  during some of this.

Kimberly Fail

---

Page 205

1      (Plaintiff's Exhibit 35 was
2      marked for identification, and
3      a copy thereof is attached
4      hereto.)
5      Q.  (BY MR. SATTERWHITE) Okay.  I'm going
6  to show you Exhibit 35.  Is this an e-mail
7  from you to Rick saying that you wanted to
8  meet him at four o'clock on -- on Thursday,
9  March 30?
10     A.  Yes.
11     Q.  Okay.  And this was sent to him on
12  Wednesday, March 29?
13     A.  Yes.
14     Q.  What was the purpose of setting up
15  that meeting?
16     A.  Well, I don't -- Actually, I don't
17  think this was to meet.  I'm not sure if this
18  was to meet with him the next day or that
19  same day.
20     Q.  Oh, okay.  I'm sorry.
21     A.  It just says:  (Reading.)
22         Please plan to meet with myself
23         and Beth at 4:00 as a followup

---

Page 206

1         to our conversation yesterday.
2      Q.  Okay.  Got you.  What was the purpose
3  of that meeting?
4      A.  To -- to follow up on the previous
5  day's meeting.
6      Q.  And what occurred at the previous
7  day's meeting?
8      A.  We discussed the report that he --
9  Well, I discussed my conversation with the
10  supervisor of the TCMs with him.
11     Q.  So, okay, let's go through that.  You
12  received a report from Ms. Grantham.  Did she
13  put that in any kind of writing or e-mail?
14     A.  No.
15     Q.  Was there any documentation of that
16  at all?
17     A.  No.
18     Q.  Did you document it at all within the
19  records of Pathway of Baldwin County at that
20  time?
21     A.  No.
22     Q.  Okay.  Did you report it to
23  Mr. Peeples in an e-mail?

---

Page 207

1      A.  I know I sent him an e-mail after
2  meeting with Rick.
3      Q.  Okay.  Did you call him after
4  Ms. Grantham made that accusation and tell
5  him what she was saying?
6          MR. O'REAR:  Call who?
7          MR. SATTERWHITE:  Mr. Peeples.
8      A.  I don't remember specifically.  I
9  could have.
10     Q.  Okay.  As far as documentation goes,
11  this report that Rick had said this to the
12  TCM case manager, was there any
13  documentation?  After you learned of that,
14  was there any documentation created between
15  when you learned of it and when Mr. Sheppard
16  was terminated?
17     A.  What do you mean?
18     Q.  Like a memo, a report, anything other
19  than just e-mails going back and forth that
20  we've got and we're going to talk about.  Was
21  there any kind of memo or report --
22     A.  No.
23     Q.  -- letter to the State, anything like

---

Page 208

1  that?
2      A.  No.
3      Q.  After Ms. Grantham told you that, did
4  anyone else from the State contact Pathway --
5      A.  No.
6      Q.  -- about that particular report?
7      A.  No.
8      Q.  Did Pathway start some type of an
9  investigation of this report from
10  Ms. Grantham to determine whether it's true
11  or not?
12     A.  I spoke to Rick.
13     Q.  Okay.  Other than that, was there an
14  investigation that was started to get to the
15  bottom of this?
16     A.  I didn't know what -- what to even
17  look for, which is why I talked to Rick.
18  Because the report was just that he said he
19  was passed up for a promotion because he
20  wouldn't do something that was fraudulent.
21  So I needed to know what that was to even
22  address it.  I had no knowledge of what that
23  was.

---

Kimberly Fail

Page 209

1   Q. Did you ask Tyrone Hartley if it was
2   true?
3   A. What was true? I didn't --
4   Q. That -- that -- Yeah, I thought you
5   said -- Well, I'll back up. So the
6   allegation that Ms. Grantham gave you was
7   that Mr. Sheppard said that he was passed
8   over for a promotion because he wouldn't, I
9   guess, cooperate with some kind of fraud.
10  Does that -- does that sum it up?
11      MR. O'REAR:  I --
12  Q. (BY MR. SATTERWHITE) All right.
13  Well, you tell me then. You tell me.
14      MR. O'REAR:  I object. That
15  mischaracterized her testimony.
16  Q. (BY MR. SATTERWHITE) Yeah. You need
17  to go ahead and tell me what it was then.
18  A. She said that Mr. Sheppard spoke to a
19  TCM and said he was passed up for a promotion
20  because he wouldn't do something that was
21  fraudulent.
22  Q. Okay. And so who was Mr. Sheppard's
23  immediate supervisor?

Page 210

1   A. It would have either been Misti Dean
2   or I -- I want to say Jessica Scott.
3   Q. Did you ask either one of them?
4   A. I didn't know what information to ask
5   them. There was no discussion about
6   Mr. Sheppard being promoted, so I was not
7   aware that there was a promotion. So it was
8   odd that he would say he was passed over for
9   a promotion.
10  Q. But they would have been the ones --
11  Were they to be given a promotion, they would
12  have been the ones to decide that?
13  A. There would have been conversations
14  among all of the supervisors, and they would
15  then have presented it like to me, hey, are
16  you okay with this?
17  Q. Uh-huh. So if you're going to
18  investigate what happened, since it's so
19  confusing, wouldn't you go to the people who
20  would have been in charge of giving him a
21  promotion to ask them? Doesn't that make
22  sense?
23  A. I needed to know what information I

Page 211

1   needed to look for, and I didn't have that
2   information.
3   Q. So based on the information that you
4   had, you decided to not do anything else to
5   investigate it other than ask him?
6   A. I didn't have enough information to
7   look at anything. I asked Mr. Sheppard for
8   information --
9   Q. You could have asked --
10  A. -- so that I could know what to
11  look -- what -- what to even look into.
12  Q. Okay. So you asked him. Did you do
13  anything else to investigate that?
14  A. Investigate what? I didn't have any
15  other information.
16      (Plaintiff's Exhibit 36 was
17      marked for identification, and
18      a copy thereof is attached
19      hereto.)
20  Q. (BY MR. SATTERWHITE) Okay. I'm going
21  to show you what we marked as Exhibit 36.
22  Okay. So do you recognize this e-mail chain?
23  A. Yes.

Page 212

1       MR. O'REAR:  Slow down. Let me see
2   if I can find that.
3       MR. SATTERWHITE:  Yes.
4       MR. O'REAR:  Is that --
5       MR. SATTERWHITE:  Pathway production
6   0143 and 0144.
7       MR. O'REAR:  I'm sorry. Could you --
8   I'm looking at your stack of exhibits there.
9   Is it down the way?
10      MR. SATTERWHITE:  It should be right
11  in this line of this stuff is going down.
12      MR. O'REAR:  I've got it.
13      MR. SATTERWHITE:  Okay. All right.
14      MR. O'REAR:  Sorry.
15  Q. (BY MR. SATTERWHITE) So is this --
16  Was e-mail exchanges going on right about
17  this time that we're talking about; right?
18  A. Right.
19  Q. It starts out with one with you
20  contacting Mr. Peeples; is that right?
21  A. Correct.
22  Q. Okay. All right. So you say:
23  (Reading.)

