IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| *ex rel* RICHARD J. SHEPPARD, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 17-00355-KD-N |
| ) | |
| PATHWAY OF BALDWIN COUNTY, ) | |
| LLC and PATHWAY, INC., ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

This action is before the Court on Defendants Pathway of Baldwin County, LLC (PBC) and Pathway, Inc.'s motion for partial summary judgment, memorandum, and exhibits (docs. 94-97); Plaintiff Richard J. Sheppard's response and exhibits (docs. 101-102), and Defendants reply (doc. 103); Sheppard's surresponse and exhibits (doc. 105), and Defendants' surreply (doc. 110). The motion was heard June 13, 2024. Upon consideration and for the reasons more specifically set forth on the record, the PBC's motion for summary judgment is DENIED. Upon reconsideration, Pathway Inc.'s motion is DENIED.

I. Background

In his First Amended Complaint under False Claims Act (FCA) (doc. 38), Sheppard alleges that Defendants retaliated against him because he reported fraud to the Alabama Medicaid Agency and because he would not participate in the scheme to defraud (Id., Count V). He alleges that the Defendants' Clinical Director and a Supervisor conspired to create a pretext for his suspension and termination by way of false accusations that Sheppard was not properly doing his job. Sheppard alleges that he was suspended and terminated for alleged

insubordination less than a month after the Clinical Director first learned that he had reported fraud to the Alabama Medicaid Agency.

Defendants move for partial summary judgment as to Count V (docs. 94-97). First, Defendants argue that Sheppard did not engage in a protected activity as defined in the second prong of the anti-retaliation provision found at 31 U.S.C. § 3730(h)(1). Specifically, they argue that Sheppard's actions were not taken as "other efforts to stop 1 or more violations" of the FCA. Id. Defendants argue that to succeed on the claim of retaliation based on other efforts, Sheppard must show that he had an objectively reasonable belief that Defendants submitted false claims to Medicaid, i.e., violated the FCA. Defendants argue that under the facts and evidence in this case, Sheppard cannot make this showing (doc. 97, p. 24-25).

Second, Defendants argue that there is no evidence that Sheppard's alleged protected activity resulted in his disciplinary reports, suspension, and termination. Defendants argue that Sheppard was terminated from his position because of his failure to follow multiple policies and procedures including his failure to work a night shift.

Third, Defendants argue that because Pathway, Inc. was not Sheppard's employer, it is not subject to the anti-retaliation provision. (Id., p. 29-30). Defendants assert that the FCA requires an employee or agency relationship and since Pathway, Inc. was not Sheppard's employer, it should be dismissed from the action. (Id.)

Sheppard responds that the facts and evidence establish that he engaged in protected activity under both prongs of the statute and that he had an objectively reasonable belief that Medicaid fraud was committed by Defendants based on the statements by other employees and the Director regarding forging or falsifying submittals to Medicaid for reimbursement (Id., p. 32-36). He also argues that he has presented sufficient facts and evidence from which a reasonable

juror could conclude that there was a causal connection between the Director's knowledge of his report of Medicaid fraud and his termination (Id., p. 37).  Last he argues that there is sufficient evidence to establish that PBC is a mere instrumentality or alter ego of Pathway, Inc. and therefore, Pathway, Inc. is a proper defendant. (Id., p. 37-38).

In reply, Defendants point out that Sheppard failed to support most of his factual allegations with citation to admissible evidence.  As an example, Defendants point out that Sheppard stated that he witnessed the submission of false claims to Medicaid, without any evidentiary support for this statement, and in contradiction of his deposition testimony that he had no knowledge or evidence of Defendants' submitting false or fraudulent claims to Medicaid (doc. 103, p. 1-2, 8-9).  Defendants object under Fed. R. Civ. P. Rule 56(c)(2) to Sheppard's attempt to use his own affidavit as support for his allegations of fact and evidence. They point out that Sheppard's affidavit contains only a conclusory allegation – "I have carefully read the Response to Defendants' Motion for Partial Summary Judgment. I attest that all statements of fact contained therein on my behalf are true and accurate to the best of my knowledge and belief" (doc. 101-2), with no evidentiary support, which fails to meet the requirement that an affidavit set out facts that would be admissible in evidence.  Defendants also argue that Sheppard's affidavit is a "sham" because "it purports to relate to statements in the brief that contradict and repudiate Sheppard's prior deposition testimony" (Id., p. 4).