Kimberly Fail

Page 213

1    I just met with Rick regarding
2    the report to targeted case
3    manages of Medicaid fraud.
4    So this is March 28 at 4:47 p.m.; right?
5    A.  Correct.
6    Q.  So we can say that you knew about an
7    allegation of Medicaid fraud on March 28 at
8    4:47 p.m.?
9    A.  I knew that Mr. Sheppard had reported
10   to a TCM that he was passed over for a
11   promotion for refusing to do something that
12   he considered fraudulent.
13   Q.  Right.  But you don't know when you
14   got that report?
15   A.  I'm sorry?
16   Q.  You don't know when you got that
17   report from Ms. Grantham?
18   A.  It -- it was right around that time.
19   Q.  Right around this time, but it would
20   have been before March 28 at -- at 4:47 p.m.?
21   A.  Correct.
22   Q.  Okay.  So before you sent this, had
23   you discussed this with anyone else?

Page 214

1    A.  I think I called Joe after I meet
2    with Lucia, but I'm not 100 percent sure.
3    Q.  Okay.  So you say:  (Reading.)
4    I just met with Rick regarding
5    the report to targeted case
6    managers of Medicaid fraud.  I
7    explained to him the importance
8    of addressing these concerns
9    with myself or you in order for
10   us to deal with them.  When the
11   conversation was started, he was
12   very defensive, did not hear me
13   out, and refused to participate
14   in the conversations stating due
15   to the seriousness of the
16   situation, I feel like it is in
17   my best interest to not have
18   this discussion.  I told him I
19   needed to understand what has
20   occurred that he feels is
21   fraudulent, and he stated, I
22   guess I don't know what Medicaid
23   fraud is.  I'm not sure where we

Page 215

1    go from here since he refuses to
2    even talk about the issue.  I
3    feel like at minimum this is
4    insubordination, but the bigger
5    issue for me right now is do --
6    I do not trust him.  Is this a
7    situation we can terminate him
8    for?  He is a liability.  He has
9    also spoken with support staff
10   that read BLS stating he will
11   meet and tell from them possibly
12   for some other report.
13   All right.  So at this point, you were
14   considering terminating Mr. Sheppard because
15   of his refusal to say anything about that
16   report you got from Ms. Grantham; isn't that
17   right?
18   A.  There were a number of issues around
19   that time.  I asked if this is something that
20   we could terminate for or should terminate
21   for.
22   Q.  So I'm asking you if you were
23   considering terminating him as a result of

Page 216

1    him refusing to tell you anything about what
2    Ms. Grantham had reported?
3    A.  I did not consider terminating him
4    just for that situation.  I asked if that is
5    something we should terminate for.
6    Q.  So if you asked about it, that means
7    you were considering it?
8    A.  I would have to ask Joe something
9    like that.  This is -- You know, I would have
10   to ask him something like that.
11   Q.  If he was told by a Medicaid
12   investigator to not say anything to anybody
13   about the investigation, would you still
14   consider that insubordinate to not tell you
15   about it?
16   A.  I had no --
17      MR. O'REAR:  Object.
18   A.  -- knowledge --
19      MR. O'REAR:  Wait, wait.  Let me
20   object to the -- that question.  Improper
21   predicate.
22   A.  I had no knowledge of that.
23   Q.  Well, I -- I know you didn't, and I'm

Kimberly Fail

Page 217

1  not trying to say you did, but if you'd have
2  known that, would you have considered him to
3  be insubordinate?
4      A.  I -- I don't know.
5      Q.  Okay.
6      A.  I consider it insubordinate to not
7  answer questions.
8      Q.  Okay.  But you consider it
9  insubordinate when you've been told by law
10  enforcement to not talk about the
11  investigation?
12      MR. O'REAR:  Objection.  No predicate
13  for that.  Improper predicate.
14      A.  I had no knowledge of any of that.
15      Q.  Yeah.  I didn't ask you that.  But
16  you said you consider it insubordinate to not
17  answer questions.  So my followup to that
18  was:  Does that mean you consider it
19  insubordinate to not answer questions when
20  the Alabama Medicaid Agency investigator told
21  Rick not to say anything?
22      MR. O'REAR:  Objection.  How --
23  improper predicate.  You're asking her about

Page 218

1  something she said she doesn't know.
2      Q.  (BY MR. SATTERWHITE) I -- I can ask
3  you the question, because you're the one that
4  said you consider it insubordinate to not
5  answer questions.  I'm just asking you to
6  elaborate on that.
7      A.  I based this on the fact that I was
8  trying to understand what he was saying was
9  occurring so that I could address whatever it
10  was, because I didn't want anything
11  fraudulent to be occurring.
12      But I didn't -- He -- he would not
13  tell me what -- He wouldn't tell me anything.
14  So I considered that insubordinate to not
15  answer direct questions and to not answer
16  questions pertaining to something that maybe
17  should be investigated.  I could not get the
18  information that I needed to -- to proceed
19  with any of that.
20      Q.  Uh-huh.  Well, assume that the
21  investigator told Mr. Sheppard not to say
22  anything about the investigation, and that's
23  the reason why he didn't tell you about it.

Page 219

1  Under that scenario, would you still consider
2  him insubordinate?
3      MR. O'REAR:  Same objection, same
4  objection.  Improper predicate and, you know,
5  based on matters not in evidence.
6      A.  I didn't -- I didn't ask him about an
7  investigation.  I didn't know an
8  investigation existed.  I asked him simple
9  questions about what was occurring.
10      Q.  I know, but I'm asking you as you sit
11  here today.  I'm not asking you about then.
12  Now you know that he is saying that the
13  investigator told him not to talk about it.
14  You may believe that, you may not.  It'll be
15  proven out in court.
16      But what I'm asking you, as you sit
17  here today, if you assume that the
18  investigator did tell him not to talk about
19  it, would you -- do you still consider that
20  to be insubordinate for him to follow the
21  investigator's warning --
22      MR. O'REAR:  Objection.
23      Q.  (BY MR. SATTERWHITE) -- and not say

Page 220

1  anything?
2      MR. O'REAR:  Same objection.  But in
3  addition, I think she's already answered that
4  fairly.
5      A.  I don't know.  I don't know what
6  authority the investigator has.  I don't
7  know.
8      Q.  Okay.  That's fair enough if you
9  don't know.  Okay.  So next we get into --
10  When you called Rick in there, who -- who all
11  was in the meeting?
12      A.  Myself and Beth Aaron.
13      Q.  Okay.
14      A.  Which meeting are you referring to,
15  the first meeting?
16      Q.  Yeah, the one that precipitated this
17  e-mail to Joe.
18      A.  Okay.
19      Q.  All right.  Did you tell Rick at that
20  time that he had stirred up a hornet's nest?
21      A.  No.
22      Q.  Did Beth say that to him?
23      A.  No.