The Court gave Sheppard the opportunity to file a sur-response which would correct the alleged inadequacies in his response (doc. 104).  In his sur-response, Sheppard again argues that he has met the first and third elements of his prima facie case because there is no dispute of fact that Defendants receive federal funds through Medicaid payments which makes them subject to the FCA and that he was subject to "at least one adverse employment action" (doc. 105, p. 3-4).

As to the remaining elements, Sheppard argues that there are genuine disputes of material fact as to whether he engaged in a protected activity and whether a causal connection exists between his protected activity and adverse employment actions (disciplinary reports, suspension, and termination), and therefore, Defendants' motion for summary judgment should be denied (Id., p. 4-19).

In support of his factual allegations, Sheppard relies primarily upon his affidavit wherein he sets out the contents of several conversations and interactions with other employees of PBC regarding allegedly fraudulent activity[1] (doc. 105-7), his conversation with the Chief Investigator for the Alabama Medicaid Agency, emails between the director of PBC and the CEO of Pathway, Inc., and the declaration of Alesha Booth.[2] Sheppard asserts that Defendants were aware of his protected activity in November 2016, December 2016, and March 2017, all before his disciplinary reports, suspension and ultimate termination on April 17, 2017.

In their sur-reply, Defendants argue that Sheppard's affidavit (doc. 105-7) is "replete with (i) contradictions from Sheppard's deposition testimony given nine months prior on July 19, 2023, (ii) hearsay, (iii) opinions, and (iv) speculation without personal knowledge." (doc. 110, p. 2). Defendants provided the Court with a chart identifying the alleged discrepancies between Sheppard's deposition testimony and his most recent affidavit and identifying "statements in the affidavit that are hearsay, speculation, or without personal knowledge and should not be considered under Rule 56(c)(4)" (Id., p. 4).

---

[1] Sheppard provides his recollection of conversations or interactions with Shayna Staska, Kimberly Fail, Ms. Aaron, Mr. Hartley, and Mr. Predmore.

[2] Sheppard did not provide a cite to the record for Alesha Booth's declaration. Instead, Sheppard wrote only "Declaration of Alesha Booth, pp. 1-2" (doc. 105, p. 5, 7). However, the declaration is an exhibit to Defendants' motion and memorandum in support of their motion for summary judgment (doc. 94-28).

II. Standard of review for summary judgment

"Summary judgment is appropriate when a movant shows that there is 'no genuine dispute as to any material fact,' such that 'the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). "The movant bears the burden of presenting pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any that establish the absence of any genuine, material factual dispute." Williamson v. Brevard County, Fla., 928 F.3d 1296, 1304 (11th Cir. 2019) (citations and quotations omitted)). "'Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial.'" James River Ins. Co., 22 F. 4th at 1251 (quoting Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010)). "If the nonmovant's evidence is 'not significantly probative,' summary judgment is appropriate." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

III. Analysis

A. False Claims Act

1. Statement of the law

"Under the FCA, entities are 'prohibited [from] making false claims for payment to the United States.'" Ruffolo v. Halifax Health, Inc., 2024 WL 1733968, at *1–2 (11th Cir. Apr. 23, 2024) (quoting Hickman v. Spirit of Athens, Ala., Inc., 985 F.3d 1284, 1287 (11th Cir. 2021)). "Additionally, the FCA allows private plaintiffs 'with knowledge of false claims against the government' to file 'qui tam' actions—recovery lawsuits brought on the government's behalf." Id. (quoting Hickman, 985 F. 3d at 1287-1288; 31 U.S.C. § 3730(b)). "The FCA also creates a private right of action for an individual whose employer retaliates against her for participating in

5

an FCA action or in response to other efforts the employee engages in to oppose a violation of the FCA." Id. (citing 31 U.S.C. § 3730(h)(1); Hickman, 985 F.3d at 1287–88).