Kimberly Fail

Page 221

1    Q.  Did you tell Rick that Pathway is now
2  under investigation?
3    A.  No.
4    Q.  Did Beth tell him that?
5    A.  No.
6    Q.  What all did Beth say to him in that
7  meeting?
8    A.  There's -- It's -- It was a long list
9  of things.  You have a summary of it.
10    Q.  A long list of things that Beth said?
11  Oh, in that whole narrative?
12    A.  Uh-huh.
13    Q.  Okay.
14      THE COURT REPORTER:  Yes?
15    A.  Yes.  I'm sorry.
16    Q.  So you've seen that narrative.  Do
17  you -- do you agree with what Beth was saying
18  in the narrative --
19    A.  Yes.
20    Q.  -- about how she reported what
21  happened?
22    A.  Say that again, about how she --
23    Q.  That's Beth narrative, so that's her

Page 222

1  reporting what happened.  And you -- you've
2  read it, and you agree with what she's saying
3  happened?
4    A.  Yes.
5    Q.  Okay, okay.  Now, the next part of
6  this, on March 28, 5:06, Joe responded:
7  (Reading.)
8        I would not place him on the
9        work schedule until he is able
10        to sit down and discuss the
11        situation.  Make sure you have a
12        witness.
13    So y'all were pulling him off the work
14  schedule?
15    A.  Yes.
16    Q.  And so he wouldn't be able to work,
17  and he wouldn't be able to earn; is that
18  right?
19    A.  I wanted him to have a discussion
20  about what he was saying occurred.
21    Q.  I'm not asking about that.  I'm
22  asking about what does it mean to place
23  somebody on the work schedule or to remove

Page 223

1  them.  So if you remove them from the
2  schedule, they cannot work, and they cannot
3  get paid?
4    A.  Until a conversation occurred.
5    Q.  Okay.  So you were not going to allow
6  him to work and get paid until he told you
7  what he knew about what Ms. Grantham had
8  reported to you?
9    A.  Yes.
10    Q.  Do you consider that to be an adverse
11  employment action --
12    A.  No.
13    Q.  -- to not let somebody work?  You
14  don't think that's an adversus employment
15  action?  That's basically a suspension, is it
16  not?
17      MR. O'REAR:  That's argumentative.
18  Objection.
19    Q.  (BY MR. SATTERWHITE) Is that a
20  suspension?
21    A.  No.
22    Q.  So they can't come to work, and they
23  can't earn, but it's not a suspension?

Page 224

1    A.  All I -- all I asked was for him to
2  have a conversation, and he could work.
3    Q.  Yeah.  I'm asking you about a
4  suspension.
5    A.  It was not a suspension.
6    Q.  So he could not come to work until he
7  complied with your instruction, so he
8  couldn't come to work.  He wasn't going to be
9  placed on the schedule.  How was that
10  different from a suspension?
11    A.  There was no written suspension in
12  his personnel file.
13    Q.  Is that the only difference?
14    A.  All he had to do was have a
15  conversation.
16    Q.  Is that the only difference between a
17  suspension and being pulled from the work
18  schedule is that when you're suspended, it's
19  a write-up in your file?
20    A.  Yes.
21    Q.  Okay, okay.  So next thing that
22  happens in this e-mail chain is that you said
23  that Beth was present.  Because Mr. Peeples

Kimberly Fail

Page 225

1  was talking about having a witness there, so
2  you told him Beth was present, and you would
3  meet with him again?
4     A. Correct.
5     Q. So okay. Then a few minutes later --
6     A. That's the next day.
7     Q. Okay. The next day. So you did meet
8  with him again?
9     A. Correct.
10    Q. Okay. So did you call and ask him to
11  come in and talk about this?
12    A. I think he was on the schedule on
13  March 29. I'm not 100 percent sure, but I
14  didn't call him in for that meeting, I don't
15  believe.
16    Q. Well, Joe just told you to pull him
17  off the schedule?
18    A. He did. And I hadn't met with Mr. --
19  Mr. Sheppard yet. I met with him the next
20  day --
21    Q. Okay.
22    A. -- for the second meeting.
23    Q. So you didn't pull him off the

Page 226

1  schedule immediately, but you were waiting
2  until after the second meeting to do that, to
3  see what happens?
4     A. The e-mail from Mr. Peeples was his
5  guidance to me after me e-mailing him about
6  the first meeting that we had with
7  Mr. Sheppard. I then met with him the next
8  day.
9     Q. Uh-huh. When did you pull him off
10  the schedule?
11    A. After meeting with him the next day.
12    Q. Okay, okay. So then tell me how that
13  meeting went.
14    A. It went.
15    Q. What happened?
16    A. We just -- we -- I tried to discuss
17  the situation with him, and he would not
18  discuss anything.
19    Q. What do you recall that he said?
20    A. There's a lot. And it's in that
21  summary. I can't remember specifics. He
22  would not say much of anything.
23    Q. Okay. Whatever's your summary --

Page 227

1     MR. O'REAR: Can you show her the
2  exhibit, or do you mind if I give her a copy?
3     MR. SATTERWHITE: I mean, if you want
4  to go -- I don't need anything more if you're
5  just --
6     MR. O'REAR: Well, I --
7     MR. SATTERWHITE: -- relying on that.
8     MR. O'REAR: I think she's saying she
9  doesn't remember everything in that summary.
10    MR. SATTERWHITE: I'm not going to
11  ask her more about it --
12    MR. O'REAR: Okay.
13    MR. SATTERWHITE: -- at least at now.
14    MR. O'REAR: I -- I -- I just
15  think --
16    MR. SATTERWHITE: I --
17    MR. O'REAR: -- it's fair to let her
18  have that document if you want to ask a lot
19  of questions about it.
20    MR. SATTERWHITE: Yeah, that's fine.
21    Q. (BY MR. SATTERWHITE) Okay. So after
22  that second meeting, then you e-mail
23  Mr. Peeples, and you told him you met with

Page 228

1  Rick. (Reading.)
2        He refused to discuss it at all.
3        I told him when he was ready to
4        discuss, to please call me. I
5        told him he would be off the
6        schedule until we had a
7        conversation. I had his keys as
8        well. As he was leaving, he
9        told Shayna he was terminated.
10    Okay. So is that all of -- Is all that
11  how -- how it happened?
12    A. Yes.
13    Q. Okay. So as a result of him not
14  telling you what he knows about what
15  Ms. Grantham had reported, he was pulled off
16  the schedule; correct?
17    A. As a result of him just simply
18  refusing to have a conversation with me at
19  all.
20    Q. And you took his keys from him?
21    A. Yes.
22    Q. What does that mean, he -- that he
23  doesn't have keys to get in and out of the

Kimberly Fail

Page 229

1  premises?
2    A. Right.
3    Q. And so this was an indefinite
4  situation? Like there was no come in
5  tomorrow, come in a week from now, let's get
6  it --
7    A. I told him to call me.
8    Q. -- resolved. So the ball --
9  According to you, the ball was in his court?
10   A. Yes.
11   Q. So if he decided he was not going to
12  ever tell you anything about that, then he
13  was not authorized to ever come back to work?
14   A. I mean, I -- I would have followed up
15  with him, but I left it with call me when
16  you're ready to discuss it.
17   Q. You would have followed up with him.
18  And if he said he still can't talk about it,
19  you would have let him come back to work?
20   A. I don't know.
21   Q. Okay. Now, it says: (Reading.)
22        As he was leaving, he told
23        Shayna he's was terminated.