"In an FCA retaliation case, as in a Title VII retaliation case, a plaintiff begins by showing that '(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities.'" Id. (quoting Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997)). Protected activities, as defined in the FCA, are "lawful acts done by the employee … in furtherance of an action under" the FCA, "or other efforts to stop 1 [one] or more violations of" the FCA. 31 U.S.C. § 3730(h)(1)[3] (bracketed text added). "After these elements are established, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action." Ruffolo, 2024 WL 1733968, at *1 (citing Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997). "If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination." Id. (citing Holifield, 115 F. 3d at 1565).

   2. Analysis

For reasons more specifically set out on the record, the Court finds that a genuine dispute of material fact exists as to whether Sheppard engaged in a protected activity. Specifically, whether Sheppard's actions were taken as "other efforts to stop 1 or more violations" of the FCA. 31 U.S.C. § 3730(h)(1). To succeed, Sheppard must show that he had an objectively reasonable belief that Defendants submitted false claims to Medicaid, i.e., violated the FCA.

---

[3] "Any employee, … shall be entitled to all relief necessary to make that employee, … whole, if that employee, … is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, … in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730 (h)(1).

6

Although Defendants argue that Sheppard had no personal knowledge of the actual process for submitting claims to Medicaid, he has produced sufficient facts for a jury to decide whether his belief that fraudulent claims were being submitted to Medicaid was objectively reasonable.

The Court further finds that there is a genuine dispute of material fact as to a causal connection between Sheppard's alleged protected activity and his disciplinary reports, suspension, and termination. Sheppard's affidavit and deposition testimony reference specific conversations and interactions with other employees of the Defendants which occurred prior to the adverse employment actions. A reasonable jury could conclude from these conversations that Pathway employees were aware of Sheppard's efforts prior to his termination. Sheppard has met his burden of showing specific facts that raise a genuine issue for trial.

B. Pathway Inc.

Defendants argue that under the FCA there must be an employment relationship for Pathway Inc. to be liable to Sheppard for retaliation. However, because no employment relationship existed between Sheppard and Pathway, Inc., summary judgment should be granted in favor of Pathway, Inc. (doc. 97, p. 29-30). Defendants argue that "[l]ike the anti-retaliation provision under Title VII and the FLSA, the anti-retaliation provision of the False Claims Act requires an employment relationship. 31 U.S.C. § 3730(h)(1) … Sheppard has not alleged that he was employed by Pathway, Inc., and it is undisputed that Sheppard was employed by PBC, and not Pathway, Inc." (doc. 97, p. 30). Defendants point out that Sheppard was paid by and terminated by PBC (Id., p. 28, citing Sheppard's Deposition, doc. 94-1, p. 3, 5).

In response, Sheppard argues that evidence shows that PBC is the alter-ego or mere instrumentality of Pathway, Inc., and summary judgment should be denied. Specifically, Sheppard argues as follows:

> 94. Finally, the Defendants have argued that Mr. Sheppard was not an employee of Pathway, Inc., so that company should not be liable for any alleged retaliation against him. However, the facts and evidence presented by Mr. Sheppard show that Pathway, Inc., organized and controlled PBC in such a manner as to make PBC a mere instrumentality of Pathway, Inc.
>
> …
>
> 97. For its part, Pathway, Inc., has produced no evidence to counter Mr. Sheppard's alter ego argument. Therefore, a jury question exists as to whether Mr. Sheppard should be able to pierce the corporate veil in pursuing a judgment against Pathway, Inc., for retaliation under the provisions of FCA.