Page 230

1    Did you witness that?
2    A. No.
3    Q. So why did you put it in here?
4    A. Because that's what Shayna reported
5  to me.
6    Q. Okay. How did she know about what
7  was happening?
8    A. She didn't.
9    Q. She just knows that Rick told her
10  that right after the meeting?
11   A. Yes.
12   Q. And then she told you?
13   A. Right.
14   Q. Was that just shortly after the
15  meeting, or a couple of hours later, or --
16   A. I don't remember exactly. I think
17  she came and told me as soon as he left.
18   Q. Did Beth witness Shayna telling you
19  that?
20   A. I don't remember.
21   Q. Okay, okay. So Mr. Peeples'
22  response: (Reading.)
23        Okay. It seems that he's making

Page 231

1        a big deal out of nothing.
2     And then you say: (Reading.)
3        Yes, for sure.
4     What were y'all talking about?
5    A. It seems like he's making a big deal
6  out of nothing, being unwillingly to have a
7  conversation.
8    Q. But why are you saying it's nothing?
9  It's a really big deal.
10   A. I didn't know. I just knew --
11   Q. I know. So you didn't know, so why
12  are you characterizing it as nothing?
13   A. It -- it seemed like he was making a
14  bigger deal out of the situation than was
15  necessary.
16   Q. Did he appear to be afraid to you?
17   A. No.
18   Q. He didn't?
19   A. I don't -- I don't know what he would
20  look like if he was afraid. He didn't appear
21  afraid to me.
22   Q. Was he nervous?
23   A. Not that I recall.

Page 232

1    Q. It seems like somebody would be
2  nervous about basically losing their job,
3  but --
4       MR. O'REAR: Move to strike the
5  statement.
6    Q. (BY MR. SATTERWHITE) What was his
7  demeanor in those meetings?
8    A. What I remember about the meetings is
9  that he was -- he was disrespectful and --
10  and defiant in his communication with me.
11   Q. Okay. So then you had one last --
12  according to this e-mail, we have one last
13  e-mail to Mr. Peeples. This is -- This says:
14  (Reading.)
15        There were grievances written
16        yesterday by kids that he has
17        again been discussing
18        inappropriate things with them
19        and inviting them to hang out
20        outside the program.
21   Were there written -- there -- This says
22  written grievances. So did you go look for
23  those written grievances to produce them in

Kimberly Fail

Page 233

1   this case?
2       A.  Yes.
3       Q.  Did you find them?
4       A.  No.
5       Q.  Huh.  At -- at the end of this you
6   say:  (Reading.)
7           I want to address that as well.
8           At this point, I would suspend
9           him for that, but I do not want
10          him to assume that his
11          disciplinary action is related
12          to his refusal to discuss this
13          incident.
14      Now, you just told us that his
15  disciplinary action is related to his refusal
16  to discuss the incident.  You just told us
17  that, but in this e-mail, you're trying to
18  say you didn't want him to think that's what
19  you were doing?
20      A.  I didn't say that his disciplinary
21  action was related to this.  What are -- what
22  are you -- what are you asking?
23      Q.  You just told me.  We discussed it

Page 234

1   for five minutes, the fact that he wouldn't
2   tell you about what Ms. Grantham said is the
3   reason he was put off the schedule, which I
4   consider --
5       A.  Right.
6       Q.  -- to be suspension.
7       A.  Well, we disagreed on that.
8       Q.  Yeah.  But it's still a disciplinary
9   action, is it not?
10      A.  No.
11      Q.  To take somebody off the work
12  schedule is not a disciplinary action?
13      A.  It's not a formal disciplinary
14  action.
15      Q.  Okay.  He can't work; correct?
16      A.  Until he has a conversation.
17      Q.  He can't earn; correct?
18      A.  Until he has a conversation.
19          (Plaintiff's Exhibit 37 was
20          marked for identification, and
21          a copy thereof is attached
22          hereto.)
23      Q.  (BY MR. SATTERWHITE) Okay.  All

Page 235

1   right.  We marked this as Exhibit 36.  This
2   is an e-mail from Rick.  I'm going to go
3   through a few of these.
4       MR. O'REAR:  Wait.  37.
5       MR. SATTERWHITE:  I'm sorry.
6       THE WITNESS:  Yeah.
7       THE COURT REPORTER:  It's supposed to
8   be 37.
9       Q.  (BY MR. SATTERWHITE) All right.  I'm
10  going to try to go through these quickly,
11  because they just show that e-mails were
12  going back and forth a good bit.  Okay.  Do
13  you remember this e-mail?
14      A.  Yes.
15      Q.  He says:  (Reading.)
16          I'm asking for a reason why I
17          was asked not to return to work.
18          And if I do return to work,
19          under what conditions I cannot
20          return to work.
21      Okay.  Do you remember getting this
22  e-mail?
23      A.  Yes.

Page 236

1       Q.  Did you respond to this question
2   about why he was not to return to work?
3       A.  I don't think I responded in e-mail.
4   I think I tried to call him.
5           (Plaintiff's Exhibit 38 was
6           marked for identification, and
7           a copy thereof is attached
8           hereto.)
9       Q.  (BY MR. SATTERWHITE) All right.  Did
10  you recognize this Exhibit 38?
11      A.  Yes.
12      Q.  Okay.  Did you receive this e-mail
13  from Rick?
14      A.  Yes.
15      Q.  Wait.  Let me see that second page.
16  I'm not sure it's supposed to go with it.
17  Yeah, okay.
18      So this is an e-mail exchange that
19  was going back and forth between you and Rick
20  about this time; correct?
21      A.  Yes.
22          (Plaintiff's Exhibit 39 was
23          marked for identification, and

Kimberly Fail

Page 237

1          a copy thereof is attached
2          hereto.)
3     Q.  (BY MR. SATTERWHITE) And then I'm
4  going to show you Exhibit 39.  Would the same
5  be true for that?
6     A.  They look like the same e-mails.
7     Q.  Okay.  But you received both of them,
8  I guess?
9        MR. O'REAR:  Well --
10    A.  It was just one.  This is his
11  printout, and this is my printout.
12    Q.  Is that what it is?  Okay.
13    A.  I think.
14    Q.  All right.  I just want to get them
15  in the record.  It's going back and forth.
16       MR. SATTERWHITE:  So we're on 40 now?
17       THE COURT REPORTER:  Yes.
18          (Plaintiff's Exhibit 40 was
19          marked for identification, and
20          a copy thereof is attached
21          hereto.)
22    Q.  (BY MR. SATTERWHITE) I'm going to
23  show you Exhibit 40.  Can you identify that?

Page 238

1     A.  This is a disciplinary report.
2     Q.  Okay.  Now, this is something that
3  happened, apparently, on March 10, that
4  you're -- that you're the one giving him this
5  staff and incident report.  Why wouldn't his
6  supervisor address this rather than you?
7     A.  Because I -- I think Tyrone may have
8  been present for this conversation.  I'm not
9  100 percent sure, but I know Beth was.
10    Q.  My question was, you previously told
11  me it was his immediate supervisor's job to
12  counsel with him about these things, but here
13  you doing it.  Why is it you're doing it
14  instead of Tyrone?
15    A.  I think this came to us as a result
16  of the reviewers who review documentation.
17  They are supervised at the time by Beth
18  Aaron.  So Beth Aaron and I discussed this
19  with him.
20    Q.  Okay.  What was this about?
21    A.  It was about basic living skills
22  documentation that he submitted.
23    Q.  What was wrong with it?