(Doc. 101, response).[4]

---

[4] In support, Sheppard asserts that he applied to work for PBC on a form labeled "Pathway, Inc. Enterprise, Alabama" (doc. 101, p. 27 citing "Exhibit K").  Exhibit K is labeled "Pathway, Inc. Enterprise, Alabama" and is a "Reference Contact" completed by a prior employer (doc. 101-11).  Sheppard asserts that all his "Employee Weekly Payroll Reports" were labeled "Pathway, Inc. Enterprise, Alabama" (doc. 101, p. 27 citing Exhibit L).  Sheppard provides the payroll report for the week of September 2, 2016.  The report is captioned "Pathway, Inc. Enterprise, Alabama Employee Weekly Payroll Report" (doc. 101-12). He also points out that PBC is "100& owned by Pathway, Inc." and as such has "complete right of control over all of PBC's operations", and that Pathway, Inc. exercised that control by "setting up PBC in Baldwin County" (doc. 101, p. 27). As evidence of control, Sheppard points out that Joseph Peeples, the CEO of Pathway Inc., set up the two companies "to be symbiotic" (Id.). Specifically, that Pathway, Inc. received the "disputed BLS forms" from PBC which Pathway, Inc. then submitted to Medicaid, that the payroll department of PBC was the same as that of Pathway, Inc., that PBC relies on offices and officers of Pathway, Inc. for many of PBC's operations because it has no similar office or officers, that PBC has no Board of Directors, CEO, CFO or other like officer except for an executive director, and that PBC never has corporate meetings.

Sheppard also points out that "PBC's Policy H-7, effective the same month as PBC took over its predecessor Camp Horizon, states: 'The facility [PBC] and its programs are managed by a single administrative officer.'" And that Policy H-7 "also states 'The facility [PBC] is under the supervision, management, and control of Pathway's Chief Executive Officer [Joseph Peeples]. Pathway's CEO serves as the single administrative officer who is responsible for the management of the facility. In the event of a long-term absence or vacancy of the CEO, the director [Kimberly Fail] will serve as the administrative officer." (doc. 101, p. 27-28).  Sheppard states that the two entities have the same policies and procedures for Involuntary Separation and Employment and Code of Conduct, and that the resident Handbooks and Plans for Provision of Client Care are exactly the same for both entities (Id. p. 29). Sheppard states that Pathway, Inc is the tenant on the lease and a party to the Equipment Usage Agreement with Baldwin County for the PBC facility. (Id.).  Sheppard states that the two entities have the same address and same agent for service of process, share the same website, and PBC uses the email address of Pathway, Inc. "@pathway-inc.com" (Id., p. 30). Last, Sheppard points out that the CEO of Pathway, Inc.

In reply, Defendants argue that Sheppard's evidence does not show that Pathway, Inc. had "complete control over PBC's finances, policy, and business practices such that PBC had no separate existence (doc. 103, p. 14). Defendants again focus on the argument that Sheppard worked for PBC and was terminated by PBC's executive director. Defendants argue that "it is commonplace for a subsidiary to adopt its parent's corporate policies, and that mere fact does not satisfy the alter ego test" instead there must be dominance and control, misuse of that control, and "harm resulting from it." (Id.).

While Sheppard has cited Alabama law in support of his theory, it is federal law that applies. The Eleventh Circuit has not addressed the issue of whether an entity can be held liable under the FCA as an alter ego and/or integrated employer. However, as explained below, both have been applied in the employment context. In that regard, the following synopsis from a sister court is instructive:

> As a general rule, a parent company will be considered a separate corporate entity from its wholly owned subsidiary. *Baker v. Raymond International, Inc.,* 656 F.2d 173 (5th Cir., Unit A, 1981)....
>
> Courts have formulated several tests to determine whether a parent company's control over a subsidiary is such that the parent should be held liable for the subsidiary's discriminatory treatment of its employees. The four tests, discussed in detail below, are (1) the "integrated enterprise" test, (2) the "agency" test, (3) the "alter ego" test, and (4) the "mere instrumentality" test.
>
> A. The "Integrated Enterprise" Test
> The "integrated enterprise" test had its genesis in labor law. The National Labor Relations Board ("NLRB") first applied this four test part test to determine whether a consolidation of separate corporate entities was warranted. The quadripartite test entails proof of the following:
>   (1) an interrelation of operations
>   (2) common management

---

through a series of emails with the Director of PBC, participated in the decision to suspend Sheppard for "not revealing" to the director "that he was the whistleblower." (Id.).