Page 239

1     A.  It had a number in the -- in the
2  documentation instead of a name.
3     Q.  Uh-huh.
4     A.  So it appeared to us that he was
5  using find and replace to replace the number
6  with the name --
7     Q.  Uh-huh.
8     A.  -- which was concerning.
9     Q.  Well, it was concerning, but why were
10  you concerned?  How was it concerning?
11    A.  Because the documentation didn't meet
12  standards for Medicaid.  And it -- Because
13  the -- the number 55 was in the response, it
14  appeared to me that he was using a previous
15  response that another resident had to that
16  same intervention and putting it on new
17  paperwork that he turned in.
18    Q.  So -- But you don't know what he
19  actually did, do you?
20    A.  In discussing it with him, he
21  acknowledged that he did -- he used that
22  procedure, the find and replace, and it was
23  in the intervention and response, I believe,

Page 240

1  but --
2     Q.  Uh-huh.
3     A.  -- for sure in the response section.
4     Q.  Okay.  So if he used find and
5  replace, and if whatever he wrote on the
6  progress note was accurately describing what
7  he did, then how is that a problem?
8     A.  What we explained to the staff
9  regularly was an -- an -- a response has to
10  be individualized for that child.  So we told
11  them they could not save responses.  It had
12  to be completely individualized.
13        And you're not going to know that
14  until you provide the intervention to the
15  child in order for them to respond.  And
16  because he had the intervention completely
17  written out with the 55, it appeared to be a
18  reused response.
19    Q.  Uh-huh.  But even if it was a reused
20  sentence or two, if he provided that service
21  that's described in that sentence or two,
22  then there's nothing really wrong with
23  submitting that.

Kimberly Fail

Page 241

1    A.  When you're saying he provided the
2   service that he wrote in the sentence or two,
3   it's not the service; it's the response, it's
4   the resident's reaction.
5    Q.  Uh-huh.
6    A.  So that would be completely
7   individualized based on that client, so you
8   can't reuse a different one.
9    Q.  Okay.  So the -- the problem is it
10  was in the response area of the progress
11  note?
12   A.  Yes, that's a problem.
13   Q.  Yeah.  That's what your problem
14  was --
15   A.  That's --
16   Q.  -- with him with that?
17   A.  Yes, that is -- that is a problem.
18   Q.  Okay.
19       MR. SATTERWHITE:  So this is 41?
20       THE COURT REPORTER:  Correct.
21          (Plaintiff's Exhibit 41 was
22          marked for identification, and
23          a copy thereof is attached

Page 242

1          hereto.)
2    Q.  (BY MR. SATTERWHITE)  Okay.  I'm going
3   to show you what we marked as 41.  Do you
4   recognize this?
5    A.  Yes.
6    Q.  Okay.  Is this his response to that?
7    A.  Yes.
8    Q.  Okay.
9        MR. O'REAR:  And let me just -- Can
10  we clarify for the record she was talking
11  about response before?  That's --
12       MR. SATTERWHITE:  Uh-huh.
13       MR. O'REAR:  -- the -- that was --
14       MR. SATTERWHITE:  The --
15       MR. O'REAR:  -- the client or the
16  resident's response.
17       MR. SATTERWHITE:  Yeah.
18       MR. O'REAR:  And this is --
19       MR. SATTERWHITE:  Yeah.
20       MR. O'REAR:  This is Sheppard's
21  response.
22       MR. SATTERWHITE:  Absolutely.
23       MR. O'REAR:  So they're two different

Page 243

1   types of responses.
2        MR. SATTERWHITE:  Right.
3        MR. O'REAR:  Okay.
4    Q.  (BY MR. SATTERWHITE) The other one
5   was in the BLS form, and this is him writing
6   a response to the staff incident report of
7   April 4, 2017, to be clear.
8        So he's claiming here that you're
9   being harder on him than other people.  And
10  he -- he's claiming that he's been doing this
11  for six years.  He is someone who's
12  recognized by Pathway as a trainer to train
13  other people to do it.  And even if he has a
14  minor mistake from time to time, you
15  shouldn't be coming down on him this hard and
16  putting something in his personnel file.
17  You're treating him differently than other
18  people.  So what is your reaction to that?
19   A.  That's not true.
20   Q.  I've noticed in the records he's
21  asked several times if y'all are going to do
22  this and write him up for these things, that
23  you include the actual BLS forms in his

Page 244

1   personnel file, and you refused to do that.
2   Why?
3    A.  I don't -- I don't remember refusing
4   to do that, but I did tell him that we don't
5   keep that information in personnel files
6   typically because of the confidential nature
7   of the --
8    Q.  Uh-huh.
9    A.  -- documentation.
10   Q.  But just like before, you could
11  redact the -- the resident's name, and the
12  evidence of the dispute would still be
13  relevant to that particular employee.
14   A.  I understand what you're saying.
15  That was not our procedure.
16   Q.  What -- what would be wrong with
17  that?
18   A.  I -- I don't know what would -- What
19  would be wrong with putting the documentation
20  in the personnel file?
21   Q.  Yeah, with the -- with the resident's
22  name redacted.
23   A.  Nothing would be wrong with it,

Kimberly Fail

Page 245

1 putting the resident's name redacted.
2   Q.  Okay.  All right.  This is what I'm
3 marking 42.
4         (Plaintiff's Exhibit 42 was
5         marked for identification, and
6         a copy thereof is attached
7         hereto.)
8   Q.  (BY MR. SATTERWHITE) Is this the
9 example of the 55 problem?
10   A.  Yes.
11   Q.  Got it circled.  Okay.  So isn't it
12 true that the kids will react in similar ways
13 to the interventions if you do an -- Let's
14 just say for cursing -- do an intervention
15 about cursing and then the kids will have a
16 common way they react to that?
17   A.  I think all the kids are different.
18   Q.  Uh-huh.  So every day he does this,
19 every day he works, maybe 200 or something
20 more days a year, don't you think there's
21 some common ways he could write?  Isn't it
22 kind of silly if they react in the same way
23 but he has to retype the same thing 150

Page 246

1 times?
2   A.  I don't think it's silly.  It's --
3 it's that child's response.  It should be
4 individualized per that child.
5   Q.  Uh-huh.  And if it's exactly like
6 another child's response, you should type it
7 all over again?
8   A.  You should type what was
9 individualized for that child.
10   Q.  Uh-huh.
11   A.  You should --
12   Q.  What if there wasn't any individual
13 difference?  What if two people reacted the
14 same way?
15   A.  It should be individualized based on
16 that child and their interaction.  You should
17 write it that day.  It's not that difficult
18 to write what they did.
19   Q.  Would you say it's common for the
20 residents to have a similar reaction to a
21 certain intervention?
22   A.  I think all the kids are different.
23 They may react similarly, but you should --

Page 247

1 you should document how they reacted
2 individually to them.
3   Q.  Uh-huh.
4         (Plaintiff's Exhibit 43 was
5         marked for identification, and
6         a copy thereof is attached
7         hereto.)
8   Q.  (BY MR. SATTERWHITE) Okay.  This is
9 43.  So this is another one of Mr. Sheppard's
10 reactions to the -- to the criticism of him.
11 Is this something that -- that you received,
12 and was in his personnel file?
13   A.  I believe this is in his file.
14   Q.  Okay.  Is it true what he's saying
15 here about the response can be actually
16 describing the kid or resident's response, or
17 it could be the group leader describes the
18 kid's response?
19       So he can summarize the kid's
20 response, or he can say exactly what -- what
21 it was.  Isn't that what he's saying here in
22 this paragraph?
23   A.  Which part are you talking about?

Page 248

1   Q.  (Reading.)
2         As it is known in training that
3         the response can be also a
4         response of the staff member and
5         or the resident.
6   A.  No.  We -- we instructed the staff
7 that the response is for how the resident
8 responded to the situation or to the
9 intervention.
10   Q.  How was Mr. Sheppard reacting to this
11 criticism of his BLS documentation?
12   A.  What do you mean?
13   Q.  Was he mild about it or was he
14 frustrated about it?
15   A.  I don't remember exactly.
16   Q.  Okay.  He's an -- he's supposedly an
17 expert, right, in BLS documentation?
18   A.  I would not call him an expert, no.
19   Q.  So he's not an expert, but you have
20 him training other people to do it?
21   A.  He -- Other people shadowed him for
22 training purposes.
23   Q.  It's the same thing.  He's not an

Kimberly Fail

Pages 249 to 252

Page 249

1  expert, but you have him training employees
2  how to do it.  I would say he is an expert.
3          MR. O'REAR:  Move to strike that
4  comment.
5          MR. SATTERWHITE:  Okay.  Is this 43?
6          THE COURT REPORTER:  It is 44.
7                  (Plaintiff's Exhibit 44 was
8                  marked for identification, and
9                  a copy thereof is attached
10                 hereto.)
11         Q.  (BY MR. SATTERWHITE) I'm trying to go
12 as fast as I can.  This is what we marked 44.
13 Tell me about this.  What's this about?
14 You're giving him psychological/psychiatric
15 services information?
16         A.  Right.
17         Q.  Why?
18         A.  He -- One of -- one of these
19 meetings -- I guess on April the 4th -- he
20 was upset.  Some of the things that he said,
21 I think, bothered us a little bit.  So I
22 wanted to make sure that he was okay.
23         Q.  So you mentioned to him this, that

Page 250

1  you were -- there's available resources?
2          A.  I called him and asked him if he was
3  interested in the information.
4          Q.  Okay.  Did he say he was?
5          A.  Yes.
6          Q.  Okay.  And that's when you sent this
7  e-mail?
8          A.  Yes.
9          Q.  Well, how was he acting?  What was he
10 saying that caused you believe there might be
11 an issue there?
12         A.  That's -- that's in that summary of
13 information.  He alluded to something about
14 he seemed to think it was the end of his
15 employment or something like that.
16         MR. SATTERWHITE:  Okay.  This is 45?
17         THE COURT REPORTER:  Yes.
18                 (Plaintiff's Exhibit 45 was
19                 marked for identification, and
20                 a copy thereof is attached
21                 hereto.)
22         Q.  (BY MR. SATTERWHITE) All right.  This
23 is Exhibit 45.  Do you recognize that e-mail?

Page 251

1          MR. O'REAR:  Hang with me here.
2          MR. SATTERWHITE:  All right.  It's
3  Defendant's 161.  I skipped one.  That was
4  just an e-mail that didn't seem that
5  important.
6          MR. O'REAR:  Okay.
7          Q.  (BY MR. SATTERWHITE) All right.  So
8  is it true that about this time, that you
9  were moving Rick to the nightshift?
10         A.  Yes, Rick went to the nightshift.
11         Q.  And when did that occur?
12         A.  I don't remember the exact date, but
13 it was around this time.
14         Q.  And he -- he had requested in the
15 past to not be put on nightshift?
16         A.  He did not discuss that with me.  I
17 think he discussed that with his supervisors.
18         Q.  Were you aware of it?
19         A.  I believe so.
20         Q.  You made the decision that he had to
21 work nightshift?
22         A.  No.
23         Q.  Who did?

Page 252

1          A.  Tyrone, Bruce, and myself discussed
2  it.
3          Q.  Somebody had to decide.  You made the
4  decision --
5          A.  The group of us discussed it and we
6  decided --
7          Q.  Okay.
8          A.  -- as a group, yes.
9          Q.  Okay.  So why did he request to not
10 be working nights?
11         A.  He said that he had a part-time job.
12         Q.  Okay.  Was there another reason?
13         A.  He said at one point something about
14 his wanting to be there for his family.
15         Q.  Uh-huh.  And so was that taken into
16 consideration when you decided to put him on
17 nightshift?
18         A.  There was a lot going on where we
19 needed him on nightshift in terms of the
20 schedule and in not having enough staff for
21 nightshift.
22         Q.  Well, his request, was it taken into
23 consideration?

Kimberly Fail

Page 253

1    A. Everyone had to take a turn.
2    Q. I understand that, but did you take
3  into consideration that he did not want to do
4  it?
5    A. I can't guarantee somebody a -- a
6  schedule based on a request. It is -- We
7  have to do what's in the best interest of the
8  program.
9    MR. SATTERWHITE: This is 46?
10    THE COURT REPORTER: Yes.
11      (Plaintiff's Exhibit 46 was
12      marked for identification, and
13      a copy thereof is attached
14      hereto.)
15    Q. (BY MR. SATTERWHITE) Okay. Let me
16  show you Exhibit 46. Is this where he was
17  explaining how that was a burden on him?
18    A. Yes.
19    Q. Okay. So you received that?
20    A. Is there a e-mail that goes with
21  this?
22    Q. He says on here he e-mailed it to
23  you. I don't know. We're running out of

Page 254

1  time, so I don't want to go over a lot of
2  these duplicate things. It says he hand
3  delivered it to Ms. Beth. Is that true? See
4  that on the bottom?
5    A. I see that.
6    Q. Is that true?
7    A. I'm not sure if he hand delivered it
8  to her or not.
9    Q. You don't know?
10    A. I'm not sure.
11    Q. Are you saying no?
12    A. I don't know if it was hand delivered
13  or not.
14    Q. Okay. Did you receive the e-mail?
15    A. This -- this looks familiar.
16    Q. Okay. So you received this either in
17  writing like this or in an e-mail --
18    A. Yes.
19    Q. -- around April 11?
20    A. Yes.
21    MR. SATTERWHITE: Okay. I'm skipping
22  a few e-mails in the stack for time.
23    MR. O'REAR: Okay.

Page 255

1    Q. (BY MR. SATTERWHITE) Was he upset
2  about this at this time? I mean, when y'all
3  in that narrative described him a little bit,
4  did it -- did it appear he was upset?
5    A. I don't think he was. You mean
6  pertaining to what?
7    Q. Okay. I mean, I don't know what he
8  was upset the most by, but, you know,
9  generally, did he appear upset? I mean, it
10  was something that made you send the
11  psychiatric information.
12    A. Right.
13    Q. So apparently he appeared to be
14  upset. I'm just asking. Would he have
15  appeared --
16    A. He --
17    Q. -- to be --
18    A. He made statements that were
19  concerning.
20    Q. So did he take some time off right
21  about this time?
22    A. I don't remember if he -- You mean
23  request time off or --

Page 256

1    Q. I guess because of whatever he was
2  dealing with.
3    A. I don't know if he requested time
4  off.
5    Q. So what caused him -- After he was
6  taken off the work schedule --
7    A. Uh-huh.
8    Q. -- when did he come back, and why did
9  he -- How was he allowed to come back when he
10  hadn't really complied with your request to
11  tell about Ms. Grantham's report?
12    A. I called him in and asked him again
13  if he wanted to have a conversation about
14  that. He said no, so I moved on.
15    Q. But he -- Didn't he come back to
16  work?
17    A. He did.
18    Q. Oh, so you moved on from making him
19  say what that was about. So --
20    A. Right.
21    Q. Yeah. I'm sorry. Go ahead.
22    A. Right.
23    Q. Okay. And why was that? Why did you

Kimberly Fail

Page 257

1  do that, because you needed people to come
2  in?
3      A.  Not necessarily.  It's just obvious
4  that he was not going to discuss anything at
5  all.  I tried multiple times to get him to
6  talk to me about the situation.
7      Q.  Wasn't there a real need to have
8  people who would come in and work at this
9  time because of staffing problems?
10     A.  We were short-staffed.
11     Q.  And was he working nights when he
12  came in?
13     A.  When he came --
14     Q.  When he came back?
15     A.  -- back?  We told him at the time
16  that he came back that he was going to be
17  placed on nightshift for a short period of
18  time.
19     Q.  And did he do that?
20     A.  He worked some, yes.
21     Q.  Uh-huh.  For like a few days?
22     A.  Seems right.
23        MR. SATTERWHITE:  Okay, okay.  Is

Page 258

1  this 48?
2        THE COURT REPORTER:  This is 47.
3        (Plaintiff's Exhibit 47 was
4        marked for identification, and
5        a copy thereof is attached
6        hereto.)
7      Q.  (BY MR. SATTERWHITE) I'm going to
8  show you Exhibit 47.  This is Defendant's
9  169.  Is this an e-mail between you and
10  Bruce?
11     A.  Yes.
12     Q.  Now, it says here you do not trust
13  Rick.  The schedule was done and not to look
14  for someone to swap with.  So -- so why are
15  you saying that?
16        First of all, is -- Was that an
17  issue?  It's my understanding he was trying
18  to swap with somebody.  Did he tell you he
19  was trying to swap?
20     A.  He did.  And the issue for me was
21  that it seemed like he was bullying people
22  into try to swap with him.
23     Q.  Huh.  Is it okay to swap?  Is that

Page 259

1  against some policy?
2      A.  Not necessarily, no.
3      Q.  Okay.  But you were not going to let
4  him do it?
5      A.  He -- he said that people wanted to
6  swap with him, and they didn't.  And it was
7  creating an issue with the other staff.
8      Q.  Was -- You said you thought he was
9  bullying people.  Is that your impression of
10  him, that he would bully people?
11     A.  I don't -- I mean, other staff
12  reported that he came to them, and there was
13  a discussion about swapping, and they didn't
14  really want to swap.  And they seemed
15  bothered that he was continuing to come to
16  them about swapping.
17     Q.  Who was that?
18     A.  I don't remember exactly.  I think it
19  was Ethan.
20        MR. SATTERWHITE:  This is 48?
21        THE COURT REPORTER:  Yes.
22        (Plaintiff's Exhibit 48 was
23        marked for identification, and

Page 260

1        a copy thereof is attached
2        hereto.)
3      Q.  (BY MR. SATTERWHITE) Let me show you
4  48.  It's Defendant's 100.  Do you recognize
5  this document?
6      A.  Yes.
7      Q.  Again, this is you doing this.  Why
8  isn't this his immediate supervisor?
9      A.  At this point, I mean, there were --
10  there were a lot of issues.  And Rick had
11  worked with us for a period of time, so I
12  wanted to make clear to him that these are
13  the things that you need to do to improve
14  your performance.
15        I really wanted to help him to save
16  his job by putting this performance
17  improvement plan together.  These are the
18  things that you needed to do.
19     Q.  Okay.  So on April 12, his job was in
20  jeopardy?
21     A.  If he didn't do what's listed on this
22  performance improvement plan, yes.
23     Q.  And this was provided to him --

Kimberly Fail

Page 261

1    A. Yes.
2    Q. -- and put in his personnel file?
3    A. Yes.
4        MR. O'REAR: I'm sorry. I'm
5    trying -- still trying to find this exhibit.
6        MR. SATTERWHITE: I had to skip a
7    bunch to try to save time, but that was --
8        MR. O'REAR: But --
9        MR. SATTERWHITE: -- Defendant's
10   Exhibit 100.
11       MR. O'REAR: Okay. And that's Number
12   48?
13       MR. SATTERWHITE: Yes.
14       MR. O'REAR: Okay.
15       MR. SATTERWHITE: I'm -- And I'm
16   skipping some.
17       MR. O'REAR: Okay.
18       MR. SATTERWHITE: Okay. Is this 49?
19       THE COURT REPORTER: Yes.
20       MR. SATTERWHITE: All right. I'm
21   marking this as Exhibit 49.
22           (Plaintiff's Exhibit 49 was
23               marked for identification, and

Page 262

1           a copy thereof is attached
2           hereto.)
3    Q. (BY MR. SATTERWHITE) What is -- What
4    was that about?
5    A. A conversation that I had with Rick.
6    Q. Okay. What did he say?
7    A. He called me and asked to speak with
8    us, and we were not at work. I mean, do you
9    want me to read it or --
10   Q. Well, either read it or just
11   summarize what he was telling you at that
12   time.
13   A. Okay. He said that -- He asked to
14   speak with us, and I informed him that we
15   were not at work. It was a holiday. And he
16   said that he would not be coming in on his
17   nightshift. He would come in to work on the
18   dayshift.
19       And I told him he was not scheduled
20   to work for days, he was scheduled for
21   nights, and he needed to come in on his
22   nightshift. And he said that he would not.
23   He refused.

Page 263

1    Q. Uh-huh.
2    A. So I asked him if he had followed the
3    call-in procedure, and he said no. So I
4    asked him if he -- or I told him we would be
5    back in the office on Monday, and we could
6    talk to him then.
7        And I requested that he come in at
8    2:00, and he refused to do that. So then I
9    said, you know, we'll be -- I'll be there at
10   8:00. I can meet with you 8:30. And he
11   agreed to do that.
12           (Plaintiff's Exhibit 50 was
13               marked for identification, and
14               a copy thereof is attached
15               hereto.)
16   Q. (BY MR. SATTERWHITE) Okay. This is
17   Plaintiff's Exhibit 50. Do you recognize
18   that?
19   A. Yes.
20   Q. Was that put in his personnel file?
21   A. Yes.
22   Q. And this is done by you. Is there a
23   reason why his immediate supervisor wasn't

Page 264

1    doing this?
2    A. He called me. He refused to do
3    anything I asked when I talked to him that
4    day.
5    Q. Okay. So this -- Based on that, on
6    April 17, his employment was terminated?
7    A. Based on this and not following his
8    performance improvement plan.
9    Q. Was this given to him? Is that his
10   signature on it?
11   A. Yes.
12   Q. So this was like when he came in on
13   Monday, y'all talked to him and gave him
14   this?
15   A. Yes.
16   Q. Okay. What was his reaction?
17   A. I don't remember. I mean, I'm sure
18   he was not thrilled, but he signed it and
19   left.
20   Q. So do -- Did you think he was having
21   some kind of psychiatric problem?
22   A. I didn't know anything about his
23   mental state. I knew that he was

Page 265

1  insubordinate.  He refused to do what I asked
2  him to do you.
3      Q.  But you had a -- at least a concern
4  that he had a -- a mental condition, because
5  you give him the psychiatric information.
6      A.  I -- I had a concern at this time
7  that he would not do anything I asked him to
8  do.  The multiple conversations that we had,
9  he was disrespectful and defied any -- any --
10 You know, he wasn't answering questions.  He
11 wouldn't have a conversation.  He refused to
12 follow call-in procedure.  He wouldn't even
13 come in to talk to me at two o'clock when I
14 requested.
15         MR. SATTERWHITE:  Is this 51?
16         THE COURT REPORTER:  It is 51.
17             (Plaintiff's Exhibit 51 was
18             marked for identification, and
19             a copy thereof is attached
20             hereto.)
21     Q.  (BY MR. SATTERWHITE) Okay.  So this
22 document is 51.  Can you identify this?
23     A.  Yes.

Page 266

1      Q.  Is this something y'all just put in
2  somebody's personnel file when there's a
3  change?
4      A.  It's a change in status.
5      Q.  You signed it?
6      A.  Yes.
7      Q.  And you did the little description
8  down there?
9      A.  Yes.
10     Q.  He's not eligible for rehire?
11     A.  Correct.
12     Q.  What if he was just having a mental
13 breakdown and he got over it, he's still not
14 eligible rehire?
15     A.  He was insubordinate and did not -- I
16 mean, we put lots together on that
17 performance improvement plan, and he --
18 There's a lot of it that he violated.
19     Q.  You majored in psychology; right?
20     A.  Yes.
21             (Plaintiff's Exhibit 52 was
22             marked for identification, and
23             a copy thereof is attached

Page 267

1             hereto.)
2      Q.  (BY MR. SATTERWHITE) All right.  This
3  is Exhibit 52.  Is that just the Pathway
4  records showing that his employment's been
5  terminated up at the top right?
6      A.  It looks like it.
7             (Plaintiff's Exhibit 53 was
8             marked for identification, and
9             a copy thereof is attached
10            hereto.)
11     Q.  (BY MR. SATTERWHITE) Okay.  Now 53 is
12 a narrative.  Is this your narrative that you
13 wrote up?
14     A.  Yes.
15     Q.  Did you and Beth work on these
16 together?
17     A.  I -- We -- we may have.
18     Q.  Did y'all --
19     A.  I know --
20         MR. O'REAR:  Let --
21     Q.  (BY MR. SATTERWHITE) Go ahead.
22         MR. O'REAR:  Let her finish.
23     A.  I know, I mean, I wrote mine, and she

Page 268

1  wrote hers.  I don't think she read mine nor
2  did I read hers prior to writing it.
3      Q.  She didn't --
4      A.  But --
5      Q.  -- even see it?  Obviously she didn't
6  cut and paste, anything like that.
7      A.  I mean, I don't -- No, she did not
8  cut and paste that I recall.  I mean, I
9  didn't -- I didn't provide this to her.
10     Q.  Okay.  And she didn't provide you
11 hers?
12     A.  No.
13     Q.  Did y'all talk about it?
14     A.  We may have.
15     Q.  Like maybe consult or confer on some
16 dates or something?
17     A.  Possibly.
18     Q.  Did anybody else consult with you
19 about writing that up?
20     A.  No.
21     Q.  Did anybody ask you to do it?
22     A.  No.
23     Q.  You took it upon yourself?

Kimberly Fail

Page 269

1    A.  There were a lot of conversations, so
2  yes.
3    Q.  Okay.
4    A.  I -- I wrote it so that we would
5  recall what occurred.
6    Q.  And did you instruct Beth to do it?
7    A.  To write up her --
8    Q.  Narrative, yeah.
9    A.  I don't recall instructing her to,
10  but we may have discussed we need to write
11  down what occurred.
12    Q.  Okay.
13    MR. SATTERWHITE:  Okay.  Is this
14  Exhibit 53?
15    THE COURT REPORTER:  54.
16    (Plaintiff's Exhibit 54 was
17    marked for identification, and
18    a copy thereof is attached
19    hereto.)
20    Q.  (BY MR. SATTERWHITE) 54.  And is this
21  what you understand to be Beth's narrative of
22  what happened?
23    A.  Yes.

Page 270

1    Q.  Is there anything that you think is
2  wrong or that you might take back in your
3  narrative?
4    A.  I don't think so, no.
5    Q.  Is there anything that you think may
6  be wrong in Beth's narrative?
7    A.  I don't think so.
8    Q.  Did you ever have any conversation
9  with Davy Chastain about Rick's reporting
10  something to him?
11    A.  No.
12    Q.  Did --
13    MR. SATTERWHITE:  Well, let's go
14  ahead and -- and switch into corporate
15  representative mode.
16    MR. O'REAR:  Okay.  So her individual
17  deposition is over?
18    MR. SATTERWHITE:  Uh-huh.  Do you
19  want to take a break first?
20    THE WITNESS:  Do you mind?
21    MR. SATTERWHITE:  Yes?
22    THE WITNESS:  Uh-huh.
23    MR. SATTERWHITE:  Okay.  She needs to

Page 271

1  take a break.
2    THE WITNESS:  Short break.
3    MR. SATTERWHITE:  All right.  Let's
4  just take about a 15-minute break.
5    THE VIDEOGRAPHER:  We're off the
6  record at 3:12 p.m.
7
8    (The deposition of KIMBERLY FAIL was
9    concluded at 3:12 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 272

C E R T I F I C A T E

STATE OF ALABAMA)
BALDWIN COUNTY )

    I hereby certify that the above
and foregoing proceedings were taken down by
me in stenotype, and the questions and
answers thereto were reduced to computer
print under my supervision, and that the
foregoing represents a true and correct
transcript of the testimony given by said
witness upon said proceedings.
    I further certify that I am
neither of counsel nor of kin to the parties
to the action, nor am I anywise interested in
the result of said cause.
    Signed the 12th day of February,
2024.

    /s/ Susan C. Andrews
    SUSAN C. ANDREWS,
    Alabama ACCR #287
    Expires 9/30/24