> (3) centralized control of labor relations, and
> (4) common ownership or financial control.

The "integrated enterprise" test was soon applied to Title VII litigation to determine whether an active parent corporation, supervising and controlling the operations of its subsidiary, would be considered the "employer" of the subsidiary's personnel for purposes of the Act. *See, e.g., Williams v. New Orleans Steamship Association,* 341 F.Supp. 613, 615 (E.D.La.1972), *Baker v. Stuart Broadcasting Co.,* 560 F.2d 389 (8th Cir.1977). This "integrated enterprise" test is "well suited" to Title VII cases because it allows courts to read the term "employer" in a manner consistent with the purposes of the Act. *See Carter v. Shop Rite Foods, Inc.,* 470 F.Supp. 1150, 1160 (N.D.Tex.1979). The test is similarly applicable to ADEA cases. *Oscar Mayer & Company v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979) (holding that interpretation of the ADEA should follow Title VII construction, given the common language and purposes of the two acts), *see also Berkowitz v. Allied Stores of Penn–Ohio Inc.,* 541 F.Supp. 1209 (E.D.Pa.1982).

By applying the four prongs of the "integrated enterprise" test to demonstrate a joint enterprise of the parent and subsidiary, the plaintiff can demonstrate that a parent company should be liable for its subsidiary's actions. *See Nation v. Winn–Dixie Stores, Inc.,* 567 F.Supp. 997, 1010 (N.D.Ga.1983) (Evans, J.), *Greason v. Southeastern Railroad Associated Bureaus,* 650 F.Supp. 1, 4 (N.D.Ga.1986) (Ward, J.), *EEOC v. Upjohn Corp.,* 445 F.Supp. 635 (N.D.Ga.1977) (Murphy, J.).

### B. The "Agency" Test

Courts which have applied the "integrated enterprise" test frequently undertake an additional inquiry to determine whether the subsidiary can be considered a mere agent of the parent corporation. This "agency" test stems from the definition of "employer" as laid out in 29 U.S.C. § 630(b). Under Section 630(b), an agent of a corporate employer is also considered an employer. *See Nation,* 567 F.Supp. at 997, *Greason,* 650 F.Supp. at 1. Thus, where a subsidiary is deemed to act as the parent company's agent, both the subsidiary and the parent will be deemed the employer of the subsidiary's personnel for the purposes of the ADEA.

### C. The "Alter Ego" Test

Under the third test, the "alter ego" test, the court examines whether the subsidiary corporation is a separate entity from the parent corporation, or merely

> the parent's "alter ego." If the court finds that a subsidiary is simply the parent's "alter ego," the court may disregard the parent company's separate existence to prevent fraud or injustice. *See, e.g., Publicker Industries, Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065 (3d Cir.1979).
>
> D. The "Mere Instrumentality" Test
> The fourth test, the "mere instrumentality" test, is closely related to the "alter ego" test. Under the "mere instrumentality" test, the court may hold a parent company liable for its subsidiary's actions if the subsidiary is merely an instrument for the parent's wrongdoing. In such a case, the court is free to disregard the parent's separate existence and "pierce the corporate veil" to prevent unjust loss or injury to the plaintiff. *See, e.g., Fanfan v. Berwind Corp.,* 362 F.Supp. 793, 795 (E.D.Pa.1973).

Wood v. S. Bell Tel. & Tel. Co., 725 F. Supp. 1244, 1247–49 (N.D. Ga. 1989).

**Upon consideration, the Court grants Sheppard's motion for reconsideration (doc. 117) and VACATES the previous oral pronouncement that summary judgment is granted on the issue of whether Pathway Inc. can be held liable. The Court previously viewed the issue as piercing the corporate veil (for purposes of satisfying a judgment). Upon further research, the Court believes it misconstrued the issue. This issue is carried to trial. Accordingly, Pathway, Inc. will remain a defendant.**

IV. Conclusion

For the reasons set forth herein, and for reasons more specifically set forth on the record, Defendants' motion for summary judgment is DENIED.

DONE and ORDERED this the 11th day of July 2024.

s/Kristi K. DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE